**LITE DEPALMA GREENBERG, LLC**
Jeremy Nash
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jnash@litedepalma.com

***Attorneys for Plaintiff***

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| STATE OF MINNESOTA, BY ITS ATTORNEY GENERAL LORI SWANSON, | : | Civil Action No.: |
| | : | |
| *Plaintiff*, | : | |
| | : | **COMPLAINT** |
| v. | : | |
| | : | |
| SANOFI-AVENTIS U.S. LLC, NOVO NORDISK, INC., AND ELI LILLY AND CO., | : | |
| | : | |
| *Defendants*. | : | |

The State of Minnesota, by its Attorney General, Lori Swanson, for its Complaint against Sanofi-Aventis U.S. LLC, Novo Nordisk, Inc., and Eli Lilly and Co. (collectively, the "Defendants"), alleges as follows:

**INTRODUCTION**

1.     Hundreds of thousands of Minnesota residents live with diabetes.  For many of them, analog insulin products are their best hope for treating this chronic disease.  These patients spend significant sums of money to purchase this medication.

2.      Defendants are three of the largest insulin manufacturers in the world.  They set two different prices for their analog insulin products.  The first, known as the "list," or "benchmark" price, is set by Defendants and published by a number of price reporting services. The second, known as the "net" price, is a price that Defendants negotiate confidentially with pharmacy benefit managers ("PBMs").  PBMs are companies that manage prescription drug benefits for health plans and self-insured employers.  Defendants negotiate the net price by offering rebates to PBMs in exchange for the PBM covering the drug on behalf of their members.  Ostensibly, PBMs are supposed to pass on those rebates to their health plan clients, which then use them to lower their health plan members' out-of-pocket expenses.  In theory, these rebates should result in lower health care costs.

3.      In reality, however, the opposite has happened.  In recent years, the price of analog insulin has skyrocketed.  Rather than compete to offer the lowest prices for their products, as one would expect in a competitive market, Defendants compete to offer the largest rebates, or "spreads," to PBMs.  In order to do so while still maintaining their profit margins, Defendants publish and disseminate deceptive and misleading list prices for their products, which allow them to offer higher rebates to PBMs while still earning approximately the same net price that they previously charged.  Defendants do not disclose to the public the amount they pay to PBMs in rebates, or the fact that their list prices are no longer fair and accurate representations of the true price Defendants charge for analog insulin.

4.      Defendants have harmed those whose payments for insulin are based on Defendants' deceptive, misleading, and misrepresentative list prices.  This includes Minnesota residents with high-deductible health plans, Minnesota residents without insurance, Minnesota residents who pay coinsurance, Minnesota Medicare beneficiaries, and the Minnesota

2

Department of Corrections, all of whom now pay more for a life-saving medication because of Defendants' conduct. Plaintiff State of Minnesota brings this action to enjoin Defendants from continuing their deceptive drug pricing practices, to collect monetary relief for its residents and the Minnesota Department of Corrections, and to impose civil penalties against Defendants.

## PARTIES

5.      Lori Swanson, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8; the Uniform Deceptive Trade Practices Act, Minnesota Statutes sections 325D.43–.48; the Consumer Fraud Act, Minnesota Statutes sections 325F.68-.694; the False Statement in Advertising Act, Minnesota Statutes section 325F.67; and has common law authority, including parens patriae authority, to bring this action to enforce Minnesota's laws, to vindicate the State's sovereign and quasi-sovereign interests in the integrity of its marketplace and the health and economic well-being of its residents, and to remediate all harm arising out of—and provide full relief for—violations of Minnesota and federal law.

6.      Novo Nordisk, Inc. ("Novo Nordisk") is a Delaware corporation and has a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

7.      Sanofi-Aventis U.S. LLC ("Sanofi") is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

8.      Eli Lilly and Company ("Eli Lilly") is an Indiana corporation and has a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

## JURISDICTION AND VENUE

9.      This Court's jurisdiction arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and 28 U.S.C. §§ 1331 and 1337.

10.     Defendants all transact business in the District of New Jersey and are subject to personal jurisdiction therein.   Venue therefore is proper in this District under 28 U.S.C. § 1391(b) and (c).

11.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over the State's claims under Minnesota Statutes sections 325F.69, 325D.44, 325F.67, and Minnesota common law.

## FACTUAL BACKGROUND

### THE IMPACT OF DIABETES

12.     According to the American Diabetes Association, approximately 445,000 people, or nearly 10 percent of Minnesota residents, have diabetes.[1]  Over 1.4 million additional adults— more than one-third of the adult population in Minnesota—have blood glucose levels that are higher than normal, but not high enough to be diagnosed as diabetes.[2]  Every year, an additional 19,000 new cases of diabetes are diagnosed in Minnesota.[3]

13.     Patients diagnosed with diabetes must cope with a rigorous and invasive treatment schedule.  Many have to undergo daily injection therapy, constant monitoring of their blood glucose levels, and adherence to a strict diet.

14.     Insulin treatments are a necessary part of life for those who have diabetes.  Insulin is a hormone usually made by the pancreas that allows a person's body to process glucose from carbohydrates in food.  Patients diagnosed with type 1 diabetes are unable to make insulin and require insulin injections to allow their bodies to process glucose.  People with type 2 diabetes do

---

[1]  *The Burden of Diabetes in Minnesota*, American Diabetes Association, *available at* http://main.diabetes.org/dorg/assets/pdfs/advocacy/state-fact-sheets/Minnesota2018.pdf  (last accessed October 10, 2018).
[2] *Id*.
[3] *Id*.

4

not respond well or are resistant to insulin.  They often require insulin shots to help process sugar and prevent long-term complications from diabetes.

15.     Insulin was first discovered in 1922, when researchers used insulin from animals to provide treatment to diabetic patients.  To ensure insulin would be open and available to the public, the scientists who created this method for insulin treatments sold the original patent for $1 to the University of Toronto.

16.     Over time, scientists discovered ways to produce human insulin as well as treatments that would last longer and improve the dosage strength of their products.  By the mid-1990s, scientists had created man-made, or analog, insulin, which could be adjusted to allow for different absorption times and more effective management of blood sugar.  Analog insulins now dominate the market and are the preferred method of treatment for both type 1 and type 2 diabetes patients.

17.     There are currently both rapid-acting and long-acting forms of analog insulin available.  Rapid-acting insulin starts working approximately 15 minutes after injection and continues to work for two to four more hours.  Patients normally take rapid-acting insulin before a meal, and usually in conjunction with long-acting insulin.  Current rapid-acting analog insulin products are Humalog, manufactured by Eli Lilly; NovoLog, manufactured by Novo Nordisk; and Apidra, manufactured by Sanofi.  Rapid-acting analogues make up approximately 35 percent of the insulin market.

18.     Long-acting insulin begins working several hours after injection and lasts approximately 24 hours.  Until recently, only two long-acting insulin analog products were available:  Lantus, manufactured by Sanofi; and Levemir, manufactured by Novo Nordisk.  Over the last two years, however, Sanofi has released a new product, Toujeo, and Novo Nordisk has

also released a product, Tresiba.  Eli Lilly has also released Basaglar, a follow-on biologic of Lantus.  Long-acting insulin analog products make up approximately 50 percent of the insulin market.

19.    Because of the deceptive, misleading, and misrepresentative list prices that Defendants have published, many patients now have to deal with the exorbitant costs of their insulin. Since 2008, Defendants have increased the list price of analog insulin products at least 10 times.  The list price of a 10-milliliter vial of Lantus, which was $99.35 in 2010, is now $269.54.  The list price of a vial of Levemir, which was $113.81 in 2008, is now $293.75.

20.    The price of rapid-acting insulins has also increased dramatically.  The list price of a vial of the most popular rapid-acting insulin, NovoLog, was $132.74 in 2008.  Today, it lists for $289.36.  Similarly, a vial of Humalog, priced at $122.60 in 2011, now has a list price of $274.70.  The list price of Apidra, another rapid-acting insulin, was $93.05 in 2010.  It now is listed at $269.91.

21.    The following charts show the manner in which Defendants' list prices have increased over the past several years:



6









22.    These list price increases are not tied to any meaningful change or improvement to Defendants' products.  In fact, Defendants have made no meaningful improvement to their products since they introduced them to the market.

23.    Such price spikes impact those who cannot afford it the most: those with high-deductible health insurance, the uninsured, and the elderly operating on limited budgets.  The resulting financial burden to patients is also substantial.  In Minnesota, patients with diabetes have medical expenses that are approximately 3.2 times higher than those without the disease,

according to a report from the Minnesota Department of Health.[4]   Total diabetes-related expenses in Minnesota now exceed $4 billion on an annual basis.

24.     Pharmaceutical costs are largely to blame for the spike in diabetes-related expenses.  Per-person *medical* costs related to the treatment of diabetes in Minnesota actually declined more than 14 percent between 2009 and 2014, according to a Minnesota Department of Health report.[5]  During the same time period, however, per-person *pharmacy* costs related to the treatment of diabetes in Minnesota residents increased more than 36 percent, with the costs for those between the ages of 18 and 64 increasing more than 52 percent.[6]  Total diabetes-related pharmacy spending in Minnesota is projected to increase an additional 30 percent by the year 2023.[7]

25.     Some patients are unable to access insulin products because of high insulin prices. Some simply cannot afford to keep up with their treatment.  One Minnesota physician reported that he now spends more time discussing with his patients what insulin they can afford, rather than determining what insulin will best treat the patient.  To help patients cope with high prices, some doctors now prescribe their patients older forms of insulin, which are not as effective. Other patients forgo insulin treatment.

26.     Patients who do not take their prescribed dose of insulin face increased risks of kidney dialysis, heart attacks, nerve damage, amputation, and ketoacidosis.  They end up with more doctor visits, hospitalizations, and medications.  Their medical expenses increase even more.

---

[4] Minnesota Department of Health, *Treated Chronic Disease Costs in Minnesota – a Look Back and a Look Forward* (Dec. 2017), available at http://www.health.state.mn.us/divs/hpsc/ hep/chronicdisease.pdf.
[5] *Id*.
[6] *Id*.
[7] *Id*.

**DEFENDANTS MANIPULATE THE PRICE OF THEIR INSULIN PRODUCTS**

27.     Typically, manufacturers set a list price, which is referred to as the "Wholesale Acquisition Cost" ("WAC").   The WAC is the reasonably approximate price at which a manufacturer sells a drug to a wholesaler.  The WAC price does not include any rebates or other price discounts the manufacturer receives from a PBM regarding the drug.  Wholesalers typically mark-up the price they charge before they sell the products to pharmacies.

28.     The WAC is also often the benchmark for a product's Average Wholesale Price ("AWP").  AWP is either directly set by the manufacturer, or is calculated by adding a certain mark-up to the manufacturer's WAC price, usually around 20 percent.  In other words, AWP is a function of WAC and establishing WAC effectively establishes AWP.   At the time of its inception, AWP was intended to represent the average price at which wholesalers sell medications to pharmacies, physicians, and other customers.  Today, AWP is used as a basis for calculating the price at which health plans reimburse pharmacies for prescriptions that they fill for health plans' members.  Generally, for brand-name products, PBMs will pay the pharmacy the AWP of a product, minus a certain percent, plus a dispensing fee.

29.     Defendants disseminate and publish the list prices of their products with a variety of reporting services, who further publicly disseminate these list prices.  These reporting services make no independent effort to verify the price that any entity actually pays for these drugs, but rely solely on Defendants' representations.  Defendants know, however, that many entities rely on the publications containing the list prices they have disseminated to reporting services to set their own prices.  Indeed, many PBMs expressly rely on these publications to determine the reimbursement rates that they pay to pharmacies.

30.     Pharmacies distribute drugs to patients.  If the patient does not have health insurance, the patient may be required to pay the entire price of the product out-of-pocket. Typically, pharmacies refer to the price they charge cash-paying customers as the "Usual and Customary Charge."  The manner in which this price is set varies from pharmacy to pharmacy, but is generally related to a product's list price.

31.     If the patient has health insurance, both the patient and the health plan may partially reimburse the pharmacy for the drug.  The consumer's share of the reimbursement may be either a flat fee (known as a co-pay) or a percentage of the drug's price (known as coinsurance).  The health plan's share of the fee paid to the pharmacy is based on its contract with the pharmacy.  Patients indirectly subsidize the health plan's share by paying monthly premiums to the health plan in exchange for coverage.

32.     Many patients are covered by health plans with an annual deductible.  Consumers with such a plan do not receive any contribution toward pharmaceutical costs from their health plan until they have paid the amount of their deductible out-of-pocket.  For example, a patient with a $500 deductible must pay his or her first $500 worth of medical expenses before the health plan provides coverage.  Once the patient has satisfied the deductible, the health plan will generally pay the remainder of the consumer's medical costs, minus the consumer's co-pay or coinsurance.

33.     As health insurance costs increase, employers and individuals have turned increasingly to high-deductible plans as a way to save money on premiums.  IRS regulations define a high deductible health plan as any plan with a deductible of at least $1,350 for an individual or $2,700 for a family.  More than 16 percent of Minnesota residents are now covered by such a plan, according to a survey by America's Health Insurance Plans.

34.     Most health plans hire PBMs to manage their members' pharmaceutical benefits. PBMs create networks of pharmacies for their health plans and negotiate the rates at which the health plans reimburse pharmacies in the PBMs' networks for the prescriptions they fill.  Three large PBMs control most of the market:  Express Scripts, Inc. ("ESI"), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, OptumRx, Inc. ("OptumRx"), a California Company with a principal place of business located at 2300 Main Street, Irvine, California, 92614, and CVS Health Corporation ("CVS"), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895.  In Minnesota, Prime Therapeutics LLC ("Prime Therapeutics"), a Delaware Limited Liability Corporation with a principal place of business located at 1305 Corporate Center Drive, Eagan, Minnesota 55121, is owned in part by Blue Cross and Blue Shield of Minnesota and also serves a substantial portion of the market.

35.     PBMs also create drug formularies for their health plans.  A drug formulary is a list of prescription drugs for which the health plan will reimburse pharmacies on behalf of the health plan's members.  If a drug is not included on a formulary, the health plan will generally not cover it.  If a doctor prescribes a drug to a patient that is not on the formulary, the patient must generally pay the entire cost of the drug out-of-pocket.

36.     For many years, PBMs included nearly all available drugs in their formularies. But over the past several years, PBMs began to ███████████████████████ by ███████ ████████████████████████████████████████████████████ PBMs

began ████████████████████████████████████████ to ████████
████████████████████████[8]

37.     Today, pharmaceutical manufacturers obtain placement of their products on PBM formularies by offering rebates to the PBM in exchange for favorable formulary placement. These rebates are typically calculated by taking a percentage of the drug's WAC and multiplying it by the number of PBM members who utilized that drug in a given time period.  So, for example, if a drug had a list price of $100 and the manufacturer agreed to a 10 percent rebate, the manufacturer would pay the PBM $10 for every member who used the drug during the relevant time period.  PBMs collect these rebates, retain a portion of them as compensation for their services, and distribute the remainder to their health plan clients.  PBMs claim to lower their health plan clients' prescription drug costs by negotiating these rebates.

38.     Manufacturers usually offer PBMs larger rebates for giving their product preferred status over a competing one.  Preferred status often means a health plan's member will pay less out-of-pocket for one drug compared to another.  In some cases, it may mean that the PBM will exclude a drug from its formulary and only provide coverage for the preferred product. The greater the preference the PBM gives a particular product on its formulary, the more the manufacturer will pay the PBM in rebates.  Because of this dynamic, PBMs generally make formulary decisions based on which manufacturer offers the most favorable rebate.

39.     PBMs and manufacturers do not disclose the rebates paid for favorable formulary placement.  They closely guard this information and consider it to be a "trade secret."  PBMs

---

[8] Since 2014, the number of drugs that PBMs have excluded from their formularies has increased by nearly 65 percent. *Formulary exclusions rising for drug makers*, Decision Resources Group, *available  at*  https://decisionresourcesgroup.com/drg-blog/health-reform/formulary-exclusions-rising-drug-makers/ (June 10, 2016).  From ████████, the total rebates secured by one large PBM, ████████ from ████████ to ████████

also do not disclose the portion of the rebate that they retain before passing on the balance, if they do so at all, to their health plans.  Because of this, the public does not know the actual drug prices that PBMs have negotiated for their health plans with manufacturers such as Defendants. The only information regarding drug prices publicly available to patients are Defendants' list prices.  Health plans know the price they reimburse pharmacies for a given drug, as well as the rebate the PBM pays the health plan for the drug, but often do not know the total rebate the PBM has negotiated and receives from a manufacturer.

**DEFENDANTS EXPLOIT THE SYSTEM BY PUBLISHING DECEPTIVE LIST PRICES**

40.     The complex system by which health plans reimburse pharmacies and receive rebates through their PBMs has resulted in a system that Defendants have exploited for their benefit.

41.     Defendants' analog insulin products are largely interchangeable.  As a result, PBMs do not have to include each analog insulin product in their formularies.  Typically, to satisfy their clients' needs, PBMs must include one long-acting insulin (until recently, either Lantus or Levemir) and one rapid-acting insulin (Apidra, Humalog, or NovoLog).

42.     It is important to Defendants that their drugs be included on PBM formularies. Patients are unlikely to use Defendants' products if their health plan does not cover it. Defendants sell more, and earn more, when PBMs list Defendants' insulin products on the PBM formularies. ████, for example, calculated that it would ██████████ if ██████████ ██████████████ over ██████████. As a result, Defendants have an incentive to offer the best deals to PBMs for favorable formulary placements.

43.     Defendants know that PBM revenue is based in part on the PBMs retaining a percentage of rebates they earn on behalf of their clients.  As a result, PBMs are likely to favor

products on their formularies that will earn them the greatest rebates.  Defendants therefore focus their marketing and negotiating efforts with PBMs not on the list price that they set for their products, but on the rebate or "spread" that the PBM can earn in exchange for including Defendants' products in the PBM's formularies.  As a result, the rebates Defendants offer have increased dramatically over the past several years.

44.     Take, for example, ███████ bid for ██████████████████ In an ███ ████ presentation regarding that bid, ██████████████████████████ recognized the ████████████████ would █████████████████████████ ████████████████ To ███████████ and ████████████ decided to ██████ ████████████ for ██████████████████████, including offering ████████████ ████████████

45.     In an agreement effective ████████████, and signed by ████████████ ██████████████████████████████ agreed to pay ████████████████████████ ████████████████ , so long as ████████████████████████████ ████████████████████████████████ . In an amendment to that agreement, dated ████████████ , ████████████████████ that it paid to ████████████ ████████████████

46.     Similarly, in an agreement effective in ████████████ agreed to pay ███ ████████ only ████████████████████████ But by ████████████████ had ████████████████ that it paid to ██████████████████████████████████ ████████████████

47.     ████████████ , in a ████████████████ agreement with ████████ , agreed to pay ████████████ if its ████████████ was ██████████████████████████



that ██████████ on its ████████ a ███████████ if ██████ was ██████████████████████, and a ██████████ if █████ was the ████████████████████ also agreed to pay ████████████ if █████ was ████████████████████ that ████████████ on its █████ ████████████████ and a ██████████ if █████ was the ████████████████ ███████. But in an ██████████ amendment to that agreement, ████████ agreed to ████████████████████, so that █████ would receive ██████████ if ████████ was █████████████████████████ that ████████████ on its █████████████████████ if █████ was ██████████████████ ███████, and █████████ if █████ was the ████████████████████████ █████████ also agreed to pay ████████████████ if █████ was the █████ ████████████.

48.   ███████████ also agreed to pay ████████████████ if its ██████ ██████ was ████████████████████ that ████████ on its ██████, ████ ████ if ██████ was the ████████████████ in ████████████████, and ██████ if ████████████████████████████. In that same agreement, ██████████ also agreed to pay ████████████ if ██████ ██████ in its █████ and ███████ if ██████████████████████████ ██████ In an ██████ amendment to that contract, ██████████ agreed to pay ████████████ of ██████ if ██████ was ████████████████ in ████ ███████, between ██████████ if ██████ was ███████████████████████, and ██████████████ if ██████ was the ██████████████████. ████ ███████ also agreed to pay ████████████ if ██████ was █████████████████.

16

49. ██████████ rebate agreement effective ████████, ██████████ ██████████████ agreed to pay ████████████████████████ to ██ in exchange for ████████████████████████. By ██████████ in an agreement signed by ████████████████ agreed to ██████████████████ ████ if its ██████████████████████████ that ████████ in its ████████████████████████, ████████ if ██████████████████████ ████████████, and ████████████ if ██████ was the ████████████████████ ████████████████.

50. ██████ also agreed, in a rebate agreement effective ██████████ to pay ████████████████ for its ██████████ to ████████████ for its ████████ ████████████, provided those ████████████████████████. By ████ ██████, ██████ had ██████████████████████████████ to as much as ████████, provided that ██████ had ██████████████████████████ on the ██████████ ████████.

51. These bids are not unusual. They are merely examples of the extent to which Defendants rely on rebates to secure formulary placements with major PBMs. Defendants have recognized, however, that they can exploit this dynamic to both obtain market share and avoid lowering their net prices. Defendants know that when the list price of their products increase, they can offer a higher rebate to the PBM, which allows them to maintain their desired formulary placements while continuing to charge the same net price that they did previously.

52. For example, ██████ increased the price of ████████████████████ and ██████████████████ in ██████████. ████████, in an internal presentation regarding this decision, that a ██████████████████ because ██████████████████

 ████████████████████ in ███.  Essentially, █████ concluded that a ██████████ would ██████████████████████████████████.

53.    In response to scrutiny surrounding its drug prices, Novo Nordisk acknowledged that it inflates its list prices to protect its revenue.  In a blog post on its website in November 2016, Novo Nordisk stated:

> For Novo Nordisk, those price increases were our response to changes in the healthcare system, including a greater focus on cost savings, and trying to keep up with inflation. PBMs and payers have been asking for greater savings – as they should. However, as the rebates, discounts and price concessions got steeper, we were losing considerable revenue – revenue we use for R&D, sales and marketing, education, disease awareness activities and medical information support. ***So, we would continue to increase the list in an attempt to offset the increased rebates, discounts and price concessions to maintain a profitable and sustainable business.*** We also monitored market conditions to ensure our prices were competitive with other medicines as part of our business model.[9]

54.    Likewise, Eli Lilly has also admitted that it increases its list prices because "PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[10]

55.    Despite these acknowledgements, no Defendant has publicly disclosed the amount it pays in rebates, or the magnitude by which its list price differs from the net price that it charges PBMs. Defendants continue to publish only their deceptive, misleading, and misrepresentative list prices.

56.    By way of example, the charts below detail the most recent 10 adjustments that Defendants have made to the list price for some of their analog insulin products.  In each case, Defendants published or knew that the new list price would be published and disseminated publicly in a variety of price reporting services, either on the date they changed the list price or

---

[9]  *Our perspectives on pricing and affordability*, Novo Nordisk US, (Nov. 30, 2016), http://www.novonordisk-us.com/blog/perspectives/2016/november/our_perspectives.html.
[10] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

shortly thereafter.   In each case, Defendants did not disclose that they had negotiated a dramatically different net price with the PBMs.

| Novo Nordisk | NovoLog 100 Units/mL Vial | NovoLog Flexpen Syringe 100 Units/mL |
|---|---|---|
| 7/31/2012 | $132.40 | $255.74 |
| 12/20/2012 | $141.67 | $273.64 |
| 7/19/2013 | $153.00 | $295.53 |
| 12/3/2013 | $168.15 | $324.80 |
| 5/28/2014 | $184.85 | $357.10 |
| 11/18/2014 | $203.24 | $392.63 |
| 5/19/2015 | $223.45 | $431.60 |
| 11/25/2015 | $236.70 | $457.10 |
| 7/6/2016 | $255.40 | $493.25 |
| 2/23/2017 | $275.58 | $532.22 |
| 7/3/2018 | $289.36 | $558.83 |

| Novo Nordisk | Levemir 100 Units/mL Vial |
|---|---|
| 11/22/2011 | $113.81 |
| 4/4/2012 | $120.64 |
| 10/3/2012 | $135.12 |
| 5/3/2013 | $148.49 |
| 8/27/2013 | $166.42 |
| 12/19/2013 | $191.28 |
| 5/31/2014 | $222.08 |
| 11/18/2014 | $248.51 |
| 8/20/2015 | $269.00 |

| 1/3/2018 | $279.76 |
|---|---|
| 7/3/2018 | $293.75 |

| Eli Lilly | HumaLog 100 Units/mL Vial | HumaLog KwikPen 100 Units/mL |
|---|---|---|
| 11/30/2011 | $122.60 | $236.80 |
| 7/11/2012 | $130 | $251 |
| 12/28/2012 | $140.40 | $271.10 |
| 7/26/2013 | $152.90 | $295.36 |
| 12/12/2013 | $167.70 | $323.95 |
| 6/5/2014 | $184.30 | $356.10 |
| 11/25/2014 | $202.60 | $391.50 |
| 5/29/2015 | $222.70 | $430.20 |
| 12/1/2015 | $237 | $457.65 |
| 7/13/2016 | $254.80 | $492 |
| 5/2/2017 | $274.70 | $530.40 |

| Sanofi | Lantus 100 Units/mL Vial | Lantus SoloStar 100 Units/mL |
|---|---|---|
| 12/17/2010 | $99.35 | $191.96 |
| 12/16/2011 | $114.51 | $205.40 |
| 4/27/2012 | $122.14 | $211.56 |
| 10/5/2012 | $131.79 | $228.27 |
| 4/26/2013 | $144.84 | $250.87 |
| 8/2/2013 | $166.42 | $275.71 |
| 12/13/2013 | $191.28 | $303.12 |
| 5/30/2014 | $222.08 | $333.12 |
| 11/7/2014 | $248.51 | $372.76 |

| 9/29/2017 | $255.97 | $383.94 |
| 4/13/2018 | $269.54 | $404.29 |

| Sanofi | Apidra 100 Units/mL Vial |
|---|---|
| 12/17/2010 | $93.05 |
| 10/5/2012 | $106.91 |
| 4/5/2013 | $120.80 |
| 9/6/2013 | $138.80 |
| 12/13/2013 | $156.76 |
| 6/27/2014 | $184.85 |
| 1/9/2015 | $203.15 |
| 6/12/2015 | $223.26 |
| 1/8/2016 | $236.21 |
| 8/12/2016 | $255.11 |
| 1/5/2018 | $269.91 |

57.     PBMs do not mind that Defendants publish deceptive, misleading, and misrepresentative list prices.  In fact, their own revenues increase when Defendants do so.  In  conducted an analysis in which it concluded that PBMs would ███████ ████████████ in ███████████████████ were to ████████████ ██████████████. In addition, many PBMs also protect themselves from list price increases by including price protection clauses in their rebate agreements with Defendants.  These clauses provide that, should Defendants increase the price of their drug by more than a certain amount, a portion of that increase will be rebated back to PBMs.

58.     As a result, when Defendants increase their list prices, PBMs obtain greater rebates, a portion (or in some instances, all) of which they pocket as additional compensation for their services.  PBMs avoid scrutiny from their health plan clients because the PBMs can inform those clients that they have secured greater savings for their members. Because many PBMs do

not share with their health plan clients the total rebates they have received from manufacturers, their clients are unaware that the net price they (i.e., the health plan) pay same net price for Defendants' analog insulin products has hardly changed.

59.     By publishing and disseminating deceptive, misleading, and misrepresentative list prices, marketing to PBMs the rebate they will earn from the sale of their products, and concealing their net prices from the public, Defendants have created a marketplace where they do not have to compete with one another to set the lowest list price.  In fact, because Defendants compete to offer the largest rebates to PBMs, they monitor each other's list prices closely and often increase them in near perfect unison. ████████████ for example, acknowledged in a ████████████████████████████ meeting that it would ████████████████████ to ████████████████ and ████████████████████████████ Eli Lilly has also explained that Defendants need to monitor and match each other's list prices because they would otherwise be unable to offer the same rebates as their competitors.[11]

60.     Industry observers refer to this trend as "shadow pricing."  Defendants do this because they know that if the other company raises its list prices, it can obtain greater market share by offering higher rebates to PBMs from those list prices.  Defendants therefore match each other's list prices so they can continue competing to offer the largest rebates without affecting the net prices of their products.  The following charts show how the list prices of major rapid- and long-acting insulin products correlate.

---

[11]  Paul Barrett & Robert Langreth, *The Crazy Math Behind Drug Prices*, Bloomberg Businessweek, June 29, 2017, available at https://www.bloomberg.com/news/articles/2017-06-29/the-crazy-math-behind-drug-prices.





61.     As a result, rebates are now, ████████ acknowledged in a presentation regarding ████████████████████████, a ████████████████ amongst ████████████████ ████████. Today, the list prices for insulin that Defendants make public have virtually no bearing on the price they actually earn when they sell their products. On ████████████████ ████████████████████████████ submitted a letter ████████████ to ████ regarding ████████████████████████, in which he stated that ████████████ ████████ because ████████ would ████████████████████████

23

█████, which it concealed from the public. Sanofi's former chief executive officer, Chris Viehbacher, also indicated, in an October 28, 2014 earnings call, that "pricing on a WAC basis" was "not so relevant" because it "largely followed what Levemir has done." In addition, when asked whether shadow pricing was indicative of collusion among Defendants, Eli Lilly did not even claim to compete on list price. It instead insisted that it was "aggressively competing on net (or negotiated) price."[12]

62.     Because of the deceptive pricing scheme that Defendants have perpetuated, the gap between their list and net prices has skyrocketed. For example, between ███████████, the difference between the list price and net price of █████████████ from ███ percent to ███ percent. An independent analysis of the same product found that the spread between the list price and the net price increased from 30 percent to 56 percent between 2011 and 2014.[13] Likewise, an independent analysis conducted by Bloomberg found that between 2009 and 2015, the difference between the list price and net price of Lantus increased from 16.05 percent to 135.77 percent.[14] The same analysis also found that between 2009 and 2015, the difference between the list price and net price of HumaLog increased from 23 percent to 66 percent.[15] Novo Nordisk has also admitted that the difference between its NovoLog list and net prices has increased to more than 315 percent since NovoLog first entered the market.[16]

---

[12] CBS News, *Lawsuit accuses makers of conspiring to hike insulin prices* (Feb. 22, 2017), available at *https://www.cbsnews.com/news/insulin-price-hike-lawsuit-accuses-drug-makers-of-conspiring/.*

[13] *See* Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*, Credit Suisse, 23 (May 1, 2015).

[14] *Decoding Big Pharma's Secret Drug Pricing Practices*, Robert Langreth, Michael Keller, and Christopher Cannon, *available at* https://www.bloomberg.com/graphics/2016-drug-prices/ (June 29, 2016).

[15] *Id*.

[16] *Our perspectives on pricing and affordability*, Novo Nordisk US, (Nov. 30, 2016), http://www.novonordisk-us.com/blog/perspectives/2016/november/our_perspectives.html.

63.     The end result: the list prices that Defendants set are so far from their net prices that Defendants' list prices no longer are an accurate approximation of the actual net price of insulin and are deceptive and misleading.  In fact, the chief executive officer of Novo Nordisk now admits that the list prices it sets are meant only to be the starting point for negotiations with PBMs and that "[i]t was never the intention that individual patients should end up paying the list price."[17]

**DEFENDANTS' DECEPTIVE AND MISLEADING LIST PRICES HARM THOSE WHO CANNOT AFFORD IT**

64.     Many patients and entities do, however, pay for their drugs based on Defendants' deceptive and misleading list prices. This is because Defendants publish those prices with various price reporting services and in various promotional and marketing materials, knowing those prices serve as benchmarks for the price that those people and entities pay. These affirmative representations by Defendants are the only prices that Defendants make publicly available regarding the price they charge for insulin.  In publishing their list prices, Defendants do not disclose that the net prices they charge PBMs are far less than the publicly-available list price.   Instead, Defendants knowingly permit their published list prices deceptively and misleadingly be understood to be the actual price they charge for their analog insulin products.

65.     PBMs do not disclose that Defendants' list prices are deceptive and not representative of the actual net price that Defendants charge for their products. Instead, PBMs conceal the rebates they receive from Defendants, both from the general public and, in some cases, to their own health plan clients. They contend that, through payment of these rebates, they

---

[17] James Paton, *Drug CEO Has Problem With U.S. Patients Paying His Prices* (Mar. 14, 2017), *available at* https://www.bloomberg.com/news/articles/2017-03-14/drug-ceo-has-big-problem-with-u-s-patients-paying-his-prices.

have secured greater savings for their clients and lowered health care costs nationwide. They do this knowing that the net prices their health plan clients pay have hardly changed.

66.     But, as described above, Defendants know that their published and publicly disseminated list prices serve as the bases on which many patients pay for their medications, including insulin. Patients with high-deductible health plans, the uninsured, those who pay coinsurance, and Medicare Part D beneficiaries do not have access to information regarding the rebates that Defendants pay the PBMs. They are unaware of the fact that the list prices that Defendants publish and publicly disseminate are deceptive and misleading. These patients, who expect that those prices are an accurate representation of the fair value of Defendants' products, may find that their life-saving medications are now unaffordable.

67.     Patients without health insurance typically pay a "cash price" to retail pharmacies directly for their medications.  The cash price that most retail pharmacies charge is based on the list price.  This is in part because manufacturers do not provide rebates to pharmacies for selling their drugs; they do so only to PBMs for placement on their formularies.  The cash price that a retail pharmacy pays a wholesaler is often based on the list price the manufacturer charges the wholesaler, plus a small mark-up.  Retail pharmacies must also change their prices when the list price of a product increases. Essentially, retail pharmacies are stuck charging a price based on Defendants' deceptive list price, and must sell at that price or higher to recoup their costs.

68.     Patients with high-deductible health plans also pay out-of-pocket a price that is based on the list price that Defendants set for their insulin products until those patients have satisfied their deductible.  Even though these patients have insurance, they do not receive the benefit of rebates that their health plan's PBM has negotiated with Defendants.  Most rebate contracts between pharmaceutical manufacturers and PBMs require ███████████

26

████████████████████████████████ even though the PBM ████████████

████████████████████ Because PBMs typically do not ████████████████

██████████████ they are ██████████████████████████████████

     69.    In addition, most PBMs include terms in their contracts ████████████ that

allow ████████████████████████████████████████████████████

████████████████████████████████ Because the PBM reimbursement

rate is usually tied to the AWP of a product, ████████████████████ that are ████

████████████████████████████ Because Defendants set the AWP either directly or

indirectly through their WAC, their list prices become the basis for the price that cash customers

pay to retail pharmacies. By way of example, the following charts detail the relationship between

the list price of some of Defendants' analog insulin products and the cash price that a major

Minnesota pharmacy set for that product:



70.     Because Defendants' list prices are deceptive and misleading and do not accurately reflect the net price they charge for insulin, the price that these cash-paying customers pay for analog insulin products has increased dramatically. The following charts detail how the cash price of analog insulin products sold by a major Minnesota pharmacy has changed since 2012:



71.     If Defendants published list prices that were not deceptive and misleading and instead accurately reflected the true net price of insulin, they would charge less to their wholesalers, which would in turn charge less to their pharmacies, which could in turn charge less to patients who pay cash for some or all of their medications, including insulin.  Patients without health insurance or with high deductible health plans would then experience a dramatic decline in the cost of their medications.

72.     Patients on Medicare Part D are also affected by Defendants' scheme to publish and disseminate deceptive and misleading list prices.   Medicare Part D is a voluntary prescription drug benefit available to patients on Medicare.  People who receive this benefit must pay for their medications out-of-pocket until they have spent $405.  After reaching this threshold, these individuals must pay 25 percent of the cost of their drugs until they and their plan have spent a combined total of $3,750.  Once this level is reached, the individual is in the "donut hole."  At this stage, the individual pays 35 percent of the cost of the brand-name drug until the beneficiary's out-of-pocket spending totals $5,000.  At that point, the person's Medicare Part D plan kicks in again, and the person must only pay 5 percent of their costs out-of-pocket.

73.     While enrollees in Medicare Part D receive the benefit of a manufacturer discount for insulin products while in the donut hole, for multiple reasons, this benefit does not begin to cover the inflated price the enrollee pays because of Defendants' deceptive, misleading, and misrepresentative list prices. First, the portion the Medicare Part D patient pays is a percentage of the drug's list price, which is inflated because of Defendants' deceptive conduct. Second, Defendants' deceptive, misleading, and misrepresentative list prices mean enrollees exhaust their benefits more quickly than they otherwise would and enter the donut hole more quickly than they

should.  Finally, if Defendants actually competed with one another to offer the lowest list price, the total cost of enrollees' Part D benefits would generally decline over time.

74.     Even health plan members who have the benefit of a PBM negotiating for on behalf of their health plan suffer because of Defendants' conduct. Many Minnesota patients have health insurance that requires them to pay coinsurance out-of-pocket when they fill a prescription. Typically, the amount the patient must pay is calculated as a percentage of a price that is based on the drug's list price. The amount that those patients pay, as a result, is inflated because of Defendants' deceptive and misleading list prices.

75.     The Minnesota Department of Corrections has purchased insulin at inflated prices because of Defendants' deceptive, misleading, and misrepresentative list prices. Minnesota's Department of Corrections has purchased more than $3,000,000 of analog insulin products since 2012. It typically pays a price that is based on the list price that the manufacturer sets or passes through to the wholesaler. As a result, the amount that the Department of Corrections pays for their analog insulin products is more than it should be because of Defendants' deceptive, misleading, and misrepresentative list prices.

76.     Finally, if Defendants actually competed to offer the lowest list price, the list price of their products should be lower due to competition between the various manufacturers. Currently, because Defendants increase both their rebates and their list prices, they are able to hold their net prices relatively steady.  Competition on list price, which is currently lacking, should cause the actual price of Defendants' products to be lower over time, saving health plans and their members money.  Defendants competition over which one can offer PBMs the biggest rebates from their list prices instead of competing on price itself is economically preferable to

them, however, because this makes it easier for Defendants to hold net prices for their insulin products relatively steady.

77.     Minnesota consumers and the Minnesota Department of Corrections have purchased analog insulin products at higher prices than they otherwise would have because of the deceptive list prices that Defendants published.

**STATUTE OF LIMITATIONS TOLLING**

78.     All relevant statutes of limitations have been tolled by Defendants' fraudulent concealment and denial of the facts alleged here. Defendants published, or caused to be published, list prices for their products that they knew to be inaccurate.  Defendants knew their list prices were deceptive, misleading, and not representative of the net prices they charged for those products because of the rebates they paid to the PBMs. Defendants did not disclose the existence or magnitude of those rebates to the State of Minnesota, its residents, or the Department of Corrections.

79.     Defendants affirmatively and purposely crafted contracts that prohibited them and the PBMs from disclosing information related to the rebates that Defendants paid to the PBMs. Defendants also concealed information regarding the impact that those rebates had on the list prices they published.

80.     The true deception of Defendants' list prices, the extent to which those list prices differed from Defendants net prices, and the fact that Defendants inflated their list prices in order to market greater rebates to PBMs, was not apparent or obvious to the State of Minnesota, its residents, or the Department of Corrections, and could not have been discovered through reasonable diligence.

32

## COUNT I
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
### (AS TO NOVO NORDISK)

81.　　The State of Minnesota re-alleges all prior paragraphs of this Complaint.

82.　　Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

83.　　PBM CVS is a person as defined by 18 U.S.C. § 1961(3).

84.　　Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

85.　　At all times relevant to this complaint, Novo Nordisk and CVS constitute an enterprise as defined by 18 U.S.C. § 1961(4).　For purposes of this count, this enterprise are referred to as the "Novo-CVS Enterprise."

86.　　The Novo-CVS Enterprise consists of an association-in-fact between Novo Nordisk, including its employees, directors, and agents, and CVS, including its employees, directors, and agents.　The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog, Levemir, and Tresiba insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Novo Nordisk actually received for these products due to the rebates and other concessions made to CVS—including by arranging placements for these products on CVS's formularies through the negotiation of rebates, price protection factors, and discounts for these products with CVS, and through the exclusion of competing insulin products from CVS's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

87.     To accomplish the common purpose of the Novo-CVS Enterprise, the component entities, Novo Nordisk and CVS, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the list price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would offer CVS for favorable formulary placement, and the price protection terms CVS demanded to protect against any increase in the list prices of Levemir, NovoLog, and Tresiba.

88.     The Novo-CVS enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba which were sold throughout the United States and its territories.

89.     CVS participated in the conduct of the Novo-CVS Enterprise in a variety of ways, including, but not limited to:

     a.  Negotiating significant rebates from the list prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;

     b.  Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates CVS would earn from the sale of those products;

     c.  Excluding competing insulin products from certain formularies in exchange for increased rebates;

     d.  Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Novo Nordisk saved those clients and their members money;

     e.  Making material misrepresentations that the list prices that Novo Nordisk published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

     f.  Concealing the actual rebates they earned from Novo Nordisk from their clients and the general public, and therefore the net price Novo Nordisk charged for these insulin products.

90.     CVS's conduct and participation is essential to the success of the enterprise.  For Novo Nordisk to maintain its net prices for these products, it required CVS to select the products based on rebates offered, rather than list price.  It also required CVS to market to its health plan clients that these rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk. CVS's participation allowed Novo Nordisk to inflate its list prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

91.     Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-CVS Enterprise by:

a.  Setting deceptive, misleading, and misrepresentative list prices for its Levemir, NovoLog, and Tresiba insulin products;

b.  Marketing to CVS the rebates that it could earn for favorable formulary placements of Levemir and NovoLog, including in some cases, for omitting competing products from certain of its formularies;

c.  Including price protection terms in its contracts with CVS, which allowed CVS to earn additional rebates when Novo Nordisk increased its list prices;

d.  Paying rebates to CVS for each prescription filled for Levemir, NovoLog, and Tresiba by a CVS health plan member;

e.  Reporting to the general public and various price reporting services the list price of Levemir, NovoLog, and Tresiba while claiming that such prices were a true and fair representation of the actual price of those products;

f.  Inflating the list price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to CVS; and

g.  Concealing and misrepresenting the magnitude of the rebates that it paid to the CVS from the general public.

92.     The component entities are all willing and knowing participants in the Novo-CVS Enterprise. Novo Nordisk negotiated rebates with CVS for favorable formulary placement and entered into contracts with CVS that concealed both the extent of those rebates and the price

protection that Novo Nordisk provided CVS.  CVS represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Novo-CVS Enterprise reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its list prices.  Novo Nordisk and CVS could not have successfully conducted the activities of the Novo-CVS Enterprise individually.

93.     The Novo-CVS Enterprise is on-going and has been in existence for all times relevant to this complaint.  CVS continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Novo Nordisk pays CVS.  CVS also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

94.     To accomplish this conduct, and to further the goals of the Novo-CVS Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their Levemir, Tresiba, and NovoLog products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

36

95.     Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with CVS.  Novo Nordisk repeatedly communicated with CVS regarding Novo Nordisk's list prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary placement, and price protection agreements to protect CVS from increases in Novo Nordisk's list prices.

96.     Novo Nordisk then published deceptive, misleading, and misrepresentative list prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Novo Nordisk knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Levemir, NovoLog, and Tresiba. In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid CVS for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Novo Nordisk represented that these prices constituted a fair and accurate price for its Levemir, Tresiba, and NovoLog products.

97.     It was also foreseeable to Novo Nordisk that CVS would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

98.     The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Novo Nordisk and CVS, working throughout the country and were repeatedly sent across state lines.

99.     Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive list prices for Levemir, NovoLog, and Tresiba, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to CVS.  This pattern of racketeering conduct is separate and distinct from the Novo-CVS Enterprise.  Novo Nordisk is a separate and distinct entity from the Novo-CVS Enterprise.

100.    Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

101.    Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

102.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Novo Nordisk set and publicly disseminated.  Novo Nordisk also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

103.     Because Novo Nordisk published deceptive and misleading list prices for the purpose of marketing greater rebates to CVS and inflated its list prices to preserve the net prices that it charged CVS, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba.  But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

104.     Though the conduct of the Novo-CVS Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

105.     Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

106.     Novo Nordisk is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT II**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO NOVO NORDISK)**

107.     The State of Minnesota re-alleges all prior paragraphs of this Complaint.

108.     Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

109.     PBM OptumRx is a person as defined by 18 U.S.C. § 1961(3).

110.    Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

111.    At all times relevant to this complaint, Novo Nordisk and OptumRx constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Novo-Optum Enterprise."

112.    The Novo-Optum Enterprise consists of an association-in-fact between Novo Nordisk, including its employees, directors, and agents, and OptumRx, including its employees, directors, and agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog, Levemir, and Tresiba insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Novo Nordisk actually received for these products due to the rebates and other concessions made to OptumRx—including by arranging placements for these products on OptumRx's formularies through the negotiation of rebates, price protection factors, and discounts for these products with OptumRx, and through the exclusion of competing insulin products from OptumRx's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

113.    To accomplish the common purpose of the Novo-Optum Enterprise, the component entities, Novo Nordisk and OptumRx, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the list price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would offer OptumRx for favorable formulary placement, and the price protection terms

OptumRx demanded to protect against any increase in the list prices of Levemir, NovoLog, and Tresiba.

114.    The Novo-Optum enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba which were sold throughout the United States and its territories.

115.    OptumRx participated in the conduct of the Novo-Optum Enterprise in a variety of ways, including, but not limited to:

a.  Negotiating significant rebates from the list prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;

b.  Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates Optum would earn from the sale of those products;

c.  Excluding competing insulin products from certain formularies in exchange for increased rebates;

d.  Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Novo Nordisk saved those clients and their members money;

e.  Making material misrepresentations that the list prices that Novo Nordisk published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

f.  Concealing the actual rebates they earned from Novo Nordisk from their clients and the general public, and therefore the net price Novo Nordisk charged for these insulin products.

116.    OptumRx's conduct and participation is essential to the success of the enterprise. For Novo Nordisk to maintain its net prices for these products, it required OptumRx to select the products based on rebates offered, rather than list price.  It also required OptumRx to market to its health plan clients that these rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk. OptumRx's participation

allowed Novo Nordisk to inflate its list prices, offer larger rebates to OptumRx to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

117.    Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-Optum Enterprise by:

> a. Setting deceptive, misleading, and misrepresentative list prices for its Levemir, NovoLog, and Tresiba insulin products;

> b. Marketing to OptumRx the rebates that it could earn for favorable formulary placements of Levemir and NovoLog, including in some cases, for omitting competing products from certain of its formularies;

> c. Including price protection terms in its contracts with OptumRx, which allowed OptumRx to earn additional rebates when Novo Nordisk increased its list prices;

> d. Paying rebates to OptumRx for each prescription filled for Levemir, NovoLog, and Tresiba by a OptumRx health plan member;

> e. Reporting to the general public and various price reporting services the list price of Levemir, NovoLog, and Tresiba while claiming that such prices were a true and fair representation of the actual price of those products;

> f. Inflating the list price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to OptumRx; and

> g. Concealing and misrepresenting the magnitude of the rebates that it paid to the OptumRx from the general public.

118.    The component entities are all willing and knowing participants in the Novo-Optum Enterprise. Novo Nordisk negotiated rebates with OptumRx for favorable formulary placement and entered into contracts with OptumRx that concealed both the extent of those rebates and the price protection that Novo Nordisk provided OptumRx.  OptumRx represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Novo-Optum Enterprise

reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its list prices.  Novo Nordisk and OptumRx could not have successfully conducted the activities of the Novo-Optum Enterprise individually.

119.    The Novo-Optum Enterprise is on-going and has been in existence for all times relevant to this complaint.  OptumRx continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Novo Nordisk pays OptumRx.  OptumRx also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

120.    To accomplish this conduct, and to further the goals of the Novo-Optum Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their Levemir, Tresiba, and NovoLog products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

121.    Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with OptumRx.  Novo

Nordisk repeatedly communicated with OptumRx regarding Novo Nordisk's list prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary placement, and price protection agreements to protect OptumRx from increases in Novo Nordisk's list prices.

122.    Novo Nordisk then published deceptive, misleading, and misrepresentative list prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Novo Nordisk knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Levemir, NovoLog, and Tresiba. In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid OptumRx for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Novo Nordisk represented that these prices constituted a fair and accurate price for its Levemir, Tresiba, and NovoLog products.

123.    It was also foreseeable to Novo Nordisk that OptumRx would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

124.    The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Novo Nordisk and OptumRx, working throughout the country and were repeatedly sent across state lines.

125.    Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive list prices for Levemir, NovoLog, and Tresiba, avoid competing on

44

list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to OptumRx.  This pattern of racketeering conduct is separate and distinct from the Novo-Optum Enterprise.  Novo Nordisk is a separate and distinct entity from the Novo-Optum Enterprise.

126.    Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

127.    Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

128.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Novo Nordisk set and publicly disseminated.  Novo Nordisk also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

129.    Because Novo Nordisk published deceptive and misleading list prices for the purpose of marketing greater rebates to OptumRx and inflated its list prices to preserve the net

prices that it charged OptumRx, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba.  But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

130.    Though the conduct of the Novo-Optum Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

131.    Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

132.    Novo Nordisk is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

### COUNT III
### RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
### (AS TO NOVO NORDISK)

133.    The State of Minnesota re-alleges all prior paragraphs of this Complaint.

134.    Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

135.    PBM ESI is a person as defined by 18 U.S.C. § 1961(3).

136.    Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

137.    At all times relevant to this complaint, Novo Nordisk and ESI constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Novo-ESI Enterprise."

138.    The Novo-ESI Enterprise consists of an association-in-fact between Novo Nordisk, including its employees, directors, and agents, and ESI, including its employees, directors, and agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog, Levemir, and Tresiba insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Novo Nordisk actually received for these products due to the rebates and other concessions made to ESI—including by arranging placements for these products on ESI's formularies through the negotiation of rebates, price protection factors, and discounts for these products with ESI, and through the exclusion of competing insulin products from ESI's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

139.    To accomplish the common purpose of the Novo-ESI Enterprise, the component entities, Novo Nordisk and ESI, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the list price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would offer ESI for favorable formulary placement, and the price protection terms ESI demanded to protect against any increase in the list prices of Levemir, NovoLog, and Tresiba.

140.    The Novo-ESI enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba which were sold throughout the United States and its territories.

141.   ESI participated in the conduct of the Novo-ESI Enterprise in a variety of ways, including, but not limited to:

a.   Negotiating significant rebates from the list prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;

b.   Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates ESI would earn from the sale of those products;

c.   Excluding competing insulin products from certain formularies in exchange for increased rebates;

d.   Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Novo Nordisk saved those clients and their members money;

e.   Making material misrepresentations that the list prices that Novo Nordisk published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

f.   Concealing the actual rebates they earned from Novo Nordisk from their clients and the general public, and therefore the net price Novo Nordisk charged for these insulin products.

142.   ESI's conduct and participation is essential to the success of the enterprise.  For Novo Nordisk to maintain its net prices for these products, it required ESI to select the products based on rebates offered, rather than list price.  It also required ESI to market to its health plan clients that these rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk. ESI's participation allowed Novo Nordisk to inflate its list prices, offer larger rebates to ESI to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

143.   Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-ESI Enterprise by:

a. Setting deceptive, misleading, and misrepresentative list prices for its Levemir, NovoLog, and Tresiba insulin products;

b. Marketing to ESI the rebates that it could earn for favorable formulary placements of Levemir and NovoLog, including in some cases, for omitting competing products from certain of its formularies;

c. Including price protection terms in its contracts with ESI, which allowed ESI to earn additional rebates when Novo Nordisk increased its list prices;

d. Paying rebates to ESI for each prescription filled for Levemir, NovoLog, and Tresiba by a ESI health plan member;

e. Reporting to the general public and various price reporting services the list price of Levemir, NovoLog, and Tresiba while claiming that such prices were a true and fair representation of the actual price of those products;

f. Inflating the list price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to ESI; and

g. Concealing and misrepresenting the magnitude of the rebates that it paid to the ESI from the general public.

144. The component entities are all willing and knowing participants in the Novo-ESI Enterprise. Novo Nordisk negotiated rebates with ESI for favorable formulary placement and entered into contracts with ESI that concealed both the extent of those rebates and the price protection that Novo Nordisk provided ESI. ESI represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Novo-ESI Enterprise reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its list prices. Novo Nordisk and ESI could not have successfully conducted the activities of the Novo-ESI Enterprise individually.

145. The Novo-ESI Enterprise is on-going and has been in existence for all times relevant to this complaint. ESI continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba;

and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Novo Nordisk pays ESI.  ESI also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

146.    To accomplish this conduct, and to further the goals of the Novo-ESI Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their Levemir, Tresiba, and NovoLog products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

147.    Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with ESI.  Novo Nordisk repeatedly communicated with ESI regarding Novo Nordisk's list prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary placement, and price protection agreements to protect ESI from increases in Novo Nordisk's list prices.

148.    Novo Nordisk then published deceptive, misleading, and misrepresentative list prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Novo Nordisk knew that other entities, including retail pharmacies, would rely on those prices to

50

determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Levemir, NovoLog, and Tresiba. In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid ESI for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices. Instead, by publishing only its list prices, Novo Nordisk represented that these prices constituted a fair and accurate price for its Levemir, Tresiba, and NovoLog products.

149.    It was also foreseeable to Novo Nordisk that ESI would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

150.    The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands. They were made by numerous employees of Novo Nordisk and ESI, working throughout the country and were repeatedly sent across state lines.

151.    Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive list prices for Levemir, NovoLog, and Tresiba, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to ESI. This pattern of racketeering conduct is separate and distinct from the Novo-ESI Enterprise. Novo Nordisk is a separate and distinct entity from the Novo-ESI Enterprise.

152.    Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

153.     Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

154.     As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Novo Nordisk set and publicly disseminated.  Novo Nordisk also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

155.     Because Novo Nordisk published deceptive and misleading list prices for the purpose of marketing greater rebates to ESI and inflated its list prices to preserve the net prices that it charged ESI, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba.  But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

156.     Though the conduct of the Novo-ESI Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs,

the list prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

157.    Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

158.    Novo Nordisk is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT IV**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO NOVO NORDISK)**

159.    The State of Minnesota re-alleges all prior paragraphs of this Complaint.

160.    Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

161.    PBM Prime Therapeutics is a person as defined by 18 U.S.C. § 1961(3).

162.    Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

163.    At all times relevant to this complaint, Novo Nordisk and Prime Therapeutics constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Novo-Prime Therapeutics Enterprise."

164.    The Novo-Prime Therapeutics Enterprise consists of an association-in-fact between Novo Nordisk, including its employees, directors, and agents, and Prime Therapeutics, including its employees, directors, and agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog,

Levemir, and Tresiba insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Novo Nordisk actually received for these products due to the rebates and other concessions made to Prime Therapeutics —including by arranging placements for these products on Prime Therapeutics' formularies through the negotiation of rebates, price protection factors, and discounts for these products with Prime Therapeutics, and through the exclusion of competing insulin products from Prime Therapeutics' formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

165.    To accomplish the common purpose of the Novo-Prime Therapeutics Enterprise, the component entities, Novo Nordisk and Prime Therapeutics, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the list price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would offer Prime Therapeutics for favorable formulary placement, and the price protection terms Prime Therapeutics demanded to protect against any increase in the list prices of Levemir, NovoLog, and Tresiba.

166.    The Novo-Prime Therapeutics enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba which were sold throughout the United States and its territories.

167.    Prime Therapeutics participated in the conduct of the Novo-Prime Therapeutics Enterprise in a variety of ways, including, but not limited to:

> a.  Negotiating significant rebates from the list prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;
>
> b.  Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates Prime Therapeutics would earn from the sale of those products;

    c.   Excluding competing insulin products from certain formularies in exchange for increased rebates;

    d.   Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Novo Nordisk saved those clients and their members money;

    e.   Making material misrepresentations that the list prices that Novo Nordisk published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

    f.   Concealing the actual rebates they earned from Novo Nordisk from their clients and the general public, and therefore the net price Novo Nordisk charged for these insulin products.

168.    Prime Therapeutics' conduct and participation is essential to the success of the enterprise.  For Novo Nordisk to maintain its net prices for these products, it required Prime Therapeutics to select the products based on rebates offered, rather than list price.  It also required Prime Therapeutics to market to its health plan clients that these rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk. Prime Therapeutics' participation allowed Novo Nordisk to inflate its list prices, offer larger rebates to Prime Therapeutics to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

169.    Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-Prime Therapeutics Enterprise by:

    a.   Setting deceptive, misleading, and misrepresentative list prices for its Levemir, NovoLog, and Tresiba insulin products;

    b.   Marketing to Prime Therapeutics the rebates that it could earn for favorable formulary placements of Levemir and NovoLog, including in some cases, for omitting competing products from certain of its formularies;

c.  Including price protection terms in its contracts with Prime Therapeutics, which allowed Prime Therapeutics to earn additional rebates when Novo Nordisk increased its list prices;

d.  Paying rebates to Prime Therapeutics for each prescription filled for Levemir, NovoLog, and Tresiba by a Prime Therapeutics health plan member;

e.  Reporting to the general public and various price reporting services the list price of Levemir, NovoLog, and Tresiba while claiming that such prices were a true and fair representation of the actual price of those products;

f.  Inflating the list price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to Prime Therapeutics; and

g.  Concealing and misrepresenting the magnitude of the rebates that it paid to the Prime Therapeutics from the general public.

170.  The component entities are all willing and knowing participants in the Novo-Prime Therapeutics Enterprise. Novo Nordisk negotiated rebates with Prime Therapeutics for favorable formulary placement and entered into contracts with Prime Therapeutics that concealed both the extent of those rebates and the price protection that Novo Nordisk provided Prime Therapeutics.  Prime Therapeutics represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Novo-Prime Therapeutics Enterprise reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its list prices.  Novo Nordisk and Prime Therapeutics could not have successfully conducted the activities of the Novo-Prime Therapeutics Enterprise individually.

171.  The Novo-Prime Therapeutics Enterprise is on-going and has been in existence for all times relevant to this complaint.  Prime Therapeutics continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Novo Nordisk pays Prime

Therapeutics.  Prime Therapeutics also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

172.    To accomplish this conduct, and to further the goals of the Novo-Prime Therapeutics Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.   Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).   The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their Levemir, Tresiba, and NovoLog products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

173.    Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with Prime Therapeutics. Novo Nordisk repeatedly communicated with Prime Therapeutics regarding Novo Nordisk's list prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary placement, and price protection agreements to protect Prime Therapeutics from increases in Novo Nordisk's list prices.

174.    Novo Nordisk then published deceptive, misleading, and misrepresentative list prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Novo

Nordisk knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Levemir, NovoLog, and Tresiba. In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid Prime Therapeutics for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Novo Nordisk represented that these prices constituted a fair and accurate price for its Levemir, Tresiba, and NovoLog products.

175.    It was also foreseeable to Novo Nordisk that Prime Therapeutics would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

176.    The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Novo Nordisk and Prime Therapeutics, working throughout the country and were repeatedly sent across state lines.

177.    Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive list prices for Levemir, NovoLog, and Tresiba, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to OptumRx.  This pattern of racketeering conduct is separate and distinct from the Novo-Prime Therapeutics Enterprise.  Novo Nordisk is a separate and distinct entity from the Novo-Prime Therapeutics Enterprise.

178.    Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

179. Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

180. As previously described, many patients pay all or a portion of their insulin costs out-of-pocket. Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket. Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Novo Nordisk set and publicly disseminated. Novo Nordisk also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

181. Because Novo Nordisk published deceptive and misleading list prices for the purpose of marketing greater rebates to Prime Therapeutics and inflated its list prices to preserve the net prices that it charged Prime Therapeutics, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba. But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

182.     Though the conduct of the Novo-Prime Therapeutics Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the list price on to patients.

183.     Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

184.     Novo Nordisk is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT V**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO SANOFI)**

185.     The State of Minnesota re-alleges all prior paragraphs of this Complaint.

186.     Sanofi is a person as defined by 18 U.S.C. § 1961(3).

187.     PBM CVS is a person as defined by 18 U.S.C. § 1961(3).

188.     Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

189.     At all times relevant to this complaint, Sanofi and CVS constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Sanofi-CVS Enterprise."

190.     The Sanofi-CVS Enterprise consists of an association-in-fact between Sanofi, including its employees, directors, and agents, and CVS, including its employees, directors, and

60

agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Sanofi actually received for these products due to the rebates and other concessions made to CVS—including by arranging placements for these products on CVS's formularies through the negotiation of rebates, price protection factors, and discounts for these products with CVS, and through the exclusion of competing insulin products from CVS's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

191.    To accomplish the common purpose of the Sanofi-CVS Enterprise, the component entities, Sanofi and CVS, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the list price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would offer CVS for favorable formulary placement, and the price protection terms CVS demanded to protect against any increase in the list prices of Lantus, Apidra, and Toujeo.

192.    The Sanofi-CVS enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo which were sold throughout the United States and its territories.

193.    CVS participated in the conduct of the Sanofi-CVS Enterprise in a variety of ways, including, but not limited to:

     a.  Negotiating significant rebates from the list prices set by Sanofi for Lantus, Apidra, and Toujeo;

     b.  Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates CVS would earn from the sale of those products;

c. Excluding competing insulin products from certain formularies in exchange for increased rebates;

d. Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Sanofi saved those clients and their members money;

e. Making material misrepresentations that the list prices that Sanofi published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

f. Concealing the actual rebates they earned from Sanofi from their clients and the general public, and therefore the net price Sanofi charged for these insulin products.

194. CVS's conduct and participation is essential to the success of the enterprise. For Sanofi to maintain its net prices for these products, it required CVS to select the products based on rebates offered, rather than list price. It also required CVS to market to its health plan clients that these rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. CVS's participation allowed Sanofi to inflate its list prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

195. Sanofi participated in, controlled, and conducted the affairs of the Sanofi-CVS Enterprise by:

a. Setting deceptive, misleading, and misrepresentative list prices for its Lantus, Apidra, and Toujeo insulin products;

b. Marketing to CVS the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

c. Including price protection terms in its contracts with CVS, which allowed CVS to earn additional rebates when Sanofi increased its list prices;

d.  Paying rebates to CVS for each prescription filled for Lantus, Apidra, and Toujeo by a CVS health plan member;

e.  Reporting to the general public and various price reporting services the list price of Lantus, Apidra, and Toujeo while claiming that such prices were a true and fair representation of the actual price of those products;

f.  Inflating the list price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to CVS; and

g.  Concealing and misrepresenting the magnitude of the rebates that it paid to the CVS from the general public.

196.   The component entities are all willing and knowing participants in the Sanofi-CVS Enterprise. Sanofi negotiated rebates with CVS for favorable formulary placement and entered into contracts with CVS that concealed both the extent of those rebates and the price protection that Sanofi provided CVS.  CVS represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Sanofi-CVS Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its list prices.  Sanofi and CVS could not have successfully conducted the activities of the Sanofi-CVS Enterprise individually.

197.   The Sanofi-CVS Enterprise is on-going and has been in existence for all times relevant to this complaint.   CVS continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra, and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays CVS.  CVS also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

198.   To accomplish this conduct, and to further the goals of the Sanofi-CVS Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's

conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their Lantus, Apidra, and Toujeo products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

199.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with CVS.  Sanofi repeatedly communicated with CVS regarding Sanofi's list prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect CVS from increases in Sanofi's list prices.

200.    Sanofi then published deceptive, misleading, and misrepresentative list prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Sanofi knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo. In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid CVS for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Sanofi represented that these prices constituted a fair and accurate price for its Lantus, Apidra, and Toujeo products.

64

201.    It was also foreseeable to Sanofi that CVS would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

202.    The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and CVS, working throughout the country and were repeatedly sent across state lines.

203.    Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive list prices for Lantus, Apidra, and Toujeo, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to CVS.  This pattern of racketeering conduct is separate and distinct from the Sanofi-CVS Enterprise.  Sanofi is a separate and distinct entity from the Sanofi-CVS Enterprise.

204.    Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

205.    Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

206.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated.  Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount

spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Sanofi set and publicly disseminated. Sanofi also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

207.    Because Sanofi published deceptive and misleading list prices for the purpose of marketing greater rebates to CVS and inflated its list prices to preserve the net prices that it charged CVS, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus, Apidra, and Toujeo. But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

208.    Though the conduct of the Sanofi-CVS Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the list price on to patients.

209.    Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

210.    Sanofi is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT VI**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO SANOFI)**

211.    The State of Minnesota re-alleges all prior paragraphs of this Complaint.

212.    Sanofi is a person as defined by 18 U.S.C. § 1961(3).

213.    PBM OptumRx is a person as defined by 18 U.S.C. § 1961(3).

214.    Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

215.    At all times relevant to this complaint, Sanofi and OptumRx constitute an enterprise as defined by 18 U.S.C. § 1961(4). For purposes of this count, this enterprise are referred to as the "Sanofi-Optum Enterprise."

216.    The Sanofi-Optum Enterprise consists of an association-in-fact between Sanofi, including its employees, directors, and agents, and OptumRx, including its employees, directors, and agents. The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Sanofi actually received for these products due to the rebates and other concessions made to OptumRx—including by arranging placements for these products on OptumRx's formularies through the negotiation of rebates, price protection factors, and discounts for these products with OptumRx, and through the exclusion of competing insulin products from OptumRx's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

217.    To accomplish the common purpose of the Sanofi-Optum Enterprise, the component entities, Sanofi and OptumRx, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the list price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would offer OptumRx for favorable formulary placement, and the price protection terms OptumRx demanded to protect against any increase in the list prices of Lantus, Apidra, and Toujeo.

218.    The Sanofi-Optum enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo which were sold throughout the United States and its territories.

219.    OptumRx participated in the conduct of the Sanofi-Optum Enterprise in a variety of ways, including, but not limited to:

    a.  Negotiating significant rebates from the list prices set by Sanofi for Lantus, Apidra, and Toujeo;

    b.  Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates OptumRx would earn from the sale of those products;

    c.  Excluding competing insulin products from certain formularies in exchange for increased rebates;

    d.  Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Sanofi saved those clients and their members money;

    e.  Making material misrepresentations that the list prices that Sanofi published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

    f.  Concealing the actual rebates they earned from Sanofi from their clients and the general public, and therefore the net price Sanofi charged for these insulin products.

220.     OptumRx's conduct and participation is essential to the success of the enterprise. For Sanofi to maintain its net prices for these products, it required OptumRx to select the products based on rebates offered, rather than list price.  It also required OptumRx to market to its health plan clients that these rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. OptumRx's participation allowed Sanofi to inflate its list prices, offer larger rebates to OptumRx to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

221.     Sanofi participated in, controlled, and conducted the affairs of the Sanofi-Optum Enterprise by:

    a.  Setting deceptive, misleading, and misrepresentative list prices for its Lantus, Apidra, and Toujeo insulin products;

    b.  Marketing to OptumRx the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

    c.  Including price protection terms in its contracts with OptumRx, which allowed OptumRx to earn additional rebates when Sanofi increased its list prices;

    d.  Paying rebates to OptumRx for each prescription filled for Lantus, Apidra, and Toujeo by a OptumRx health plan member;

    e.  Reporting to the general public and various price reporting services the list price of Lantus, Apidra, and Toujeo while claiming that such prices were a true and fair representation of the actual price of those products;

    f.  Inflating the list price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to OptumRx; and

    g.  Concealing and misrepresenting the magnitude of the rebates that it paid to the OptumRx from the general public.

222.   The component entities are all willing and knowing participants in the Sanofi-Optum Enterprise. Sanofi negotiated rebates with OptumRx for favorable formulary placement and entered into contracts with OptumRx that concealed both the extent of those rebates and the price protection that Sanofi provided OptumRx.  OptumRx represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Sanofi-Optum Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its list prices.  Sanofi and OptumRx could not have successfully conducted the activities of the Sanofi-Optum Enterprise individually.

223.   The Sanofi-Optum Enterprise is on-going and has been in existence for all times relevant to this complaint.  OptumRx continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra, and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays OptumRx.  OptumRx also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

224.   To accomplish this conduct, and to further the goals of the Sanofi-Optum Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose

(i.e., inflating the list price of their Lantus, Apidra, and Toujeo products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

225.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with OptumRx.  Sanofi repeatedly communicated with OptumRx regarding Sanofi's list prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect OptumRx from increases in Sanofi's list prices.

226.    Sanofi then published deceptive, misleading, and misrepresentative list prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Sanofi knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo. In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid OptumRx for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Sanofi represented that these prices constituted a fair and accurate price for its Lantus, Apidra, and Toujeo products.

227.    It was also foreseeable to Sanofi that OptumRx would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

228.   The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and OptumRx, working throughout the country and were repeatedly sent across state lines.

229.   Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive list prices for Lantus, Apidra, and Toujeo, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to OptumRx.  This pattern of racketeering conduct is separate and distinct from the Sanofi-Optum Enterprise.  Sanofi is a separate and distinct entity from the Sanofi-Optum Enterprise.

230.   Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

231.   Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

232.   As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Sanofi set and publicly disseminated.  Sanofi also

knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

233.   Because Sanofi published deceptive and misleading list prices for the purpose of marketing greater rebates to OptumRx and inflated its list prices to preserve the net prices that it charged OptumRx, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus, Apidra, and Toujeo.  But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

234.   Though the conduct of the Sanofi-Optum Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

235.   Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

236.   Sanofi is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT VII
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
## (AS TO SANOFI)

237.   The State of Minnesota re-alleges all prior paragraphs of this Complaint.

238.   Sanofi is a person as defined by 18 U.S.C. § 1961(3).

239.    PBM ESI is a person as defined by 18 U.S.C. § 1961(3).

240.    Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

241.    At all times relevant to this complaint, Sanofi and ESI constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Sanofi-ESI Enterprise."

242.    The Sanofi-ESI Enterprise consists of an association-in-fact between Sanofi, including its employees, directors, and agents, and ESI, including its employees, directors, and agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Sanofi actually received for these products due to the rebates and other concessions made to ESI —including by arranging placements for these products on ESI's formularies through the negotiation of rebates, price protection factors, and discounts for these products with ESI, and through the exclusion of competing insulin products from ESI's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

243.    To accomplish the common purpose of the Sanofi-ESI Enterprise, the component entities, Sanofi and ESI, developed extensive relationships, both contractually and financially. The component entities communicated regularly through the wires and mail regarding the list price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would offer ESI for favorable

formulary placement, and the price protection terms ESI demanded to protect against any increase in the list prices of Lantus, Apidra, and Toujeo.

244.    The Sanofi-ESI enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo which were sold throughout the United States and its territories.

245.    ESI participated in the conduct of the Sanofi-ESI Enterprise in a variety of ways, including, but not limited to:

a.  Negotiating significant rebates from the list prices set by Sanofi for Lantus, Apidra, and Toujeo;

b.  Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates ESI would earn from the sale of those products;

c.  Excluding competing insulin products from certain formularies in exchange for increased rebates;

d.  Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Sanofi saved those clients and their members money;

e.  Making material misrepresentations that the list prices that Sanofi published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

f.  Concealing the actual rebates they earned from Sanofi from their clients and the general public, and therefore the net price Sanofi charged for these insulin products.

246.    ESI's conduct and participation is essential to the success of the enterprise.  For Sanofi to maintain its net prices for these products, it required ESI to select the products based on rebates offered, rather than list price.  It also required ESI to market to its health plan clients that these rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. ESI's participation allowed Sanofi to inflate its list prices, offer larger

rebates to ESI to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

247. Sanofi participated in, controlled, and conducted the affairs of the Sanofi-ESI Enterprise by:

a. Setting deceptive, misleading, and misrepresentative list prices for its Lantus, Apidra, and Toujeo insulin products;

b. Marketing to ESI the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

c. Including price protection terms in its contracts with ESI, which allowed ESI to earn additional rebates when Sanofi increased its list prices;

d. Paying rebates to ESI for each prescription filled for Lantus, Apidra, and Toujeo by a ESI health plan member;

e. Reporting to the general public and various price reporting services the list price of Lantus, Apidra, and Toujeo while claiming that such prices were a true and fair representation of the actual price of those products;

f. Inflating the list price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to ESI; and

g. Concealing and misrepresenting the magnitude of the rebates that it paid to the ESI from the general public.

248. The component entities are all willing and knowing participants in the Sanofi-ESI Enterprise. Sanofi negotiated rebates with ESI for favorable formulary placement and entered into contracts with ESI that concealed both the extent of those rebates and the price protection that Sanofi provided ESI. ESI represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Sanofi-ESI Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its list prices. Sanofi and ESI could not have successfully conducted the activities of the Sanofi-ESI Enterprise individually.

249.    The Sanofi-ESI Enterprise is on-going and has been in existence for all times relevant to this complaint.  ESI continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra, and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays ESI.  ESI also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

250.    To accomplish this conduct, and to further the goals of the Sanofi-ESI Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5). The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their Lantus, Apidra, and Toujeo products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

251.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with ESI.  Sanofi repeatedly communicated with ESI regarding Sanofi's list prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect ESI from increases in Sanofi's list prices.

252.    Sanofi then published deceptive, misleading, and misrepresentative list prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Sanofi knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo. In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid ESI for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Sanofi represented that these prices constituted a fair and accurate price for its Lantus, Apidra, and Toujeo products.

253.    It was also foreseeable to Sanofi that ESI would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

254.    The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and ESI, working throughout the country and were repeatedly sent across state lines.

255.    Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive list prices for Lantus, Apidra, and Toujeo, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to ESI.  This pattern of racketeering conduct is separate and distinct from the Sanofi-ESI Enterprise.  Sanofi is a separate and distinct entity from the Sanofi-ESI Enterprise.

256.    Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

257.    Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

258.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Sanofi set and publicly disseminated.  Sanofi also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

259.    Because Sanofi published deceptive and misleading list prices for the purpose of marketing greater rebates to ESI and inflated its list prices to preserve the net prices that it charged ESI, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus, Apidra, and Toujeo.  But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

260.     Though the conduct of the Sanofi-ESI Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

261.     Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

262.     Sanofi is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT VIII**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO SANOFI)**

263.     The State of Minnesota re-alleges all prior paragraphs of this Complaint.

264.     Sanofi is a person as defined by 18 U.S.C. § 1961(3).

265.     PBM Prime Therapeutics is a person as defined by 18 U.S.C. § 1961(3).

266.     Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

267.     At all times relevant to this complaint, Sanofi and Prime Therapeutics constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Sanofi-Prime Therapeutics Enterprise."

268.     The Sanofi-Prime Therapeutics Enterprise consists of an association-in-fact between Sanofi, including its employees, directors, and agents, and Prime Therapeutics,

including its employees, directors, and agents.   The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Sanofi actually received for these products due to the rebates and other concessions made to Prime Therapeutics —including by arranging placements for these products on Prime Therapeutics' formularies through the negotiation of rebates, price protection factors, and discounts for these products with Prime Therapeutics, and through the exclusion of competing insulin products from Prime Therapeutics' formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

269.     To accomplish the common purpose of the Sanofi-Prime Therapeutics Enterprise, the component entities, Sanofi and Prime Therapeutics, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the list price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would offer Prime Therapeutics for favorable formulary placement, and the price protection terms Prime Therapeutics demanded to protect against any increase in the list prices of Lantus, Apidra, and Toujeo.

270.     The Sanofi-Prime Therapeutics enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo which were sold throughout the United States and its territories.

271.     Prime Therapeutics participated in the conduct of the Sanofi-Prime Therapeutics Enterprise in a variety of ways, including, but not limited to:

> a.   Negotiating significant rebates from the list prices set by Sanofi for Lantus, Apidra, and Toujeo;

81

b. Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates Prime Therapeutics would earn from the sale of those products;

c. Excluding competing insulin products from certain formularies in exchange for increased rebates;

d. Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Sanofi saved those clients and their members money;

e. Making material misrepresentations that the list prices that Sanofi published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

f. Concealing the actual rebates they earned from Sanofi from their clients and the general public, and therefore the net price Sanofi charged for these insulin products.

272.    Prime Therapeutics' conduct and participation is essential to the success of the enterprise.   For Sanofi to maintain its net prices for these products, it required Prime Therapeutics to select the products based on rebates offered, rather than list price.   It also required Prime Therapeutics to market to its health plan clients that these rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. Prime Therapeutics' participation allowed Sanofi to inflate its list prices, offer larger rebates to Prime Therapeutics to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

273.    Sanofi participated in, controlled, and conducted the affairs of the Sanofi-Prime Therapeutics Enterprise by:

a. Setting deceptive, misleading, and misrepresentative list prices for its Lantus, Apidra, and Toujeo insulin products;

b.  Marketing to Prime Therapeutics the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

c.  Including price protection terms in its contracts with Prime Therapeutics, which allowed Prime Therapeutics to earn additional rebates when Sanofi increased its list prices;

d.  Paying rebates to Prime Therapeutics for each prescription filled for Lantus, Apidra, and Toujeo by a Prime Therapeutics health plan member;

e.  Reporting to the general public and various price reporting services the list price of Lantus, Apidra, and Toujeo while claiming that such prices were a true and fair representation of the actual price of those products;

f.  Inflating the list price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to Prime Therapeutics; and

g.  Concealing and misrepresenting the magnitude of the rebates that it paid to the Prime Therapeutics from the general public.

274.  The component entities are all willing and knowing participants in the Sanofi-Prime Therapeutics Enterprise. Sanofi negotiated rebates with Prime Therapeutics for favorable formulary placement and entered into contracts with Prime Therapeutics that concealed both the extent of those rebates and the price protection that Sanofi provided Prime Therapeutics.  Prime Therapeutics represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Sanofi-Prime Therapeutics Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its list prices.  Sanofi and Prime Therapeutics could not have successfully conducted the activities of the Sanofi-Prime Therapeutics Enterprise individually.

275.  The Sanofi-Prime Therapeutics Enterprise is on-going and has been in existence for all times relevant to this complaint.  Prime Therapeutics continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra,

and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays Prime Therapeutics.  Prime Therapeutics also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

276.    To accomplish this conduct, and to further the goals of the Sanofi-Prime Therapeutics Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their Lantus, Apidra, and Toujeo products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

277.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with Prime Therapeutics.  Sanofi repeatedly communicated with Prime Therapeutics regarding Sanofi's list prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect Prime Therapeutics from increases in Sanofi's list prices.

278.    Sanofi then published deceptive, misleading, and misrepresentative list prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Sanofi knew

that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo. In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid Prime Therapeutics for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices. Instead, by publishing only its list prices, Sanofi represented that these prices constituted a fair and accurate price for its Lantus, Apidra, and Toujeo products.

279.    It was also foreseeable to Sanofi that Prime Therapeutics would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

280.    The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and Prime Therapeutics, working throughout the country and were repeatedly sent across state lines.

281.    Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive list prices for Lantus, Apidra, and Toujeo, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to Prime Therapeutics.  This pattern of racketeering conduct is separate and distinct from the Sanofi-Prime Therapeutics Enterprise.  Sanofi is a separate and distinct entity from the Sanofi-Prime Therapeutics Enterprise.

282.    Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

283.   Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

284.   As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Sanofi set and publicly disseminated.  Sanofi also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

285.   Because Sanofi published deceptive and misleading list prices for the purpose of marketing greater rebates to Prime Therapeutics and inflated its list prices to preserve the net prices that it charged Prime Therapeutics, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus, Apidra, and Toujeo.  But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

286.   Though the conduct of the Sanofi-Prime Therapeutics Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their

respective PBMs, the list prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

287.   Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

288.   Sanofi is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT IX
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
### (AS TO ELI LILLY)

289.   The State of Minnesota re-alleges all prior paragraphs of this Complaint.

290.   Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

291.   PBM CVS is a person as defined by 18 U.S.C. § 1961(3).

292.   Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

293.   At all times relevant to this complaint, Eli Lilly and CVS constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Eli Lilly-CVS Enterprise."

294.   The Eli Lilly-CVS Enterprise consists of an association-in-fact between Eli Lilly, including its employees, directors, and agents, and CVS, including its employees, directors, and agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent

scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Eli Lilly actually received for these products due to the rebates and other concessions made to CVS—including by arranging placements for these products on CVS's formularies through the negotiation of rebates, price protection factors, and discounts for these products with CVS, and through the exclusion of competing insulin products from CVS's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

295.    To accomplish the common purpose of the Eli Lilly-CVS Enterprise, the component entities, Eli Lilly and CVS, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the list price of HumaLog and Basaglar, the rebates that Eli Lilly would offer CVS for favorable formulary placement, and the price protection terms CVS demanded to protect against any increase in the list prices of HumaLog and Basaglar.

296.    The Eli Lilly-CVS enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of HumaLog and Basaglar which were sold throughout the United States and its territories.

297.    CVS participated in the conduct of the Eli Lilly-CVS Enterprise in a variety of ways, including, but not limited to:

      a.   Negotiating significant rebates from the list prices set by Eli Lilly for HumaLog and Basaglar;

      b.   Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates CVS would earn from the sale of those products;

      c.   Excluding competing insulin products from certain formularies in exchange for increased rebates;

    d.   Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Eli Lilly saved those clients and their members money;

    e.   Making material misrepresentations that the list prices that Eli Lilly published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

    f.   Concealing the actual rebates they earned from Eli Lilly from their clients and the general public, and therefore the net price Eli Lilly charged for these insulin products.

298.    CVS's conduct and participation is essential to the success of the enterprise.  For Eli Lilly to maintain its net prices for these products, it required CVS to select the products based on rebates offered, rather than list price.  It also required CVS to market to its health plan clients that these rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly. CVS's participation allowed Eli Lilly to inflate its list prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

299.    Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-CVS Enterprise by:

    a.   Setting deceptive, misleading, and misrepresentative list prices for its HumaLog and Basaglar insulin products;

    b.   Marketing to Eli Lilly the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;

    c.   Including price protection terms in its contracts with CVS, which allowed CVS to earn additional rebates when Eli Lilly increased its list prices;

    d.   Paying rebates to CVS for each prescription filled for HumaLog and Basaglar by a CVS health plan member;

    e.   Reporting to the general public and various price reporting services the list price of HumaLog and Basaglar while claiming that such prices were a true and fair representation of the actual price of those products;

    f.   Inflating the list price of HumaLog and Basaglar to account for the rebates that it paid to CVS; and

    g.   Concealing and misrepresenting the magnitude of the rebates that it paid to the CVS from the general public.

300.    The component entities are all willing and knowing participants in the Eli Lilly-CVS Enterprise. Eli Lilly negotiated rebates with CVS for favorable formulary placement and entered into contracts with CVS that concealed both the extent of those rebates and the price protection that Eli Lilly provided CVS. CVS represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Eli Lilly-CVS Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its list prices. Eli Lilly and CVS could not have successfully conducted the activities of the Eli Lilly-CVS Enterprise individually.

301.    The Eli Lilly-CVS Enterprise is on-going and has been in existence for all times relevant to this complaint. CVS continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Eli Lilly pays CVS. CVS also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

302.    To accomplish this conduct, and to further the goals of the Eli Lilly-CVS Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343. Eli Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the

intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5). The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their HumaLog and Basaglar products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods. It was carried out across state boundaries.

303.    Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with CVS. Eli Lilly repeatedly communicated with CVS regarding Eli Lilly's list prices, the rebates that Eli Lilly would provide in exchange for favorable formulary placement, and price protection agreements to protect CVS from increases in Eli Lilly's list prices.

304.    Eli Lilly then published deceptive, misleading, and misrepresentative list prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Eli Lilly knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for HumaLog and Basaglar. In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid CVS for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices. Instead, by publishing only its list prices, Eli Lilly represented that these prices constituted a fair and accurate price for its HumaLog and Basaglar products.

305.   It was also foreseeable to Eli Lilly that CVS would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

306.   The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Eli Lilly and CVS, working throughout the country and were repeatedly sent across state lines.

307.   Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive list prices for HumaLog and Basaglar, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to CVS.  This pattern of racketeering conduct is separate and distinct from the Eli Lilly-CVS Enterprise.  Eli Lilly is a separate and distinct entity from the Eli Lilly-CVS Enterprise.

308.   Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

309.   Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

310.   As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated.  Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount

spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Eli Lilly set and publicly disseminated.  Eli Lilly also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

311.    Because Eli Lilly published deceptive and misleading list prices for the purpose of marketing greater rebates to CVS and inflated its list prices to preserve the net prices that it charged CVS, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for HumaLog and Basaglar.  But for this conduct, Eli Lilly would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

312.    Though the conduct of the Eli Lilly-CVS Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Eli Lilly set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

313.    Eli Lilly's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

314.    Eli Lilly is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT X
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
## (AS TO ELI LILLY)

315.   The State of Minnesota re-alleges all prior paragraphs of this Complaint.

316.   Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

317.   PBM OptumRx is a person as defined by 18 U.S.C. § 1961(3).

318.   Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

319.   At all times relevant to this complaint, Eli Lilly and OptumRx constitute an enterprise as defined by 18 U.S.C. § 1961(4).   For purposes of this count, this enterprise are referred to as the "Eli Lilly-Optum Enterprise."

320.   The Eli Lilly-OptumRx Enterprise consists of an association-in-fact between Eli Lilly, including its employees, directors, and agents, and OptumRx, including its employees, directors, and agents.   The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Eli Lilly actually received for these products due to the rebates and other concessions made to OptumRx —including by arranging placements for these products on OptumRx's formularies through the negotiation of rebates, price protection factors, and discounts for these products with OptumRx, and through the exclusion of competing insulin products from OptumRx's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

94

321.  To accomplish the common purpose of the Eli Lilly-Optum Enterprise, the component entities, Eli Lilly and OptumRx, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the list price of HumaLog and Basaglar, the rebates that Eli Lilly would offer OptumRx for favorable formulary placement, and the price protection terms OptumRx demanded to protect against any increase in the list prices of HumaLog and Basaglar.

322.  The Eli Lilly-OptumRx enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of HumaLog and Basaglar which were sold throughout the United States and its territories.

323.  OptumRx participated in the conduct of the Eli Lilly-Optum Enterprise in a variety of ways, including, but not limited to:

    a.  Negotiating significant rebates from the list prices set by Eli Lilly for HumaLog and Basaglar;

    b.  Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates OptumRx would earn from the sale of those products;

    c.  Excluding competing insulin products from certain formularies in exchange for increased rebates;

    d.  Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Eli Lilly saved those clients and their members money;

    e.  Making material misrepresentations that the list prices that Eli Lilly published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

    f.  Concealing the actual rebates they earned from Eli Lilly from their clients and the general public, and therefore the net price Eli Lilly charged for these insulin products.

324.    OptumRx's conduct and participation is essential to the success of the enterprise. For Eli Lilly to maintain its net prices for these products, it required OptumRx to select the products based on rebates offered, rather than list price.  It also required OptumRx to market to its health plan clients that these rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly. OptumRx's participation allowed Eli Lilly to inflate its list prices, offer larger rebates to OptumRx to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

325.    Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-Optum Enterprise by:

   a.  Setting deceptive, misleading, and misrepresentative list prices for its HumaLog and Basaglar insulin products;

   b.  Marketing to Eli Lilly the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;

   c.  Including price protection terms in its contracts with OptumRx, which allowed OptumRx to earn additional rebates when Eli Lilly increased its list prices;

   d.  Paying rebates to OptumRx for each prescription filled for HumaLog and Basaglar by a OptumRx health plan member;

   e.  Reporting to the general public and various price reporting services the list price of HumaLog and Basaglar while claiming that such prices were a true and fair representation of the actual price of those products;

   f.  Inflating the list price of HumaLog and Basaglar to account for the rebates that it paid to OptumRx; and

   g.  Concealing and misrepresenting the magnitude of the rebates that it paid to the OptumRx from the general public.

326.    The component entities are all willing and knowing participants in the Eli Lilly-Optum Enterprise. Eli Lilly negotiated rebates with OptumRx for favorable formulary placement and entered into contracts with OptumRx that concealed both the extent of those rebates and the price protection that Eli Lilly provided OptumRx.  OptumRx represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Eli Lilly-Optum Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its list prices.  Eli Lilly and OptumRx could not have successfully conducted the activities of the Eli Lilly-OptumRx Enterprise individually.

327.    The Eli Lilly-Optum Enterprise is on-going and has been in existence for all times relevant to this complaint.  OptumRx continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Eli Lilly pays OptumRx.  OptumRx also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

328.    To accomplish this conduct, and to further the goals of the Eli Lilly-Optum Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Eli Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the

same purpose (i.e., inflating the list price of their HumaLog and Basaglar products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

329.    Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with OptumRx.  Eli Lilly repeatedly communicated with OptumRx regarding Eli Lilly's list prices, the rebates that Eli Lilly would provide in exchange for favorable formulary placement, and price protection agreements to protect OptumRx from increases in Eli Lilly's list prices.

330.    Eli Lilly then published deceptive, misleading, and misrepresentative list prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Eli Lilly knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for HumaLog and Basaglar. In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid OptumRx for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Eli Lilly represented that these prices constituted a fair and accurate price for its HumaLog and Basaglar products.

331.    It was also foreseeable to Eli Lilly that OptumRx would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

332.     The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.   They were made by numerous employees of Eli Lilly and OptumRx, working throughout the country and were repeatedly sent across state lines.

333.     Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive list prices for HumaLog and Basaglar, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to OptumRx.  This pattern of racketeering conduct is separate and distinct from the Eli Lilly-Optum Enterprise.  Eli Lilly is a separate and distinct entity from the Eli Lilly-Optum Enterprise.

334.     Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

335.     Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

336.     As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Eli Lilly set and publicly disseminated.  Eli Lilly also

knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

337.    Because Eli Lilly published deceptive and misleading list prices for the purpose of marketing greater rebates to OptumRx and inflated its list prices to preserve the net prices that it charged OptumRx, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for HumaLog and Basaglar.  But for this conduct, Eli Lilly would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

338.    Though the conduct of the Eli Lilly-Optum Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Eli Lilly set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

339.    Eli Lilly's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

340.    Eli Lilly is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

### COUNT XI
### RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
### (AS TO ELI LILLY)

341.    The State of Minnesota re-alleges all prior paragraphs of this Complaint.

342.    Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

343.    PBM ESI is a person as defined by 18 U.S.C. § 1961(3).

344.    Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

345.    At all times relevant to this complaint, Eli Lilly and ESI constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Eli Lilly-ESI Enterprise."

346.    The Eli Lilly-ESI Enterprise consists of an association-in-fact between Eli Lilly, including its employees, directors, and agents, and ESI, including its employees, directors, and agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Eli Lilly actually received for these products due to the rebates and other concessions made to ESI —including by arranging placements for these products on ESI's formularies through the negotiation of rebates, price protection factors, and discounts for these products with ESI, and through the exclusion of competing insulin products from ESI's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

347.    To accomplish the common purpose of the Eli Lilly-ESI Enterprise, the component entities, Eli Lilly and ESI, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the list price of HumaLog and Basaglar, the rebates that Eli Lilly would offer ESI for

favorable formulary placement, and the price protection terms ESI demanded to protect against any increase in the list prices of HumaLog and Basaglar.

348. The Eli Lilly-ESI enterprise affected interstate commerce. Through their respective negotiations, they determined the price of HumaLog and Basaglar which were sold throughout the United States and its territories.

349. ESI participated in the conduct of the Eli Lilly-ESI Enterprise in a variety of ways, including, but not limited to:

    a. Negotiating significant rebates from the list prices set by Eli Lilly for HumaLog and Basaglar;

    b. Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates ESI would earn from the sale of those products;

    c. Excluding competing insulin products from certain formularies in exchange for increased rebates;

    d. Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Eli Lilly saved those clients and their members money;

    e. Making material misrepresentations that the list prices that Eli Lilly published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

    f. Concealing the actual rebates they earned from Eli Lilly from their clients and the general public, and therefore the net price Eli Lilly charged for these insulin products.

350. ESI's conduct and participation is essential to the success of the enterprise. For Eli Lilly to maintain its net prices for these products, it required ESI to select the products based on rebates offered, rather than list price. It also required ESI to market to its health plan clients that these rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly. ESI's participation allowed Eli Lilly to inflate its list prices, offer

larger rebates to ESI to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

351.    Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-ESI Enterprise by:

> a. Setting deceptive, misleading, and misrepresentative list prices for its HumaLog and Basaglar insulin products;
>
> b. Marketing to Eli Lilly the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;
>
> c. Including price protection terms in its contracts with ESI, which allowed ESI to earn additional rebates when Eli Lilly increased its list prices;
>
> d. Paying rebates to ESI for each prescription filled for HumaLog and Basaglar by a ESI health plan member;
>
> e. Reporting to the general public and various price reporting services the list price of HumaLog and Basaglar while claiming that such prices were a true and fair representation of the actual price of those products;
>
> f. Inflating the list price of HumaLog and Basaglar to account for the rebates that it paid to ESI; and
>
> g. Concealing and misrepresenting the magnitude of the rebates that it paid to the ESI from the general public.

352.    The component entities are all willing and knowing participants in the Eli Lilly-ESI Enterprise. Eli Lilly negotiated rebates with ESI for favorable formulary placement and entered into contracts with ESI that concealed both the extent of those rebates and the price protection that Eli Lilly provided ESI.  ESI represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Eli Lilly-ESI Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its list prices.  Eli Lilly and ESI could not have successfully conducted the activities of the Eli Lilly-ESI Enterprise individually.

353.    The Eli Lilly-ESI Enterprise is on-going and has been in existence for all times relevant to this complaint.  ESI continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Eli Lilly pays ESI.  ESI also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

354.    To accomplish this conduct, and to further the goals of the Eli Lilly-ESI Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Eli Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their HumaLog and Basaglar products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

355.    Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with ESI.  Eli Lilly repeatedly communicated with ESI regarding Eli Lilly's list prices, the rebates that Eli Lilly would provide in exchange for favorable formulary placement, and price protection agreements to protect ESI from increases in Eli Lilly's list prices.

356.     Eli Lilly then published deceptive, misleading, and misrepresentative list prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated list prices to various price reporting services. Eli Lilly knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for HumaLog and Basaglar. In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid ESI for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices.  Instead, by publishing only its list prices, Eli Lilly represented that these prices constituted a fair and accurate price for its HumaLog and Basaglar products.

357.     It was also foreseeable to Eli Lilly that ESI would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

358.     The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Eli Lilly and ESI, working throughout the country and were repeatedly sent across state lines.

359.     Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive list prices for HumaLog and Basaglar, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to ESI.  This pattern of racketeering conduct is separate and distinct from the Eli Lilly-ESI Enterprise.  Eli Lilly is a separate and distinct entity from the Eli Lilly-ESI Enterprise.

360.    Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

361.    Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

362.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Eli Lilly set and publicly disseminated.  Eli Lilly also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

363.    Because Eli Lilly published deceptive and misleading list prices for the purpose of marketing greater rebates to ESI and inflated its list prices to preserve the net prices that it charged ESI, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for HumaLog and Basaglar.  But for this conduct, Eli Lilly would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

364.    Though the conduct of the Eli Lilly-ESI Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their respective PBMs, the list prices that Eli Lilly set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the list price on to patients.

365.    Eli Lilly's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

366.    Eli Lilly is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT XII**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO ELI LILLY)**

367.    The State of Minnesota re-alleges all prior paragraphs of this Complaint.

368.    Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

369.    PBM Prime Therapeutics is a person as defined by 18 U.S.C. § 1961(3).

370.    Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

371.    At all times relevant to this complaint, Eli Lilly and Prime Therapeutics constitute an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise are referred to as the "Eli Lilly-Prime Therapeutics Enterprise."

372.    The Eli Lilly-Prime Therapeutics Enterprise consists of an association-in-fact between Eli Lilly, including its employees, directors, and agents, and Prime Therapeutics,

107

including its employees, directors, and agents.  The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent scheme described in this complaint of publishing inflated list prices for these products that was not reasonably reflective of the secret, undisclosed net price that Eli Lilly actually received for these products due to the rebates and other concessions made to Prime Therapeutics —including by arranging placements for these products on Prime Therapeutics' formularies through the negotiation of rebates, price protection factors, and discounts for these products with Prime Therapeutics, and through the exclusion of competing insulin products from Prime Therapeutics' formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).

373.    To accomplish the common purpose of the Eli Lilly-Prime Therapeutics Enterprise, the component entities, Eli Lilly and Prime Therapeutics, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the list price of HumaLog and Basaglar, the rebates that Eli Lilly would offer Prime Therapeutics for favorable formulary placement, and the price protection terms Prime Therapeutics demanded to protect against any increase in the list prices of HumaLog and Basaglar.

374.    The Eli Lilly-Prime Therapeutics enterprise affected interstate commerce. Through their respective negotiations, they determined the price of HumaLog and Basaglar which were sold throughout the United States and its territories.

375.    Prime Therapeutics participated in the conduct of the Eli Lilly-Prime Therapeutics Enterprise in a variety of ways, including, but not limited to:

      a.  Negotiating significant rebates from the list prices set by Eli Lilly for HumaLog and Basaglar;

b.  Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates Prime Therapeutics would earn from the sale of those products;

c.  Excluding competing insulin products from certain formularies in exchange for increased rebates;

d.  Marketing formularies to their health plan clients and making material representations that the rebates they negotiated from Eli Lilly saved those clients and their members money;

e.  Making material misrepresentations that the list prices that Eli Lilly published were the true and fair prices of these insulin products and that those prices were a fair and accurate basis on which out-of-pocket payments should be based; and

f.  Concealing the actual rebates they earned from Eli Lilly from their clients and the general public, and therefore the net price Eli Lilly charged for these insulin products.

376.   Prime Therapeutics' conduct and participation is essential to the success of the enterprise.  For Eli Lilly to maintain its net prices for these products, it required Prime Therapeutics to select the products based on rebates offered, rather than list price.  It also required Prime Therapeutics to market to its health plan clients that these rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly. Prime Therapeutics' participation allowed Eli Lilly to inflate its list prices, offer larger rebates to Prime Therapeutics to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

377.   Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-Prime Therapeutics Enterprise by:

a.  Setting deceptive, misleading, and misrepresentative list prices for its HumaLog and Basaglar insulin products;

    b.  Marketing to Eli Lilly the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;

    c.  Including price protection terms in its contracts with Prime Therapeutics, which allowed Prime Therapeutics to earn additional rebates when Eli Lilly increased its list prices;

    d.  Paying rebates to Prime Therapeutics for each prescription filled for HumaLog and Basaglar by a Prime Therapeutics health plan member;

    e.  Reporting to the general public and various price reporting services the list price of HumaLog and Basaglar while claiming that such prices were a true and fair representation of the actual price of those products;

    f.  Inflating the list price of HumaLog and Basaglar to account for the rebates that it paid to Prime Therapeutics; and

    g.  Concealing and misrepresenting the magnitude of the rebates that it paid to the Prime Therapeutics from the general public.

378. The component entities are all willing and knowing participants in the Eli Lilly-Prime Therapeutics Enterprise. Eli Lilly negotiated rebates with Prime Therapeutics for favorable formulary placement and entered into contracts with Prime Therapeutics that concealed both the extent of those rebates and the price protection that Eli Lilly provided Prime Therapeutics. Prime Therapeutics represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Eli Lilly-Prime Therapeutics Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its list prices. Eli Lilly and Prime Therapeutics could not have successfully conducted the activities of the Eli Lilly- Prime Therapeutics Enterprise individually.

379. The Eli Lilly- Prime Therapeutics Enterprise is on-going and has been in existence for all times relevant to this complaint. Prime Therapeutics continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding

HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Eli Lilly pays Prime Therapeutics.  Prime Therapeutics also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

380.    To accomplish this conduct, and to further the goals of the Eli Lilly-Prime Therapeutics Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Eli Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud Plaintiff State of Minnesota, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the list price of their HumaLog and Basaglar products and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.   It was carried out across state boundaries.

381.    Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with Prime Therapeutics.  Eli Lilly repeatedly communicated with Prime Therapeutics regarding Eli Lilly's list prices, the rebates that Eli Lilly would provide in exchange for favorable formulary placement, and price protection agreements to protect Prime Therapeutics from increases in Eli Lilly's list prices.

382.    Eli Lilly then published deceptive, misleading, and misrepresentative list prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit

information regarding those inflated list prices to various price reporting services. Eli Lilly knew that other entities, including retail pharmacies, would rely on those prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for HumaLog and Basaglar. In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid Prime Therapeutics for favorable formulary placements, nor did it disclose the substantial difference between its list prices and net prices. Instead, by publishing only its list prices, Eli Lilly represented that these prices constituted a fair and accurate price for its HumaLog and Basaglar products.

383.     It was also foreseeable to Eli Lilly that Prime Therapeutics would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

384.     The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Eli Lilly and Prime Therapeutics, working throughout the country and were repeatedly sent across state lines.

385.     Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive list prices for HumaLog and Basaglar, avoid competing on list price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to Prime Therapeutics.  This pattern of racketeering conduct is separate and distinct from the Eli Lilly-Prime Therapeutics Enterprise.  Eli Lilly is a separate and distinct entity from the Eli Lilly-Prime Therapeutics Enterprise.

386.     Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

387.    Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State of Minnesota's residents and the Minnesota Department of Corrections, all of whom have paid inflated prices for insulin products.

388.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading list price that Eli Lilly set and publicly disseminated.  Eli Lilly also knew that payments by these persons were based directly on the list price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading list prices.

389.    Because Eli Lilly published deceptive and misleading list prices for the purpose of marketing greater rebates to Prime Therapeutics and inflated its list prices to preserve the net prices that it charged Prime Therapeutics, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for HumaLog and Basaglar.  But for this conduct, Eli Lilly would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

390.    Though the conduct of the Eli Lilly-Prime Therapeutics Enterprise was primarily for the purpose of securing favorable formulary placements for various health plans through their

respective PBMs, the list prices that Eli Lilly set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the list price on to patients.

391. Eli Lilly's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1961, *et seq*.

392. Eli Lilly is therefore liable for treble the damage suffered by Plaintiff State of Minnesota's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT XIII
## CONSUMER FRAUD
## (AS TO ALL DEFENDANTS)

393. The State of Minnesota re-alleges all prior paragraphs of this Complaint.

394. Minnesota Statutes section 325F.69, subdivision 1, provides that:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

395. The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes goods and objects. Minn. Stat. § 325F.68, subd. 2.

396. Defendants have repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive practices described in this Complaint. Defendants knowingly and purposefully increased their list prices so that they could offer undisclosed higher rebates to PBMs, thereby allowing Defendants to retain preferred formulary access for their insulin products without reducing the net price of their products. Because of Defendants' conduct, the undisclosed difference between their list prices and their net prices is so substantial

that their list prices do not reasonably approximate the actual price Defendants charge for their insulin products.   By nevertheless publishing their deceptive and misleading list prices Defendants represented that they were a reasonable approximation of the actual price they charge for their insulin products, and Defendants' public dissemination of these deceptive and misleading list prices is thus a deceptive practice.

397.    Defendants knew, as described in this complaint, that the list prices they published would be used as a benchmark and to determine the price that Minnesota: (1) consumers without insurance; (2) consumers with high-deductible plans; (3) consumers who are Medicare Part D beneficiaries; (4) consumers who pay coinsurance as part of their health plan; and (5) the Minnesota Department of Corrections would pay for their insulin.   Because of Defendants' deceptive and misleading pricing practices, these persons and entities paid more for insulin than they otherwise would have, thereby causing them harm and enriching Defendants.

398.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.69.

## COUNT XIV
## DECEPTIVE TRADE PRACTICES
## (AS TO ALL DEFENDANTS)

399.    The State of Minnesota re-alleges all prior paragraphs of this Complaint.

400.    Minnesota Statutes section 325D.44, subdivision 1, provides, in part, that:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

***

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

*** ; or

(13) engages in any other conduct which similarly creates a
likelihood of confusion or of misunderstanding.

401.    Defendants have repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by engaging in the deceptive practices described in this Complaint.  Defendants knowingly and purposefully increased their list prices so that they could offer undisclosed higher rebates to PBMs, thereby allowing Defendants to retain preferred formulary access for their insulin products without reducing the net price of their products.  Because of Defendants' conduct, the undisclosed difference between their list prices and their net prices is so substantial that their list prices do not reasonably approximate the actual price Defendants charge for their insulin products.  By nevertheless publishing these deceptive and misleading list prices Defendants represented that they were a reasonable approximation of the actual price they charge for their insulin products, and Defendants' public dissemination of these deceptive and misleading list prices is thus a deceptive practice.  Defendants publishing of their deceptive list prices was also a misleading statement about the existence of and/or amount of the price reductions that Defendants offered on their insulin products to PBMs in the form of rebates. Defendants' publishing of their deceptive and misleading prices created a likelihood of confusion and misunderstanding among the Minnesota persons and entities referenced in the next paragraph regarding the actual price that they charge for their insulin products.

402.    Defendants knew, as described in this complaint, that the list prices they published would be used as a benchmark and to determine the price that Minnesota: (1) consumers without insurance; (2) consumers with high-deductible plans; (3) consumers who are Medicare Part D beneficiaries; (4) consumers who pay coinsurance as part of their health plan; and (5) the Minnesota Department of Corrections would pay for their insulin.  Because of

Defendants' deceptive and misleading pricing practices, these persons and entities paid more for insulin than they otherwise would have, thereby causing them harm and enriching Defendants.

403.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

### COUNT XV
### FALSE ADVERTISING
### (AS TO ALL DEFENDANTS)

404.    The State of Minnesota re-alleges all prior paragraphs in this Complaint.

405.    Minnesota Statutes section 325F.67 provides that:

> Any person, firm, corporation, or association who, with intent to sell or in anywise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation, or association, directly or indirectly, to the public, for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an advertisement of any sort regarding merchandise, securities, service, or anything so offered to the public, for use, consumption, purchase, or sale, which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

406.    Defendants have repeatedly violated Minnesota Statutes section 325F.67 by causing their deceptive and misleading list prices to be publicly disseminated and published, including in price reporting services.  Defendants knowingly and purposefully increased their list prices so that they could offer undisclosed higher rebates to PBMs, thereby allowing Defendants to retain preferred formulary access for their insulin products without reducing the net price of

their products.  Because of Defendants' conduct, the undisclosed difference between their list prices and their net prices is so substantial that their list prices do not reasonably approximate the actual price Defendants charge for their insulin products.  By nevertheless publishing these deceptive and misleading list prices Defendants represented that they were a reasonable approximation of the actual price they charge for their insulin products, and Defendants' public dissemination of these deceptive and misleading list prices is thus a deceptive practice.

407.    Defendants knew, as described in this complaint, that the list prices they published would be used as a benchmark and to determine the price that Minnesota: (1) consumers without insurance; (2) consumers with high-deductible plans; (3) consumers who are Medicare Part D beneficiaries; (4) consumers who pay coinsurance as part of their health plan; and (5) the Minnesota Department of Corrections would pay for their insulin.  Because of Defendants' deceptive and misleading pricing practices, these persons and entities paid more for insulin than they otherwise would have, thereby causing them harm and enriching Defendants.

408.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.67.

## COUNT XVI
## UNJUST ENRICHMENT
## (AS TO ALL DEFENDANTS)

409.    The State of Minnesota realleges all prior paragraphs in this Complaint.

410.    The State of Minnesota's residents and the Minnesota Department of Corrections conferred a benefit on Defendants by purchasing their insulin products at a price based on Defendants' deceptive and misleading inflated list price for the products.

411.    Defendants knowingly accepted and retained such benefits.

412.    Defendants' acceptance and retention of such benefits under the circumstances would be unjust and inequitable, given that the State of Minnesota's residents and the Minnesota Department of Corrections paid prices far higher than the actual net price at which Defendants sold insulin.

413.    Defendants' conduct constitutes unjust enrichment under Minnesota common law, for which, as a matter of equity, they should not derive any gain and/or the State of Minnesota's residents and the Minnesota Department of Corrections should be made whole.

414.    Pursuant to the common law pertaining to unjust enrichment and the State's inherent *parens patriae* authority, the State is entitled to injunctive relief, disgorgement and/or restitution, and other legal and/or equitable relief for Defendants' conduct resulting in unjust enrichment.

## RELIEF

The State of Minnesota, by its Attorney General, Lori Swanson, respectfully asks this Court to enter judgment against Defendants awarding the following relief:

415.    Declaring that Defendants' acts described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1962(c), Minnesota Statutes sections 325D.44, 325F.67, and 325F.69, and unjustly enriched Defendants;

416.    Enjoining Defendants and their employees, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in the unlawful acts described in this Complaint or in any other way violating 18 U.S.C. § 1962(c) or Minnesota Statutes sections 325D.44, 325F.67, or 325F.69, including enjoining Defendants from publishing or otherwise disseminating deceptive or misleading list prices for their insulin products;

119

417.    Awarding the State of Minnesota, its residents, and the Minnesota Department of Corrections monetary relief, including damages, restitution, disgorgement, and/or all other available legal and equitable monetary remedies available under 18 U.S.C. § 1964 and Minnesota Statutes sections 8.31, the *parens patriae* doctrine, Minnesota common law, and the general equitable powers of this Court, as necessary to remedy the harm from Defendant's acts described in this Complaint;

418.    Awarding civil penalties pursuant to Minnesota Statutes section 8.31, subdivision 3, for each separate violation of Minnesota law;

419.    Awarding the State of Minnesota its attorneys' fees, litigation costs, and costs of investigation, as authorized by 18 U.S.C. § 1964(c) and Minnesota Statutes section 8.31, subdivision 3a; and

420.    Granting such further relief as provided by law or equity, or as the Court deems appropriate and just.

**LITE DEPALMA GREENBERG, LLC**

Dated: October 16, 2018          _/s/ Jeremy Nash_
                                 Jeremy Nash
                                 570 Broad Street, Suite 1201
                                 Newark, NJ 07102
                                 Telephone: (973) 623-3000
                                 Facsimile: (973) 623-0858
                                 jnash@litedepalma.com

**STATE OF MINNESOTA**

LORI SWANSON
Attorney General
State of Minnesota

JAMES W. CANADAY
Deputy Attorney General

BENJAMIN VELZEN (*pro hac vice* pending)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2134
Telephone: (651) 757-1235
Facsimile: (651) 296-7438
benjamin.velzen@ag.state.mn.us

JUSTIN MOOR (*pro hac vice* pending)
Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2134
Telephone: (651) 757-1060
Facsimile: (651) 296-9663
justin.moor@ag.state.mn.us

***Attorneys for State of Minnesota***