**LITE DEPALMA GREENBERG, LLC**
Jeremy Nash
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jnash@litedepalma.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF MINNESOTA, BY ITS ATTORNEY GENERAL, KEITH ELLISON, | Civil Action No.: 18-cv-14999-BRM-LHG |
| *Plaintiff,* | |
| v. | **FIRST AMENDED COMPLAINT** |
| SANOFI-AVENTIS U.S. LLC, NOVO NORDISK, INC., AND ELI LILLY AND CO., | |
| *Defendants.* | |

The State of Minnesota, by its Attorney General, Keith Ellison ("State" or "AGO"), for its Complaint against Sanofi-Aventis U.S. LLC, Novo Nordisk, Inc., and Eli Lilly and Co. (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.     Hundreds of thousands of Minnesota residents live with diabetes.  For many of them, analog insulin products are their best hope for treating this chronic disease.  These patients spend significant sums of money to purchase this medication.

2.       Defendants are three of the largest insulin manufacturers in the world.  They set two different prices for their analog insulin products.  The first, often colloquially referred to as Defendants' "benchmark" or "list" price, is directly set by Defendants and published by a number of price reporting services.  The second, typically labeled the "net" price, is the *actual* price that Defendants negotiate with pharmacy benefit managers ("PBMs"), which is confidential and not publicly disclosed.  PBMs are companies that manage prescription drug benefits for health plans and self-insured employers.  Defendants negotiate the net price by offering rebates to PBMs in exchange for the PBM covering the drug on behalf of health plan members.  Ostensibly, PBMs are supposed to pass on these rebates to their health plan clients, which then use them to lower their health plan members' out-of-pocket expenses.  In theory, the rebates Defendants pay PBMs should thus result in lower health care costs.

3.       In reality, however, the opposite has happened.  In recent years, the price of analog insulin has skyrocketed.  Rather than compete to offer the lowest prices for their products, as one would expect in a competitive market, Defendants compete to offer the largest rebates to PBMs.  In order to do so while still maintaining their profit margins, Defendants publish and disseminate deceptively and misleadingly inflated benchmark prices for their products, which allow them to offer higher rebates to PBMs while still earning approximately the same, secret net price that they previously received.  Defendants do not disclose to the public the amount they pay to PBMs in rebates, or the fact that their benchmark prices are no longer accurate representations of the actual price Defendants receive for analog insulin.  The difference between Defendants' deceptive benchmark prices and the net price that they actually receive for their insulin is often colloquially referred to as the "spread" between the prices.

4.     Defendants have harmed those whose payments for insulin are based on Defendants' deceptive, misleading, and misrepresentative benchmark prices.  This includes Minnesota residents without insurance, Minnesota residents with high-deductible health plans, Minnesota residents who pay coinsurance, Minnesota Medicare beneficiaries, and the Minnesota Department of Corrections, all of whom have paid more for a life-saving medication because of Defendants' conduct.  The State brings this action to enjoin Defendants from continuing their deceptive drug pricing practices, to collect monetary relief for its residents and the Minnesota Department of Corrections, and to impose civil penalties against Defendants.

## PARTIES

5.     Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8; the Uniform Deceptive Trade Practices Act, Minnesota Statutes sections 325D.43–.48; the Consumer Fraud Act, Minnesota Statutes sections 325F.68-.694; the False Statement in Advertising Act, Minnesota Statutes section 325F.67; and has common law authority, including *parens patriae* authority, to bring this action to enforce Minnesota's laws, to vindicate the State's sovereign and quasi-sovereign interests in the integrity of its marketplace and the health and economic well-being of its residents, and to remediate all harm arising out of—and provide full relief for—violations of Minnesota and federal law.

6.     Novo Nordisk, Inc. ("Novo Nordisk") is a Delaware corporation and has a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

7.     Sanofi-Aventis U.S. LLC ("Sanofi") is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

8.     Eli Lilly and Company ("Eli Lilly") is an Indiana corporation and has a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

## JURISDICTION AND VENUE

9.      This Court's jurisdiction arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 and 1964, and 28 U.S.C. §§ 1331 and 1337.

10.      Defendants all transact substantial business in the District of New Jersey and/or are found in the District of New Jersey and are thus subject to personal jurisdiction therein. Venue therefore is proper in this District under 28 U.S.C. § 1391(b) and (c).

11.      Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over the State's claims brought under Minn. Stat. §§ 325D.44, 325F.67, and 325F.69, as well as its claim brought under Minnesota common law.

## FACTUAL BACKGROUND

### THE IMPACT OF DIABETES.

12.      According to the American Diabetes Association, approximately 445,000 people, or nearly 10 percent of Minnesota residents, have diabetes.[1] Over 1.4 million additional adults— more than one-third of the adult population in Minnesota—have blood glucose levels that are higher than normal, but not high enough to be diagnosed as diabetes.[2] Every year, an additional 19,000 new cases of diabetes are diagnosed in Minnesota.[3]

13.      Patients diagnosed with diabetes must cope with a rigorous and invasive treatment schedule.  Many have to undergo daily injection therapy, constant monitoring of their blood glucose levels, and adherence to a strict diet.

---

[1]  *The Burden of Diabetes in Minnesota*, American Diabetes Association, *available at* http://main.diabetes.org/dorg/assets/pdfs/advocacy/state-fact-sheets/Minnesota2018.pdf (last accessed October 10, 2018).
[2]  *Id.*
[3]  *Id.*

4

14.     Insulin treatments are a necessary part of life for those who have diabetes.  Insulin is a hormone usually made by the pancreas that allows a person's body to process glucose from carbohydrates in food.  Patients diagnosed with type 1 diabetes are unable to make insulin and require insulin injections to allow their bodies to process glucose.  People with type 2 diabetes do not respond well or are resistant to insulin.  They often require insulin shots to help process sugar and prevent long-term complications from diabetes.

15.     Insulin was first discovered in 1922, when researchers used insulin from animals to provide treatment to diabetic patients.  To ensure insulin would be open and available to the public, the scientists who created this method for insulin treatments sold the original patent for $1 to the University of Toronto.

16.     Over time, scientists discovered ways to produce human insulin as well as treatments that would last longer and improve the dosage strength of their products.  By the mid-1990s, scientists had created man-made, or analog, insulin, which could be adjusted to allow for different absorption times and more effective management of blood sugar.  Analog insulins now dominate the market and are the preferred method of treatment for both type 1 and type 2 diabetes patients.

17.     There are currently both rapid-acting and long-acting forms of analog insulin available.  Rapid-acting insulin starts working approximately 15 minutes after injection and continues to work for two to four more hours.  Patients normally take rapid-acting insulin before a meal, and usually in conjunction with long-acting insulin.  Current rapid-acting analog insulin products include Humalog, manufactured by Eli Lilly; NovoLog and Fiasp, manufactured by Novo Nordisk; and Apidra, manufactured by Sanofi.  All of these insulin products are branded drugs.  Rapid-acting analogues make up approximately 35 percent of the insulin market.

18.     Long-acting insulin begins working several hours after injection and lasts approximately 24 hours.  Until recently, only two long-acting insulin analog products were available:  Lantus, manufactured by Sanofi; and Levemir, manufactured by Novo Nordisk.  Over the last two years, however, Sanofi has released a new product, Toujeo, and Novo Nordisk has also released a product, Tresiba.  Eli Lilly has also released Basaglar, a follow-on biologic of Lantus.  All of these insulin products are likewise branded drugs.  Long-acting insulin analog products make up approximately 50 percent of the insulin market.

19.     Because of the deceptive, misleading, and misrepresentative benchmark prices that Defendants have published, many patients now have to deal with the exorbitant costs of their insulin. Since 2008, Defendants have increased the benchmark price of their analog insulin products at least 10 times.  The benchmark price of a 10-milliliter vial of Lantus, which was $99.35 in 2010, is now $269.54.  The benchmark price of a vial of Levemir, which was $113.81 in 2008, is now $293.75.

20.     The price of rapid-acting insulins has also increased dramatically.  The benchmark price of a vial of the most popular rapid-acting insulin, NovoLog, was $132.74 in 2008.  Today, it lists for $289.36.  Similarly, a vial of Humalog, priced at $122.60 in 2011, now has a benchmark price of $274.70.  The benchmark price of Apidra, another rapid-acting insulin, was $93.05 in 2010.  It now is listed at $269.91.

21.     The following charts show the manner in which Defendants' benchmark prices have increased over the past several years:











22.     These price increases are not tied to any meaningful change or improvement to Defendants' products.  In fact, Defendants have made no meaningful improvement to their products since they introduced them to the market.

23.     Such price spikes most impact those who cannot afford them: the uninsured, those with high-deductible health insurance, and the elderly operating on limited budgets.  The resulting financial burden to patients is also substantial.  In Minnesota, patients with diabetes have medical expenses that are approximately 3.2 times higher than those without the disease,

according to a report from the Minnesota Department of Health.[4]   Total diabetes-related expenses in Minnesota now exceed $4 billion on an annual basis.

24.     Pharmaceutical costs are largely to blame for the spike in diabetes-related expenses.  Per-person *medical* costs related to the treatment of diabetes in Minnesota actually declined more than 14% between 2009 and 2014, according to a Minnesota Department of Health report.[5]  During the same time period, however, per-person *pharmacy* costs related to the treatment of diabetes in Minnesota residents increased more than 36%, with the costs for those between the ages of 18 and 64 increasing more than 52%.[6]   Total diabetes-related pharmacy spending in Minnesota is projected to increase an additional 30% by the year 2023.[7]

25.     Some patients are unable to access insulin products because of high insulin prices. Some simply cannot afford to keep up with their treatment.  One Minnesota physician reported that he now spends more time discussing with his patients what insulin they can afford, rather than determining what insulin will best treat the patient.  To help patients cope with high prices, some doctors now prescribe their patients older forms of insulin, which are not as effective. Other patients forgo insulin treatment.

26.     Patients who do not take their prescribed dose of insulin face increased risks of kidney dialysis, heart attacks, nerve damage, amputation, and ketoacidosis.  They end up with more doctor visits, hospitalizations, and medications.  This increases their medical expenses even more.

---

[4]  Minnesota Department of Health, *Treated Chronic Disease Costs in Minnesota – a Look Back and a Look Forward* (Dec. 2017), available at http://www.health.state.mn.us/divs/hpsc/hep/chronicdisease.pdf.
[5]  *Id.*
[6]  *Id.*
[7]  *Id.*

**MANY MINNESOTA PATIENTS STILL PAY FOR THE DRUGS THEY NEED OUT-OF-POCKET.**

27.     Pharmacies distribute drugs to patients.  If the patient does not have health insurance, the patient may be required to pay the entire price of the drug out-of-pocket. Typically, pharmacies refer to the price they charge cash-paying customers as the "Usual and Customary Charge," or more informally their "cash price."  A pharmacy's cash price for insulin is directly connected to Defendants' benchmark prices for insulin, as discussed further below.

28.     If the patient has health insurance, both the patient and the health plan may partially reimburse the pharmacy for the drug.  The patient's share of the reimbursement may be either a flat fee, known as a copay, or a percentage of the drug's price, known as coinsurance. The health plan's share of the fee paid to the pharmacy is based on its contract with the pharmacy, or its PBM's contract with the pharmacy.  Patients indirectly subsidize the health plan's share of the fee by paying monthly premiums to the health plan in exchange for coverage.

29.     Many patients are covered by health plans with an annual deductible.  Patients with such a plan do not receive any contribution toward pharmaceutical costs from their health plan until they have paid the amount of their deductible out-of-pocket.  For example, a patient with a $500 deductible must pay his or her first $500 worth of medical expenses before the health plan provides coverage.  Once the patient has satisfied the deductible, the health plan will generally pay the remainder of the consumer's medical costs, minus the copay or coinsurance amount.

30.     As health insurance costs increase, employers and individuals have turned increasingly to high-deductible plans as a way to reduce the premiums they must pay.  IRS regulations define a high deductible health plan as any plan with a deductible of at least $1,350

for an individual or $2,700 for a family.  More than 16% of Minnesota residents are now covered by such a plan, according to a survey by America's Health Insurance Plans.

**DEFENDANTS PUBLISH PRICES FOR THEIR INSULIN PRODUCTS THAT THEY KNOW WILL BE USED AS BENCHMARKS TO ESTABLISH THE PRICES THAT ARE SUBSEQUENTLY CHARGED TO PATIENTS.**

31.     Drug manufacturers, including Defendants, generally directly set a price for their products, referred to as the Wholesale Acquisition Cost ("WAC").  WAC is the approximate price at which a manufacturer sells a drug to a wholesale drug distributor.  Importantly, however, WAC does not include any rebates or other discounts the manufacturer provides to a PBM regarding the drug, which reduces the *actual* price a manufacturer receives for the drug.  Wholesale drug distributors typically mark-up a manufacturer's WAC before they sell the products to pharmacies.

32.      The manufacturer-set WAC is generally used to establish a product's Average Wholesale Price ("AWP").  AWP is either also directly set by the manufacturer, or is established by adding a certain mark-up to the manufacturer's WAC price, usually around 20%.  In other words, AWP is merely a mathematical function of WAC and a manufacturer setting WAC also effectively sets AWP.  WAC/AWP are often colloquially referred to as drug manufacturers' "list" or "benchmark" prices.

33.     At the time of its inception, AWP was intended to represent the average price at which drug wholesalers sell medications to pharmacies, physicians, and other customers.  Today, AWP is used as a benchmark for calculating the price at which health plans (or their PBMs on their behalf) reimburse pharmacies for prescriptions that they fill for plan members.  Generally, for brand-name products like Defendants' insulin, PBMs will reimburse pharmacies the AWP of a product, minus a certain percent, plus a dispensing fee.

34.     Defendants disseminate and publish the benchmark prices they set for their products, including insulin, with a variety of reporting services for further public dissemination. These reporting services make no independent effort to verify the price that any entity actually receives for the drugs, and instead rely solely on Defendants' representations about the price they receive.  Defendants know, however, that many other entities rely on the publications containing the benchmark prices they have disseminated to reporting services to set their own prices. Indeed, many PBMs expressly rely on these published benchmark prices to determine the reimbursement rates that they pay to pharmacies.

35.     Defendants further publish their benchmark prices in various promotional and marketing materials, in addition to with price reporting services.

36.     Defendants thus set and publicly disseminate their list prices knowing that these prices directly operate as a benchmark that health plans/PBMs, wholesalers, and pharmacies will use to set the prices that they charge (or rates they reimburse) when a Minnesota patient purchases Defendants' insulin.  Accordingly, if Defendants raise their benchmark prices they know this will directly cause the prices paid by certain Minnesota patients and others who purchase insulin out-of-pocket to increase, as well as causing coinsurance payments to increase. This remains true *regardless* of any mark ups that may be added to Defendants' benchmark prices by wholesalers or pharmacies, or any insurer's alteration of coinsurance amounts, because Defendants' benchmark prices are the lodestar for the price charged during all subsequent sales of insulin.

**PBMS LEVERAGE THEIR ABILITY TO DRIVE DEMAND FOR COMPETING DRUGS TO EXTRACT REBATES FROM DEFENDANTS THAT REDUCE THE PRICE DEFENDANTS' RECEIVE FOR THEIR INSULIN.**

37.     Most health plans hire PBMs to manage their members' pharmaceutical benefits. PBMs create contractual networks of pharmacies on behalf of their health plan clients and negotiate the rates at which the health plans reimburse pharmacies in the PBMs' networks for the prescriptions the pharmacies fill.

38.     Three large PBMs control most of the market:  Express Scripts, Inc. ("Express Scripts"), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, OptumRx, Inc. ("OptumRx"), a California Company with a principal place of business located at 2300 Main Street, Irvine, California, 92614, and CVS Health Corporation ("CVS"), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895.  In Minnesota, Prime Therapeutics LLC ("Prime Therapeutics"), a Delaware Limited Liability Corporation with a principal place of business located at 1305 Corporate Center Drive, Eagan, Minnesota 55121, is owned in part by Blue Cross and Blue Shield of Minnesota and also serves a substantial portion of the market.

39.     PBMs also create drug "formularies" for their health plan clients.  A drug formulary is industry jargon for a list of prescription drugs for which the health plan will reimburse pharmacies on behalf of the plan's members.  If a drug is not included on a formulary, the health plan generally will not cover it.  If a doctor prescribes a drug to a patient that is not on the formulary, the patient must generally pay the entire cost of the drug out-of-pocket.

40.     For many years, PBMs included nearly all available drugs in their formularies. Recently, PBMs began to ███████████████████ by ██████████████████ ████████████████████████████████████████. PBMs began ████████

████████████████████████████████████████████████ to ostensibly ████████

████████████████████████████.[8]  Through such conduct, PBMs have thus become

important drivers of demand for competing drugs made by different manufacturers—including

Defendants and their insulin products—by giving a particular manufacturer's drug favorable (or

unfavorable) treatment on their formularies.

41.  Today, this has led to manufacturers obtaining placement of their products on

PBMs' formularies by paying rebates to PBMs in exchange for favorable formulary treatment.

These rebates are typically calculated by taking a percentage of the drug's benchmark price and

multiplying it by the number of health plan members who utilized that drug in a given time

period.  So, for example, if a drug had a benchmark price of $100 and the manufacturer agreed to

a 10% rebate, the manufacturer would pay the PBM $10 for every health plan member who

purchased the drug during the relevant time period.  PBMs collect these rebates, retain all or a

portion of them as compensation for their services, and distribute the remainder, if any, to their

health plan clients.  PBMs claim to lower their health plan clients' prescription drug costs by

negotiating these rebates.

42.  Manufacturers usually offer PBMs larger rebates for giving their product

preferred status over a competing one.  Preferred status often means a health plan's member will

pay less out-of-pocket for one drug compared to another competing drug.  In some cases, it may

mean that the PBM will exclude a competing drug from its formulary altogether and only

provide coverage for the preferred product. The greater the preference the PBM gives a

particular drug on its formulary, the more the manufacturer will pay the PBM in rebates.

---

[8] Since 2014, the number of drugs that PBMs have excluded from their formularies has increased by nearly 65%. *Formulary exclusions rising for drug makers*, Decision Resources Group, *available at* https://decisionresourcesgroup.com/drg-blog/health-reform/formulary-exclusions-rising-drug-makers/ (June 10, 2016). From ████████, the total rebates secured by one large PBM, ████, increased from ████████ to ████████.

Because of this dynamic, PBMs generally make formulary decisions—and thus drive demand for a drug among the health plan members that the PBM services—based on which manufacturer offers the most favorable rebate terms to the PBM.

43.     Neither manufacturers or PBMs disclose the amount or nature of the rebates paid for favorable formulary placement, including to wholesalers and pharmacies.  They closely guard this information and consider it to be a "trade secret."  Health plans know the price pharmacies are reimbursed for a given drug, as well as the amount of the rebate the PBM passes along to the health plan for the drug, but they often do not know the total rebate for the drug that the PBM is paid by a manufacturer.  This is because PBMs generally do not disclose the portion of the rebate that they retain before passing on the balance (if they pass on any balance at all) to their health plan clients.

44.     Given these circumstances, neither health plans or the public knows the true prices that PBMs have negotiated with pharmacies when a health plan member purchases a manufacturer's drug.  Similarly, after taking into account the rebates they pay, the actual or "net" sales price a manufacturer receives when selling a drug is concealed from and not known by wholesalers, pharmacies, health plans, or the public.  Thus, the only information regarding Defendants' insulin prices that are publicly available to patients are Defendants' published benchmark prices.

**THE REBATES DEFENDANTS PAY TO PBMS BASED ON SALES OF THEIR INSULIN PRODUCTS HAVE INCREASED DRAMATICALLY OVER THE YEARS.**

45.     The complex system by which health plans reimburse pharmacies through their PBMs and also receive a portion of any manufacturer rebate through their PBMs—with little if any transparency into manufacturer side of these arrangements—has resulted in a system that Defendants have exploited for their benefit.

46.     Defendants' analog insulin products are largely interchangeable and PBMs do not have to include each analog insulin product in their formularies.  Typically, to satisfy their health plan clients' needs, PBMs must include one long-acting insulin (until recently, either Sanofi's Lantus or Novo Nordisk's Levemir) and one rapid-acting insulin (Sanofi's Apidra, Novo Nordisk's NovoLog or Fiasp, or Eli Lilly's Humalog).

47.     It is important to Defendants that their drugs be included on PBMs' formularies. Patients are unlikely to use Defendants' products if their health plan does not cover it. Defendants sell more, and earn more, when PBMs list Defendants' insulin products on the PBM formularies. ███, for example, calculated that it would ██████████ if █████████████ over ███████████. As a result, Defendants have an incentive to offer the best deals to PBMs for favorable formulary placements.  The current practice of downstream prices being set based directly on Defendants' published benchmark prices—which Defendants have dramatically increased to enable them to offer larger rebates to PBMs off of these prices without lowering their net price, as described further below—further incentivizes Defendants and PBMs to perpetuate these pricing practices.

48.     Defendants know that PBM revenue is based in part on the PBMs retaining a portion of the rebates that drug manufacturers pay PBMs.  As a result, Defendants further know that PBMs are likely to favor products on their formularies that will earn them the greatest rebates.  Defendants thus focus their marketing and negotiating efforts with PBMs not on the benchmark price that they set for their insulin products, but on the rebate—or "spread" from Defendants' benchmark price—that the PBM can earn in exchange for including Defendants' products in the PBM's formularies.  As a result, the rebates Defendants have offered have increased dramatically over the past number of years.  For example:

49.    In an ██████████ presentation regarding ██████████ bid for ██████
██████████████, ██████ employees ██████████████████████ recognized the
risk that ██████████ would ██████████████████████████████████████ for
██████. To ████████████ and ████████████, ██████ decided to ████████████████
for its ████████████████████ products, including offering ██████████████████
██████.

50.    In a ██████ agreement signed by ████████████████████████████
██████, ██████ agreed to pay ██████████████████████████████, so long as
certain formulary-related and other criteria were satisfied. ██████ subsequently ██████████
██████ that it paid to ████████████ for ██████████ in ██████.

51.    Similarly, in a ██████ agreement, ██████ agreed to pay ████████████████
██████ only ██████████████████. But by ██████, ██████ had ████████████████ that
it paid to ████████████████ in its ████████████████████████████ to ██████████
██████.

52.    ████████████, in a ██████████ agreement with ██████, agreed to pay a rebates
of ██████ on its ████████████████████, with the ██████████████████ to
████████████████████████████████████████████████. ██████████, ██████
██████ had ████████████████ it paid to ██████████ for ██████████████████ under the
contract to ████████████.

53.    Similarly, ████████████ agreed to pay ██████████████████ on its
████████████████ in a ██████ agreement, with the ████████████████████████
████████████████████████████. In that same agreement, ██████████████ also
agreed to pay ████████████ if ████████████████████ in its ██████████ and ██████ if ██████



██████████████████████████████. In a ████ amendment to that

contract, ██████████ agreed to increase the rebates it paid ████████████████████

product and ██████████████.

54.    ████████ rebate agreement, ██████████████████████████████

agreed to pay ████████████████ to ██████████████ in exchange for ████████████████

██████████████. By ██████, in an agreement signed by ██████████████████ agreed

to ██████████████████████████████████ if it was ██████████████████

██████████████ on ██████████████ formulary for ██████████████████████.

55.    ████████ also agreed, in a ████ rebate agreement, to pay ██████████████ for

its ██████ product to ██████████████ for its ████████████████████, provided those

██████████████████████████████. By ████, ████████ had ██████████████████

██████████████████████ to as much as ██████.

**DEFENDANTS MANIPULATE THE PRICE OF THEIR INSULIN PRODUCTS SO IT IS EASIER FOR THEM TO OFFER PBMs LARGER REBATES WITHOUT SACRIFICING PROFITS.**

56.    The above rebate arrangements are not unusual.  They are merely examples of the extent to which Defendants rely on rebates to secure preferred formulary placements with major PBMs for their insulin products.  Defendants have recognized, however, that they can exploit this dynamic to both obtain market share while also avoiding lowering the net prices they receive for their insulin.  Defendants know that when the benchmark price of their products increase, they can offer a larger rebate to the PBM, which allows them to maintain their desired formulary placements with PBMs while continuing to receive the same net price for a product as they did previously.



57.    In response to scrutiny surrounding its drug prices, Novo Nordisk acknowledged

that it inflates its benchmark prices to protect its revenue.   In a blog post on its website in

November 2016, Novo Nordisk stated:

> For Novo Nordisk, those price increases were our response to changes in
> the healthcare system, including a greater focus on cost savings, and trying
> to keep up with inflation. PBMs and payers have been asking for greater
> savings – as they should. However, as the rebates, discounts and price
> concessions got steeper, we were losing considerable revenue – revenue
> we use for R&D, sales and marketing, education, disease awareness
> activities and medical information support.  ***So, we would continue to
> increase the list in an attempt to offset the increased rebates, discounts
> and price concessions to maintain a profitable and sustainable business.***
> We also monitored market conditions to ensure our prices were
> competitive with other medicines as part of our business model.[9]

59.    Likewise, Eli Lilly has also admitted that it increases its benchmark prices

because "PBMs demand higher rebates in exchange for including the drug on their preferred-

drug lists."[10]

60.    Despite these acknowledgements, no Defendant has publicly disclosed the amount

it pays in rebates, or the magnitude by which their benchmark price differs from the actual, net

price that Defendants receive for their insulin products after accounting for rebates paid to

---

[9] *Our perspectives on pricing and affordability*, Novo Nordisk US, (Nov. 30, 2016), http://www.novonordisk-us.com/blog/perspectives/2016/november/our_perspectives.html.
[10] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

PBMs. Defendants continue to publish only their deceptive, misleading, and misrepresentative benchmark prices.

61.     By way of example, the charts below detail recent adjustments that Defendants have made to WAC for some of their analog insulin products.   In each case, Defendants published or knew that their new WAC would be published and disseminated publicly in a variety of price reporting services, either on the date they changed the WAC or shortly thereafter. In each case, Defendants did not disclose that they had negotiated a dramatically different and lower net price with the PBMs.

| Novo Nordisk | NovoLog 100 Units/mL Vial | NovoLog Flexpen Syringe 100 Units/Ml |
|---|---|---|
| 7/31/2012 | $132.40 | $255.74 |
| 12/20/2012 | $141.67 | $273.64 |
| 7/19/2013 | $153.00 | $295.53 |
| 12/3/2013 | $168.15 | $324.80 |
| 5/28/2014 | $184.85 | $357.10 |
| 11/18/2014 | $203.24 | $392.63 |
| 5/19/2015 | $223.45 | $431.60 |
| 11/25/2015 | $236.70 | $457.10 |
| 7/6/2016 | $255.40 | $493.25 |
| 2/23/2017 | $275.58 | $532.22 |
| 7/3/2018 | $289.36 | $558.83 |

| Novo Nordisk | Levemir 100 Units/mL Vial |
|---|---|
| 11/22/2011 | $113.81 |
| 4/4/2012 | $120.64 |
| 10/3/2012 | $135.12 |
| 5/3/2013 | $148.49 |

| 8/27/2013 | $166.42 |
|---|---|
| 12/19/2013 | $191.28 |
| 5/31/2014 | $222.08 |
| 11/18/2014 | $248.51 |
| 8/20/2015 | $269.00 |
| 1/3/2018 | $279.76 |
| 7/3/2018 | $293.75 |
| 1/8/2019 | $308.14 |

| Eli Lilly | HumaLog 100 Units/mL Vial | HumaLog KwikPen 100 Units/mL |
|---|---|---|
| 11/30/2011 | $122.60 | $236.80 |
| 7/11/2012 | $130 | $251 |
| 12/28/2012 | $140.40 | $271.10 |
| 7/26/2013 | $152.90 | $295.36 |
| 12/12/2013 | $167.70 | $323.95 |
| 6/5/2014 | $184.30 | $356.10 |
| 11/25/2014 | $202.60 | $391.50 |
| 5/29/2015 | $222.70 | $430.20 |
| 12/1/2015 | $237 | $457.65 |
| 7/13/2016 | $254.80 | $492 |
| 5/2/2017 | $274.70 | $530.40 |

| Sanofi | Lantus 100 Units/mL Vial | Lantus SoloStar 100 Units/mL |
|---|---|---|
| 12/17/2010 | $99.35 | $191.96 |
| 12/16/2011 | $114.51 | $205.40 |
| 4/27/2012 | $122.14 | $211.56 |
| 10/5/2012 | $131.79 | $228.27 |

| 4/26/2013 | $144.84 | $250.87 |
| 8/2/2013 | $166.42 | $275.71 |
| 12/13/2013 | $191.28 | $303.12 |
| 5/30/2014 | $222.08 | $333.12 |
| 11/7/2014 | $248.51 | $372.76 |
| 9/29/2017 | $255.97 | $383.94 |
| 4/13/2018 | $269.54 | $404.29 |
| 1/4/2019 | $283.56 | $425.31 |

| Sanofi | Apidra 100 Units/mL Vial |
| --- | --- |
| 12/17/2010 | $93.05 |
| 10/5/2012 | $106.91 |
| 4/5/2013 | $120.80 |
| 9/6/2013 | $138.80 |
| 12/13/2013 | $156.76 |
| 6/27/2014 | $184.85 |
| 1/9/2015 | $203.15 |
| 6/12/2015 | $223.26 |
| 1/8/2016 | $236.21 |
| 8/12/2016 | $255.11 |
| 1/5/2018 | $269.91 |
| 1/4/2019 | $308.14 |

62.    Defendants produce other variations of the above-referenced insulin products with their own unique National Drug Codes—as well as the insulin products Fiasp, Toujeo, Tresiba, and Basaglar that likewise have varying NDCs—all of which have seen similar increases in their benchmark price and/or reflect significant spreads between these products' respective benchmark and actual price, and all of which are the subject of this complaint.

63.     Given Defendants' publishing and public dissemination of their list prices, this is *not* merely a case of Defendants telling a potential buyer the price at which they are willing to sell their insulin products to that person.  To the contrary, it is one were Defendants have falsely and deceptively represented to the patients, payers, and the public the price that they receive for their insulin products, and have done so knowing their misleadingly inflated pricing representations would be used as benchmarks to establish the price of subsequent sales of their insulin products.

64.     PBMs do not mind that Defendants publish deceptive and misleading benchmark prices.  In fact, their own revenues increase when Defendants do so.  In ████, ████ conducted an analysis in which it concluded that PBMs would ████████████████ and ██████████ in ██████████████ if ██████ were to ████████████████████████████████ ██████.  In addition, many PBMs also protect themselves from price increases by including price protection clauses in their rebate agreements with Defendants.  These clauses provide that, should Defendants increase the benchmark price of their drug by more than a certain amount, a portion of that increase will be rebated back to PBMs.

65.     As a result, when Defendants increase their benchmark prices, PBMs obtain greater rebates, a portion—or in some instances, all—of which they pocket as additional revenue.  PBMs avoid scrutiny from their health plan clients because the PBMs can inform those clients that they have secured greater savings for the plans' members.  Because PBMs generally do not share with their health plan clients the total rebates they have received from manufacturers, health plans are unaware that the net price paid for Defendants' insulin products has hardly changed.

66.     By publishing and disseminating deceptive and misleading benchmark prices, marketing to PBMs the rebate they will earn from the sale of their products, and concealing their net prices from the public, Defendants have created a marketplace where they do not have to compete with one another to set the lowest price.  In fact, because Defendants compete to offer the largest rebates to PBMs, they monitor each other's benchmark prices closely and often increase them in near perfect unison. ██████████, for example, acknowledged in an ████████ ██████████████ meeting that it would ████████████████████ to ██████████ ████████ and ██████████████████████████████." Eli Lilly has also explained that Defendants need to monitor and match each other's benchmark prices because they would otherwise be unable to offer the same rebates as their competitors.[11]

67.     Industry observers refer to this trend as "shadow pricing."  Defendants do this because they know that if a competitor raises its benchmark prices, it can obtain greater market share by offering larger rebates to PBMs from those prices.  Defendants therefore match each other's benchmark prices so they can continue competing to offer the largest rebates without affecting the net prices of their products.  The following charts provide examples of how the benchmark prices of major rapid- and long-acting insulin products correlate.

---

[11] Paul Barrett & Robert Langreth, *The Crazy Math Behind Drug Prices*, Bloomberg Businessweek, June 29, 2017, available at https://www.bloomberg.com/news/articles/2017-06-29/the-crazy-math-behind-drug-prices.





68.     As a result, rebates are now, as ███ acknowledged in a presentation regarding an ███████████████ a ██████████████ amongst ████████ ███████.   Today, the benchmark prices for insulin that Defendants knowingly publish and disseminate and that they know will be used to directly set the prices charged to patients have virtually no bearing on the price Defendants actually earn when they sell their products.   Indeed, on ███████ ████████████████████████████████ ██████ submitted a letter ███████████ to ███ regarding the ████████████████ in which he

25

stated that ███████████████ because ████████ would ████████████████ ████████████████, which it concealed from the public.  Sanofi's former chief executive officer, Chris Viehbacher, also indicated, in an October 28, 2014 earnings call, that "pricing on a WAC basis" was "not so relevant" because it "largely followed what Levemir has done."  In addition, when asked whether shadow pricing was indicative of collusion among Defendants, Eli Lilly did not even claim to compete on benchmark prices.  It instead insisted that it was "aggressively competing on net (or negotiated) price."[12]

69.    Because of the deceptive pricing scheme that Defendants have perpetuated, the gap between their benchmark and net prices has skyrocketed. For example, between ████ and ████, the difference, or "spread," between the benchmark price and net price of ████████ increased from ██████ to ██████.  An independent analysis of the same product found that the spread between the benchmark price and the net price increased from 30% to 56% between 2011 and 2014.[13] Likewise, an independent analysis conducted by Bloomberg found that between 2009 and 2015, the difference between the benchmark price and net price of Lantus increased from 16.05% to 135.77%.[14]  The same analysis also found that between 2009 and 2015, the spread between the benchmark price and net price of HumaLog increased from 23% to 66%.[15] Novo Nordisk has also admitted that the difference between its NovoLog benchmark and net prices has increased to more than 315% since NovoLog first entered the market.[16]

---

[12]  CBS News, *Lawsuit accuses makers of conspiring to hike insulin prices* (Feb. 22, 2017), available at *https://www.cbsnews.com/news/insulin-price-hike-lawsuit-accuses-drug-makers-of-conspiring/.*

[13]  *See* Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*, Credit Suisse, 23 (May 1, 2015).

[14]  *Decoding Big Pharma's Secret Drug Pricing Practices*, Robert Langreth, Michael Keller, and Christopher Cannon, *available at* https://www.bloomberg.com/graphics/2016-drug-prices/ (June 29, 2016).

[15]  *Id.*

[16]  *Our perspectives on pricing and affordability*, Novo Nordisk US, (Nov. 30, 2016), http://www.novonordisk-us.com/blog/perspectives/2016/november/our_perspectives.html.

70.     The end result: the benchmark prices that Defendants set and publish are now so removed from the actual, net prices that Defendants' receive for their insulin that the they are no longer are an accurate approximation of this price, and are thus falsely, deceptively, and misleadingly inflated.  In fact, the chief executive officer of Novo Nordisk now admits that the benchmark prices it sets are meant only to be the starting point for negotiations with PBMs and that "[i]t was never the intention that individual patients should end up paying the list price."[17]

**DEFENDANTS' DECEPTIVE AND MISLEADING BENCHMARK PRICES HARM MOST THOSE WHO CANNOT AFFORD THEM.**

71.     Many patients and entities do, however, pay for their drugs based on Defendants' deceptively and misleadingly inflated benchmark prices.  This is because Defendants publish those prices with various price reporting services and in various promotional and marketing materials, knowing those prices serve as direct benchmarks for the price that those people and entities pay. These affirmative pricing misrepresentations by Defendants are the only prices that Defendants make publicly available regarding their insulin products.  In publishing their benchmark prices, Defendants do not disclose that the actual, net prices they receive for their insulin products are far less than the publicly-available benchmark price.  Instead, Defendants knowingly permit their inflated benchmark prices to deceptively and misleadingly be understood to be the actual price they receive for their analog insulin products and to be treated as such.  The vast majority of Minnesota diabetics were unaware that Defendants' benchmark prices were deceptively inflated due to the fraudulent scheme described in this complaint, and did not know the size of the spread between Defendants' benchmark prices and the real prices they received.

---

[17] James Paton, *Drug CEO Has Problem With U.S. Patients Paying His Prices* (Mar. 14, 2017), *available at* https://www.bloomberg.com/news/articles/2017-03-14/drug-ceo-has-big-problem-with-u-s-patients-paying-his-prices.

72.     PBMs do not disclose that Defendants' benchmark prices are deceptive and not representative of the actual net price that Defendants charge for their products.  Instead, PBMs conceal the rebates they receive from Defendants, both from the general public and, in many cases, from their own health plan clients.  PBMs contend that, through payment of these rebates, they have secured greater savings for their health plan clients and lowered health care costs nationwide. They do this knowing that the net prices their health plan clients pay have hardly changed.

73.     But, as described above, Defendants know that their published and publicly disseminated benchmark prices directly serve as the benchmark on which many Minnesota patients pay for their medications, including insulin.  The uninsured, patients with high-deductible health plans, those who pay coinsurance, and Medicare Part D beneficiaries do not have access to information regarding the rebates that Defendants pay PBMs.  Such persons are unaware of the fact that the benchmark prices that Defendants publish and publicly disseminate are deceptively and misleadingly inflated.  These Minnesota patients cannot stop taking insulin because they need it to manage their diabetes, will have to continue purchasing Defendants' insulin for the rest of their lives, will continue to pay inflated prices benchmarked to Defendants' false and misleading list prices, and thus have already or will soon find that the life-saving insulin they need is becoming unaffordable.

74.     Patients without health insurance typically pay a "cash price" to retail pharmacies directly for their medications.  The cash price that most retail pharmacies charge is directly set based on Defendants' benchmark prices.  This is in part because manufacturers do not provide rebates to pharmacies for selling their drugs; they do so only to PBMs for placement of drugs on their formularies.  The cash price that a retail pharmacy pays a wholesaler is often directly based

on the benchmark price the manufacturer charges the wholesaler, plus a small mark-up.  Retail pharmacies must also change their prices when the benchmark price of a product increases. Essentially, retail pharmacies are stuck charging a price directly based on Defendants' benchmark price, and must sell insulin to cash patients at that deceptive and misleading price or higher to recoup their costs.

75.     Patients with high-deductible health plans also pay out-of-pocket a price that is directly based on the benchmark price that Defendants set for their insulin products, until those patients have satisfied their deductible.  Even though these patients have insurance, they do not receive the benefit of rebates that their health plan's PBM has negotiated with Defendants.  Most rebate contracts between manufacturers and PBMs require the ████████████████████████ ████████████████, ████████████████, even though the PBM ████████████████████ ████████████████.  Because PBMs typically do not ████████████████████████████ ██████, they are stuck paying a price based directly on Defendants' deceptively and misleadingly inflated benchmark price.

76.     In addition, most PBMs include terms in their contracts ████████████ that allow ████████████████████████████████████████████████████████████ ████████████████████████████████████.  Because the PBM reimbursement rate is usually tied to the WAC or AWP of a product, ████████████████████████ that are ████████████████████████████.  Because Defendants set the AWP either directly or effectively through setting their WAC, their benchmark prices become the basis for the price that cash customers pay to retail pharmacies.  By way of example, the following charts detail the relationship between the benchmark price of some of Defendants' analog insulin products and the cash price that a major Minnesota pharmacy set for that product:





77.    Because Defendants' benchmark prices are deceptive and misleading and do not accurately reflect the actual, net price they receive for insulin, the price that these cash customers pay for analog insulin products has increased dramatically. The following charts detail how the cash price of analog insulin products sold by a major Minnesota pharmacy has changed since 2012:





78.     If Defendants published benchmark prices that were not deceptive and misleading and instead accurately reflected the true net price of insulin, they would charge less to their wholesalers, which could in turn charge less to pharmacies, which could in turn charge less to patients who pay cash for some or all of their medications, including insulin.  Patients without health insurance or with high deductible health plans would then experience a dramatic decline in the cost of their medications.  Instead, the fraudulent pricing practices described herein cause Defendants to charge wholesalers more for insulin, wholesalers to charge pharmacies more for insulin, and pharmacies to charge patients more for insulin—all of which is directly caused by Defendants setting and publishing deceptively and misleadingly inflated benchmark prices.

79.     Patients on Medicare Part D are also affected by Defendants' scheme of publishing deceptive and misleading benchmark prices.   Medicare Part D is a voluntary prescription drug benefit available to patients on Medicare.  People who receive this benefit must pay for their medications out-of-pocket until they have spent $405.  After reaching this threshold, these individuals must pay 25% of the cost of their drugs until they and their plan have spent a combined total of $3,750.  Once this level is reached, the individual is in the "donut hole."  At this stage, the individual pays 35% of the cost of the brand-name drug until the beneficiary's out-of-pocket spending totals $5,000.  At that point, the person's Medicare Part D plan kicks in again, and the person must only pay 5% of their costs out-of-pocket.

80.     While enrollees in Medicare Part D receive the benefit of a manufacturer discount for insulin products while in the donut hole, for multiple reasons, this benefit does not begin to cover the inflated costs that enrollees incur because of Defendants' misrepresentative benchmark prices.   First, the portion the Medicare Part D patient pays is a percentage of the drug's benchmark price, which is inflated because of Defendants' deceptive conduct.   Second, Defendants' deceptive benchmark prices mean enrollees exhaust their benefits more quickly than they otherwise would and enter the donut hole more quickly than they should.  Finally, if Defendants actually competed with one another to offer the lowest price, the total cost of enrollees' Part D benefits would generally decline over time.

81.     Even health plan members who have the benefit of a PBM negotiating on behalf of their health plan suffer because of Defendants' conduct.  Many Minnesota patients have health insurance that requires them to pay coinsurance out-of-pocket when they fill a prescription.  Typically, the amount the patient must pay as coinsurance is calculated as a percentage of a price

that is based on the drug's benchmark price. The amount that those patients pay, as a result, is inflated because of Defendants' deceptive and misleading benchmark prices.

82. The Minnesota Department of Corrections has incurred additional costs to provide insulin to the offenders it supervises as a result of Defendants' deceptive and misleading benchmark prices. The Minnesota Department of Corrections has purchased insulin from a wholesaler whose price, like those of other wholesalers, is based on the benchmark price that the manufacturer sets or passes through to the wholesaler. The inflated prices at which the department has purchased insulin through this wholesaler has either reduced the amount of its claims-related underspend that it is entitled to have returned to it or has increased its obligation to pay excess claims-related spend, as applicable, under the governing contracts. In other words, Defendants' misrepresentative insulin benchmark prices have financially harmed the Minnesota Department of Corrections by reducing its health care-related savings, increasing its health care-related costs, or both.

83. Finally, if Defendants actually competed to offer the lowest price, the benchmark price of their products should be lower due to competition between the various manufacturers. Currently, because Defendants increase both their rebates and their benchmark prices, they are able to hold their net prices relatively steady. Competition on price, which is currently lacking, should cause the actual price of Defendants' products to be lower over time, saving health plans and their members money. Defendants competition over which one can offer PBMs the biggest rebates from their benchmark prices instead of competing on price itself is economically preferable to them, however, because this makes it easier for Defendants to hold net prices for their insulin products relatively steady.

84.     Minnesota residents and the Minnesota Department of Corrections have purchased analog insulin products at higher prices and/or incurred additional insulin-related expenses than they otherwise would have because of the deceptive and misleading benchmark prices that Defendants knowingly published and publicly disseminated.

STATUTE OF LIMITATIONS TOLLING.

85.     All relevant statutes of limitations have been tolled by Defendants' fraudulent concealment and denial of the facts alleged herein.  Defendants published, or caused to be published, benchmark prices for their products that they knew to be inaccurate.  Defendants knew their benchmark prices were deceptive, misleading, and not representative of the actual, net prices they receive for those products because of the rebates they pay to the PBMs.  Defendants did not disclose the existence or magnitude of those rebates to the State, its residents, or the Minnesota Department of Corrections.

86.     Defendants affirmatively and purposely crafted contracts that prohibited both Defendants and the PBMs from disclosing information related to the rebates that they paid to the PBMs.  Defendants also concealed information regarding the impact that those rebates had on the accuracy of the benchmark prices they published.

87.     The deceptive nature of Defendants' benchmark prices, the extent to which those benchmark prices differed from Defendants' actual prices, the fact that Defendants significantly inflated their benchmark prices to market larger spreads to PBMs, and Defendants' affirmative efforts to conceal the spread between their benchmark and actual prices were not apparent or obvious to the State, its residents, or the Minnesota Department of Corrections, and could not have been discovered through reasonable diligence.

## COUNT I
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
## (AS TO NOVO NORDISK)

88.     The State re-alleges all prior paragraphs of this Complaint.

89.     Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

90.     CVS is a person as defined by 18 U.S.C. § 1961(3).

91.     The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

92.     At all times relevant to this Complaint, Novo Nordisk and CVS constituted an enterprise as defined by 18 U.S.C. § 1961(4).   For purposes of this count, this enterprise is referred to as the "Novo-CVS Enterprise."

93.     The Novo-CVS Enterprise consists of an association-in-fact between Novo Nordisk, including its directors, employees, and other agents, and CVS, including its directors, employees, and other agents.

94.     The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog, Levemir, and Tresiba insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Novo Nordisk actually received for these products due to the rebates and other concessions made to CVS—including by arranging placements for these products on CVS's formularies through the negotiation of rebates, price protection factors, and discounts for these products with CVS, and through the exclusion of competing insulin products from CVS's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).   Perpetuating the use of such fraudulent pricing practices was in the common interest of Novo Nordisk and

36

CVS because they enhanced CVS's ability to demand—and Novo Nordisk's ability to offer—larger rebates off of Novo Nordisk's benchmark prices (to the financial benefit of CVS), while also allowing Novo Nordisk to hold its net insulin prices relatively steady (to the financial benefit of Novo Nordisk).  In other words, Novo Nordisk and CVS had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein—which neither could have accomplished alone—for the financial gain of both.

95.     To accomplish the common purpose of the Novo-CVS Enterprise, the component entities, Novo Nordisk and CVS, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would provide CVS for favorable formulary placement, and the price protection terms CVS demanded to protect against any increase in the benchmark prices of Levemir, NovoLog, and Tresiba.

96.     The Novo-CVS enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba sold throughout the United States and its territories.

97.     CVS participated in the conduct of the Novo-CVS Enterprise in a variety of ways, including but not limited to:

> (a) Negotiating significant rebates from the benchmark prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;
>
> (b) Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates CVS would earn from the sale of those products;
>
> (c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Novo Nordisk saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Novo Nordisk published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Novo Nordisk from health plan clients and the general public, and therefore concealing the actual, net price Novo Nordisk received for these insulin products.

98.     CVS's conduct and participation is essential to the success of the enterprise.  For Novo Nordisk to maintain its net prices for these products, it required CVS to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices.  It also required CVS to market to its health plan clients that the rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk.  CVS's participation allowed Novo Nordisk to inflate its benchmark prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

99.     Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-CVS Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Levemir, NovoLog, and Tresiba insulin products;

(b) Marketing to CVS the rebates that it could earn for favorable formulary placements of Levemir, NovoLog, and Tresiba, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with CVS, which allowed CVS to earn additional rebates when Novo Nordisk increased its benchmark prices;

(d) Paying rebates to CVS for each prescription filled for Levemir, NovoLog, and Tresiba by a CVS health plan member;

38

(e) Reporting to the general public and various price reporting services the benchmark price of Levemir, NovoLog, and Tresiba while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to CVS; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to CVS.

In so conducting the Novo-CVS Enterprise's affairs, Novo Nordisk engaged in unlawful conduct that it could not have accomplished without CVS—securing through fraud and deception favorable treatment on CVS's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Novo Nordisk would have had to do in normal commercial circumstances.

100.    The component entities are all willing and knowing participants in the Novo-CVS Enterprise.  Novo Nordisk negotiated rebates with CVS for favorable formulary placement and entered into contracts with CVS that concealed both the extent of those rebates and the price protection that Novo Nordisk provided CVS.  CVS represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Novo-CVS Enterprise reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its benchmark prices.  Novo Nordisk and CVS could not have successfully conducted the activities of the Novo-CVS Enterprise individually.

101.    The Novo-CVS Enterprise is on-going and has been in existence for all times relevant to this Complaint.  CVS continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba; and continues to develop formularies that provide varying levels of preference to those products

based on the rebates that Novo Nordisk pays CVS.  CVS also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

102.    To accomplish this conduct, and to further the goals of the Novo-CVS Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Levemir, Tresiba, and NovoLog and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

103.    Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with CVS.  Novo Nordisk repeatedly communicated with CVS regarding Novo Nordisk's benchmark prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary placement, and price protection agreements to protect CVS from increases in Novo Nordisk's benchmark prices.

104.    Novo Nordisk then published deceptive, misleading, and misrepresentative benchmark prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated prices to various price reporting services.  Novo Nordisk knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota

Department of Corrections would pay for Levemir, NovoLog, and Tresiba.  In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid CVS for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Novo Nordisk represented that these prices constituted an accurate price for its Levemir, Tresiba, and NovoLog products.

105.    It was also foreseeable to Novo Nordisk that CVS would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

106.    The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Novo Nordisk and CVS, working throughout the country and were repeatedly sent across state lines.

107.    Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive and misleading benchmark prices for Levemir, NovoLog, and Tresiba, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to CVS.  This pattern of racketeering conduct is separate and distinct from the Novo-CVS Enterprise.  Novo Nordisk is a separate and distinct entity from the Novo-CVS Enterprise.

108.    Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

109.    Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

110.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent.  In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system.  Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Novo Nordisk set and publicly disseminated. Novo Nordisk also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

111.    Because Novo Nordisk published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to CVS and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba.  But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

112.   The benchmark prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the deceptively inflated benchmark price on to patients.

113.   Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

114.   Novo Nordisk is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT II
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
## (AS TO NOVO NORDISK)

115.   The State re-alleges all prior paragraphs of this Complaint.

116.   Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

117.   OptumRx is a person as defined by 18 U.S.C. § 1961(3).

118.   The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

119.   At all times relevant to this Complaint, Novo Nordisk and OptumRx constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Novo-Optum Enterprise."

120.   The Novo-Optum Enterprise consists of an association-in-fact between Novo Nordisk, including its directors, employees, and other agents, and OptumRx, including its directors, employees, and other agents.

121.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog, Levemir, and Tresiba insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Novo Nordisk actually received for these products due to the rebates and other concessions made to OptumRx—including by arranging placements for these products on OptumRx's formularies through the negotiation of rebates, price protection factors, and discounts for these products with OptumRx, and through the exclusion of competing insulin products from OptumRx's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).   Perpetuating the use of such fraudulent pricing practices was in the common interest of Novo Nordisk and OptumRx because they enhanced OptumRx's ability to demand—and Novo Nordisk's ability to offer—larger rebates off of Novo Nordisk's benchmark prices (to the financial benefit of OptumRx), while also allowing Novo Nordisk to hold its net insulin prices relatively steady (to the financial benefit of Novo Nordisk).   In other words, Novo Nordisk and OptumRx had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

122.    To accomplish the common purpose of the Novo-Optum Enterprise, the component entities, Novo Nordisk and OptumRx, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would provide OptumRx for favorable formulary placement, and the price protection terms OptumRx demanded to protect against any increase in the benchmark prices of Levemir, NovoLog, and Tresiba.

123.    The Novo-Optum enterprise affected interstate commerce.    Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba sold throughout the United States and its territories.

124.    OptumRx participated in the conduct of the Novo-Optum Enterprise in a variety of ways, including, but not limited to:

(a) Negotiating significant rebates from the benchmark prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;

(b) Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates OptumRx would earn from the sale of those products;

(c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Novo Nordisk saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Novo Nordisk published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Novo Nordisk from health plan clients and the general public, and therefore concealing the actual, net price Novo Nordisk received for these insulin products.

125.    OptumRx's conduct and participation is essential to the success of the enterprise. For Novo Nordisk to maintain its net prices for these products, it required OptumRx to select the products based on the rebates offered, rather on which ones had the lowest benchmark prices.  It also required OptumRx to market to its health plan clients that the rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk. OptumRx's participation allowed Novo Nordisk to inflate its benchmark prices, offer larger

rebates to OptumRx to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

126.    Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-Optum Enterprise by, among other ways:

> (a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Levemir, NovoLog, and Tresiba insulin products;

> (b) Marketing to OptumRx the rebates that it could earn for favorable formulary placements of Levemir, NovoLog, and Tresiba, including in some cases, for omitting competing products from certain of its formularies;

> (c) Including price protection terms in its contracts with OptumRx, which allowed OptumRx to earn additional rebates when Novo Nordisk increased its benchmark prices;

> (d) Paying rebates to OptumRx for each prescription filled for Levemir, NovoLog, and Tresiba by a OptumRx health plan member;

> (e) Reporting to the general public and various price reporting services the benchmark price of Levemir, NovoLog, and Tresiba while claiming that such prices represented the actual approximate price it received for those products;

> (f) Inflating the benchmark price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to OptumRx; and

> (g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to OptumRx.

In so conducting the Novo-OptumRx Enterprise's affairs, Novo Nordisk engaged in unlawful conduct that it could not have accomplished without OptumRx—securing through fraud and deception favorable treatment on OptumRx's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Novo Nordisk would have had to do in normal commercial circumstances.

127.    The component entities are all willing and knowing participants in the Novo-Optum Enterprise.   Novo Nordisk negotiated rebates with OptumRx for favorable formulary

placement and entered into contracts with OptumRx that concealed both the extent of those rebates and the price protection that Novo Nordisk provided OptumRx.  OptumRx represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Novo-Optum Enterprise reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its benchmark prices.  Novo Nordisk and OptumRx could not have successfully conducted the activities of the Novo-Optum Enterprise individually.

128.    The Novo-Optum Enterprise is on-going and has been in existence for all times relevant to this Complaint.  OptumRx continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Novo Nordisk pays OptumRx.  OptumRx also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

129.    To accomplish this conduct, and to further the goals of the Novo-Optum Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Levemir, Tresiba, and NovoLog and

deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

130.    Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with OptumRx.  Novo Nordisk repeatedly communicated with OptumRx regarding Novo Nordisk's benchmark prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary placement, and price protection agreements to protect OptumRx from increases in Novo Nordisk's benchmark prices.

131.    Novo Nordisk then published deceptive, misleading, and misrepresentative benchmark prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated prices to various price reporting services.  Novo Nordisk knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Levemir, NovoLog, and Tresiba.  In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid OptumRx for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Novo Nordisk represented that these prices constituted an accurate price for its Levemir, Tresiba, and NovoLog products.

132.    It was also foreseeable to Novo Nordisk that OptumRx would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

133.    The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Novo Nordisk and OptumRx, working throughout the country and were repeatedly sent across state lines.

134.    Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive and misleading benchmark list prices for Levemir, NovoLog, and Tresiba, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to OptumRx. This pattern of racketeering conduct is separate and distinct from the Novo-Optum Enterprise. Novo Nordisk is a separate and distinct entity from the Novo-Optum Enterprise.

135.    Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

136.    Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

137.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent.  In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system.  Each amount that these persons pay is based directly on

the deceptive and misleading benchmark price that Novo Nordisk set and publicly disseminated. Novo Nordisk also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

138.    Because Novo Nordisk published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to OptumRx and inflated its benchmark prices to preserve the actual net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba.  But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

139.    The benchmark prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the deceptively inflated benchmark price on to patients.

140.    Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

141.    Novo Nordisk is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT III**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO NOVO NORDISK)**

142.    The State re-alleges all prior paragraphs of this Complaint.

143.    Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

144.    Express Scripts is a person as defined by 18 U.S.C. § 1961(3).

145.    The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

146.    At all times relevant to this Complaint, Novo Nordisk and Express Scripts constituted an enterprise as defined by 18 U.S.C. § 1961(4).   For purposes of this count, this enterprise is referred to as the "Novo-Express Scripts Enterprise."

147.    The Novo-Express Scripts Enterprise consists of an association-in-fact between Novo Nordisk, including its directors, employees, and other agents, and Express Scripts, including its directors, employees, and other agents.

148.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog, Levemir, and Tresiba insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Novo Nordisk actually received for these products due to the rebates and other concessions made to Express Scripts—including by arranging placements for these products on Express Scripts's formularies through the negotiation of rebates, price protection factors, and discounts for these products with Express Scripts, and through the exclusion of competing insulin products from Express Scripts's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).   Perpetuating the use of such fraudulent pricing practices was in the

common interest of Novo Nordisk and Express Scripts because they enhanced Express Scripts's ability to demand—and Novo Nordisk's ability to offer—larger rebates off of Novo Nordisk's benchmark prices (to the financial benefit of Express Scripts), while also allowing Novo Nordisk to hold its net insulin prices relatively steady (to the financial benefit of Novo Nordisk).  In other words, Novo Nordisk and Express Scripts had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

149.   To accomplish the common purpose of the Novo-Express Scripts Enterprise, the component entities, Novo Nordisk and Express Scripts, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would provide Express Scripts for favorable formulary placement, and the price protection terms Express Scripts demanded to protect against any increase in the benchmark prices of Levemir, NovoLog, and Tresiba.

150.   The Novo-Express Scripts enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba sold throughout the United States and its territories.

151.   Express Scripts participated in the conduct of the Novo-Express Scripts Enterprise in a variety of ways, including, but not limited to:

> (a) Negotiating significant rebates from the benchmark prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;
>
> (b) Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates Express Scripts would earn from the sale of those products;

(c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Novo Nordisk saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Novo Nordisk published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Novo Nordisk from health plan clients and the general public, and therefore concealing the net price Novo Nordisk received for these insulin products.

152.    Express Scripts's conduct and participation is essential to the success of the enterprise.  For Novo Nordisk to maintain its net prices for these products, it required Express Scripts to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices.  It also required Express Scripts to market to its health plan clients that the rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk.  Express Scripts's participation allowed Novo Nordisk to inflate its benchmark prices, offer larger rebates to Express Scripts to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

153.    Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-Express Scripts Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Levemir, NovoLog, and Tresiba insulin products;

(b) Marketing to Express Scripts the rebates that it could earn for favorable formulary placements of Levemir, NovoLog, and Tresiba, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with Express Scripts, which allowed Express Scripts to earn additional rebates when Novo Nordisk increased its benchmark prices;

(d) Paying rebates to Express Scripts for each prescription filled for Levemir, NovoLog, and Tresiba by a Express Scripts health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of Levemir, NovoLog, and Tresiba while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to Express Scripts; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to Express Scripts.

In so conducting the Novo-Express Scripts Enterprise's affairs, Novo Nordisk engaged in unlawful conduct that it could not have accomplished without Express Scripts—securing through fraud and deception favorable treatment on Express Scripts's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Novo Nordisk would have had to do in normal commercial circumstances.

154.    The component entities are all willing and knowing participants in the Novo-Express Scripts Enterprise.  Novo Nordisk negotiated rebates with Express Scripts for favorable formulary placement and entered into contracts with Express Scripts that concealed both the extent of those rebates and the price protection that Novo Nordisk provided Express Scripts. Express Scripts represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Novo-Express Scripts Enterprise reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its benchmark prices.  Novo Nordisk and Express Scripts could not have successfully conducted the activities of the Novo-Express Scripts Enterprise individually.

155.    The Novo-Express Scripts Enterprise is on-going and has been in existence for all times relevant to this Complaint.  Express Scripts continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Novo Nordisk pays Express Scripts. Express Scripts also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

156.    To accomplish this conduct, and to further the goals of the Novo-Express Scripts Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud The State, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Levemir, Tresiba, and NovoLog and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

157.    Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with Express Scripts.  Novo Nordisk repeatedly communicated with Express Scripts regarding Novo Nordisk's benchmark prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary

placement, and price protection agreements to protect Express Scripts from increases in Novo Nordisk's benchmark prices.

158.    Novo Nordisk then published deceptive, misleading, and misrepresentative benchmark prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated benchmark prices to various price reporting services. Novo Nordisk knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Levemir, NovoLog, and Tresiba.   In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid Express Scripts for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.   Instead, by publishing only its benchmark prices, Novo Nordisk represented that these prices constituted an accurate price for its Levemir, Tresiba, and NovoLog products.

159.    It was also foreseeable to Novo Nordisk that Express Scripts would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

160.    The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Novo Nordisk and Express Scripts, working throughout the country and were repeatedly sent across state lines.

161.    Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive and misleading benchmark prices for Levemir, NovoLog, and Tresiba,

avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to Express Scripts. This pattern of racketeering conduct is separate and distinct from the Novo-Express Scripts Enterprise. Novo Nordisk is a separate and distinct entity from the Novo-Express Scripts Enterprise.

162. Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

163. Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

164. As previously described, many patients pay all or a portion of their insulin costs out-of-pocket. Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket. Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Novo Nordisk set and publicly disseminated. Novo Nordisk also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

165.    Because Novo Nordisk published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to Express Scripts and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba.  But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

166.    The benchmark prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the deceptively inflated benchmark price on to patients.

167.    Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

168.    Novo Nordisk is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT IV**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO NOVO NORDISK)**

169.    The State re-alleges all prior paragraphs of this Complaint.

170.    Novo Nordisk is a person as defined by 18 U.S.C. § 1961(3).

171.    Prime Therapeutics is a person as defined by 18 U.S.C. § 1961(3).

172.    The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Novo Nordisk's conduct.

173.    At all times relevant to this Complaint, Novo Nordisk and Prime Therapeutics constituted an enterprise as defined by 18 U.S.C. § 1961(4).   For purposes of this count, this enterprise is referred to as the "Novo-Prime Enterprise."

174.    The Novo-Prime Enterprise consists of an association-in-fact between Novo Nordisk, including its directors, employees, and other agents, and Prime Therapeutics, including its directors, employees, and other agents.

175.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Novo Nordisk's NovoLog, Levemir, and Tresiba insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Novo Nordisk actually received for these products due to the rebates and other concessions made to Prime Therapeutics—including by arranging placements for these products on Prime Therapeutics' formularies through the negotiation of rebates, price protection factors, and discounts for these products with Prime Therapeutics, and through the exclusion of competing insulin products from Prime Therapeutics' formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).   Perpetuating the use of such fraudulent pricing practices was in the common interest of Novo Nordisk and Prime Therapeutics because they enhanced Prime Therapeutics' ability to demand—and Novo Nordisk's ability to offer—larger rebates off of Novo Nordisk's benchmark prices (to the financial benefit of Prime Therapeutics), while also allowing Novo Nordisk to hold its net insulin prices relatively steady (to the financial benefit of Novo Nordisk).   In other words, Novo Nordisk and Prime Therapeutics had both the

mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

176.    To accomplish the common purpose of the Novo-Prime Enterprise, the component entities, Novo Nordisk and Prime Therapeutics, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of NovoLog, Levemir, and Tresiba, the rebates that Novo Nordisk would provide Prime Therapeutics for favorable formulary placement, and the price protection terms Prime Therapeutics demanded to protect against any increase in the benchmark prices of Levemir, NovoLog, and Tresiba.

177.    The Novo-Prime Enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Levemir, NovoLog, and Tresiba sold throughout the United States and its territories.

178.    Prime Therapeutics participated in the conduct of the Novo-Prime Enterprise in a variety of ways, including, but not limited to:

(a) Negotiating significant rebates from the benchmark prices set by Novo Nordisk for Levemir, NovoLog, and Tresiba;

(b) Developing formularies that provided Novo Nordisk favorable placements for Levemir, NovoLog, and Tresiba based on the rebates Prime Therapeutics would earn from the sale of those products;

(c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Novo Nordisk saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Novo Nordisk published approximated the actual prices of these insulin products

and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Novo Nordisk from health plan clients and the general public, and therefore concealing the actual, net price Novo Nordisk received for these insulin products.

179. Prime Therapeutics' conduct and participation is essential to the success of the enterprise. For Novo Nordisk to maintain its net prices for these products, it required Prime Therapeutics to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices. It also required Prime Therapeutics to market to its health plan clients that the rebates Novo Nordisk offered saved the clients and their members money to conceal the actual rebates paid by Novo Nordisk. Prime Therapeutics' participation allowed Novo Nordisk to inflate its benchmark prices, offer larger rebates to Prime Therapeutics to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

180. Novo Nordisk participated in, controlled, and conducted the affairs of the Novo-Prime Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Levemir, NovoLog, and Tresiba insulin products;

(b) Marketing to Prime Therapeutics the rebates that it could earn for favorable formulary placements of Levemir, NovoLog, and Tresiba, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with Prime Therapeutics, which allowed Prime Therapeutics to earn additional rebates when Novo Nordisk increased its benchmark prices;

(d) Paying rebates to Prime Therapeutics for each prescription filled for Levemir, NovoLog, and Tresiba by a Prime Therapeutics health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of Levemir, NovoLog, and Tresiba while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of Levemir, NovoLog, and Tresiba to account for the rebates that it paid to Prime Therapeutics; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to Prime Therapeutics.

In so conducting the Novo-Prime Enterprise's affairs, Novo Nordisk engaged in unlawful conduct that it could not have accomplished without Prime Therapeutics—securing through fraud and deception favorable treatment on Prime Therapeutics' formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Novo Nordisk would have had to do in normal commercial circumstances.

181.    The component entities are all willing and knowing participants in the Novo-Prime Enterprise.  Novo Nordisk negotiated rebates with Prime Therapeutics for favorable formulary placement and entered into contracts with Prime Therapeutics that concealed both the extent of those rebates and the price protection that Novo Nordisk provided Prime Therapeutics. Prime Therapeutics represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Novo-Prime Enterprise reaped increased profits from Novo Nordisk's deceptive and misleading representations regarding its benchmark prices.  Novo Nordisk and Prime Therapeutics could not have successfully conducted the activities of the Novo-Prime Enterprise individually.

182.    The Novo-Prime Enterprise is on-going and has been in existence for all times relevant to this Complaint.  Prime Therapeutics continues to have contractual relationships with Novo Nordisk; continues to negotiate rebates with Novo Nordisk regarding Levemir, NovoLog, and Tresiba; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Novo Nordisk pays Prime Therapeutics.   Prime

Therapeutics also continues to make substantial profits on the rebates that it earns from sale of Novo Nordisk's products.

183.    To accomplish this conduct, and to further the goals of the Novo-Prime Enterprise, Novo Nordisk participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Novo Nordisk's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections. Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Levemir, Tresiba, and NovoLog and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

184.    Through the use of the U.S. Mail and interstate wire facilities, Novo Nordisk negotiated rebates for its Levemir, NovoLog, and Tresiba products with Prime Therapeutics. Novo Nordisk repeatedly communicated with Prime Therapeutics regarding Novo Nordisk's benchmark prices, the rebates that Novo Nordisk would provide in exchange for favorable formulary placement, and price protection agreements to protect Prime Therapeutics from increases in Novo Nordisk's benchmark prices.

185.    Novo Nordisk then published deceptive, misleading, and misrepresentative benchmark prices of Levemir, NovoLog, and Tresiba and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated benchmark prices to various price reporting services. Novo Nordisk knew that other entities, including retail pharmacies, would

rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Levemir, NovoLog, and Tresiba.  In making these transmissions, Novo Nordisk did not disclose the existence, nature, or magnitude of the rebates that it paid Prime Therapeutics for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Novo Nordisk represented that these prices constituted an accurate price for its Levemir, Tresiba, and NovoLog products.

186.    It was also foreseeable to Novo Nordisk that Prime Therapeutics would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Novo Nordisk paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

187.    The number of transmissions that Novo Nordisk sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Novo Nordisk and Prime Therapeutics, working throughout the country and were repeatedly sent across state lines.

188.    Through this pattern of racketeering conduct, Novo Nordisk was able to publish and disseminate deceptive and misleading benchmark prices for Levemir, NovoLog, and Tresiba, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Novo Nordisk provided to Prime Therapeutics.  This pattern of racketeering conduct is separate and distinct from the Novo-Prime Enterprise.  Novo Nordisk is a separate and distinct entity from the Novo-Prime Enterprise.

189.    Novo Nordisk continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

190.     Novo Nordisk's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

191.     As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent.  In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system.  Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Novo Nordisk set and publicly disseminated. Novo Nordisk also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

192.     Because Novo Nordisk published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to Prime Therapeutics and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for NovoLog, Levemir, and Tresiba.  But for this conduct, Novo Nordisk would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

193.    The benchmark prices that Novo Nordisk set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).  Each of those entities could pass the deceptively inflated benchmark price on to patients.

194.    Novo Nordisk's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

195.    Novo Nordisk is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT V
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
## (AS TO SANOFI)

196.    The State re-alleges all prior paragraphs of this Complaint.

197.    Sanofi is a person as defined by 18 U.S.C. § 1961(3).

198.    CVS is a person as defined by 18 U.S.C. § 1961(3).

199.    The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

200.    At all times relevant to this Complaint, Sanofi and CVS constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Sanofi-CVS Enterprise."

201.    The Sanofi-CVS Enterprise consists of an association-in-fact between Sanofi, including its directors, employees, and other agents, and CVS, including its directors, employees, and other agents.

202.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Sanofi actually received for these products due to the rebates and other concessions made to CVS—including by arranging placements for these products on CVS's formularies through the negotiation of rebates, price protection factors, and discounts for these products with CVS, and through the exclusion of competing insulin products from CVS's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c). Perpetuating the use of such fraudulent pricing practices was in the common interest of Sanofi and CVS because they enhanced CVS's ability to demand—and Sanofi's ability to offer—larger rebates off of Sanofi's benchmark prices (to the financial benefit of CVS), while also allowing Sanofi to hold its net insulin prices relatively steady (to the financial benefit of Sanofi). In other words, Sanofi and CVS had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

203.    To accomplish the common purpose of the Sanofi-CVS Enterprise, the component entities, Sanofi and CVS, developed extensive relationships, both contractually and financially. The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would provide CVS for favorable formulary placement, and the price protection terms CVS demanded to protect against any increase in the benchmark prices of Lantus, Apidra, and Toujeo.

204.   The Sanofi-CVS Enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo sold throughout the United States and its territories.

205.   CVS participated in the conduct of the Sanofi-CVS Enterprise in a variety of ways, including, but not limited to:

(a)   Negotiating significant rebates from the benchmark prices set by Sanofi for Lantus, Apidra, and Toujeo;

(b)   Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates CVS would earn from the sale of those products;

(c)   Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d)   Marketing formularies to health plan clients and making material representations that the rebates negotiated from Sanofi saved those clients and their members money;

(e)   Making material misrepresentations that the benchmark prices that Sanofi published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f)   Concealing the actual rebates earned from Sanofi from health plan clients and the general public, and therefore concealing the actual, net price Sanofi received for these insulin products.

206.   CVS's conduct and participation is essential to the success of the enterprise.  For Sanofi to maintain its net prices for these products, it required CVS to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices.  It also required CVS to market to its health plan clients that the rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. CVS's participation allowed Sanofi to inflate its benchmark prices, offer larger rebates to CVS to maintain access to

that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

207.    Sanofi participated in, controlled, and conducted the affairs of the Sanofi-CVS Enterprise by, among other ways:

> (a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Lantus, Apidra, and Toujeo insulin products;

> (b) Marketing to CVS the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

> (c) Including price protection terms in its contracts with CVS, which allowed CVS to earn additional rebates when Sanofi increased its benchmark prices;

> (d) Paying rebates to CVS for each prescription filled for Lantus, Apidra, and Toujeo by a CVS health plan member;

> (e) Reporting to the general public and various price reporting services the benchmark price of Lantus, Apidra, and Toujeo while claiming that such prices represented the actual approximate price it received for those products;

> (f) Inflating the benchmark price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to CVS; and

> (g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to CVS.

In so conducting the Sanofi-CVS Enterprise's affairs, Sanofi engaged in unlawful conduct that it could not have accomplished without CVS—securing through fraud and deception favorable treatment on CVS's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Sanofi would have had to do in normal commercial circumstances.

208.    The component entities are all willing and knowing participants in the Sanofi-CVS Enterprise.  Sanofi negotiated rebates with CVS for favorable formulary placement and entered into contracts with CVS that concealed both the extent of those rebates and the price

protection that Sanofi provided CVS.  CVS represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Sanofi-CVS Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its benchmark prices.  Sanofi and CVS could not have successfully conducted the activities of the Sanofi-CVS Enterprise individually.

209.    The Sanofi-CVS Enterprise is on-going and has been in existence for all times relevant to this Complaint.  CVS continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra, and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays CVS.  CVS also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

210.    To accomplish this conduct, and to further the goals of the Sanofi-CVS Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Lantus, Apidra, and Toujeo and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

211.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with CVS.  Sanofi repeatedly communicated with CVS regarding Sanofi's benchmark prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect CVS from increases in Sanofi's benchmark prices.

212.    Sanofi then published deceptive, misleading, and misrepresentative benchmark prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated benchmark prices to various price reporting services. Sanofi knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo.  In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid CVS for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Sanofi represented that these prices constituted an accurate price for its Lantus, Apidra, and Toujeo products.

213.    It was also foreseeable to Sanofi that CVS would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

214.    The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and CVS, working throughout the country and were repeatedly sent across state lines.

215.    Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive and misleading benchmark prices for Lantus, Apidra, and Toujeo, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to CVS.  This pattern of racketeering conduct is separate and distinct from the Sanofi-CVS Enterprise.  Sanofi is a separate and distinct entity from the Sanofi-CVS Enterprise.

216.    Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

217.    Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

218.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent.  In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system.  Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Sanofi set and publicly disseminated.  Sanofi also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

219.     Because Sanofi published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to CVS and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus, Apidra, and Toujeo.  But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

220.     The benchmark prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the deceptively inflated benchmark price on to patients.

221.     Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

222.     Sanofi is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT VI**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO SANOFI)**

223.     The State re-alleges all prior paragraphs of this Complaint.

224.     Sanofi is a person as defined by 18 U.S.C. § 1961(3).

225.     OptumRx is a person as defined by 18 U.S.C. § 1961(3).

226.     The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

227.    At all times relevant to this Complaint, Sanofi and OptumRx constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Sanofi-Optum Enterprise."

228.    The Sanofi-Optum Enterprise consists of an association-in-fact between Sanofi, including its directors, employees, and other agents, and OptumRx, including its directors, employees, and other agents.

229.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Sanofi actually received for these products due to the rebates and other concessions made to OptumRx—including by arranging placements for these products on OptumRx's formularies through the negotiation of rebates, price protection factors, and discounts for these products with OptumRx, and through the exclusion of competing insulin products from OptumRx's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).  Perpetuating the use of such fraudulent pricing practices was in the common interest of Sanofi and OptumRx because they enhanced OptumRx's ability to demand—and Sanofi's ability to offer—larger rebates off of Sanofi's benchmark prices (to the financial benefit of OptumRx), while also allowing Sanofi to hold its net insulin prices relatively steady (to the financial benefit of Sanofi). In other words, Sanofi and OptumRx had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

230.    To accomplish the common purpose of the Sanofi-Optum Enterprise, the component entities, Sanofi and OptumRx, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would provide OptumRx for favorable formulary placement, and the price protection terms OptumRx demanded to protect against any increase in the benchmark prices of Lantus, Apidra, and Toujeo.

231.    The Sanofi-Optum enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo sold throughout the United States and its territories.

232.    OptumRx participated in the conduct of the Sanofi-Optum Enterprise in a variety of ways, including, but not limited to:

> (a) Negotiating significant rebates from the benchmark prices set by Sanofi for Lantus, Apidra, and Toujeo;
>
> (b) Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates OptumRx would earn from the sale of those products;
>
> (c) Excluding competing insulin products from certain formularies in exchange for increased rebates;
>
> (d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Sanofi saved those clients and their members money;
>
> (e) Making material misrepresentations that the benchmark prices that Sanofi published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and
>
> (f) Concealing the actual rebates earned from Sanofi from health plan clients and the general public, and therefore concealing the actual, net price Sanofi received for these insulin products.

233. OptumRx's conduct and participation is essential to the success of the enterprise. For Sanofi to maintain its net prices for these products, it required OptumRx to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices. It also required OptumRx to market to its health plan clients that the rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. OptumRx's participation allowed Sanofi to inflate its benchmark prices, offer larger rebates to OptumRx to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

234. Sanofi participated in, controlled, and conducted the affairs of the Sanofi-Optum Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Lantus, Apidra, and Toujeo insulin products;

(b) Marketing to OptumRx the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with OptumRx, which allowed OptumRx to earn additional rebates when Sanofi increased its benchmark prices;

(d) Paying rebates to OptumRx for each prescription filled for Lantus, Apidra, and Toujeo by a OptumRx health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of Lantus, Apidra, and Toujeo while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to OptumRx; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to OptumRx.

In so conducting the Sanofi-Optum Enterprise's affairs, Sanofi engaged in unlawful conduct that it could not have accomplished without OptumRx—securing through fraud and deception favorable treatment on OptumRx's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Sanofi would have had to do in normal commercial circumstances.

235.    The component entities are all willing and knowing participants in the Sanofi-Optum Enterprise.  Sanofi negotiated rebates with OptumRx for favorable formulary placement and entered into contracts with OptumRx that concealed both the extent of those rebates and the price protection that Sanofi provided OptumRx.  OptumRx represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Sanofi-Optum Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its benchmark prices.  Sanofi and OptumRx could not have successfully conducted the activities of the Sanofi-Optum Enterprise individually.

236.    The Sanofi-Optum Enterprise is on-going and has been in existence for all times relevant to this Complaint.  OptumRx continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra, and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays OptumRx.  OptumRx also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

237.    To accomplish this conduct, and to further the goals of the Sanofi-Optum Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's

conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Lantus, Apidra, and Toujeo and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

238.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with OptumRx.  Sanofi repeatedly communicated with OptumRx regarding Sanofi's benchmark prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect OptumRx from increases in Sanofi's benchmark prices.

239.    Sanofi then published deceptive, misleading, and misrepresentative benchmark prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated benchmark prices to various price reporting services. Sanofi knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo.  In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid OptumRx for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark

prices, Sanofi represented that these prices constituted an accurate price for its Lantus, Apidra, and Toujeo products.

240.     It was also foreseeable to Sanofi that OptumRx would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

241.     The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and OptumRx, working throughout the country and were repeatedly sent across state lines.

242.     Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive and misleading benchmark prices for Lantus, Apidra, and Toujeo, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to OptumRx.  This pattern of racketeering conduct is separate and distinct from the Sanofi-Optum Enterprise.  Sanofi is a separate and distinct entity from the Sanofi-Optum Enterprise.

243.     Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

244.     Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

245.     As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated.

Uninsured patients also pay the entire cost of the drug out-of-pocket. Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Sanofi set and publicly disseminated. Sanofi also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

246. Because Sanofi published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to OptumRx and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus, Apidra, and Toujeo. But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

247. The benchmark prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the deceptively inflated benchmark price on to patients.

248. Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

249.    Sanofi is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT VII**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO SANOFI)**

250.    The State re-alleges all prior paragraphs of this Complaint.

251.    Sanofi is a person as defined by 18 U.S.C. § 1961(3).

252.    Express Scripts is a person as defined by 18 U.S.C. § 1961(3).

253.    The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

254.    At all times relevant to this Complaint, Sanofi and Express Scripts constituted an enterprise as defined by 18 U.S.C. § 1961(4).   For purposes of this count, this enterprise is referred to as the "Sanofi-Express Scripts Enterprise."

255.    The Sanofi-Express Scripts Enterprise consists of an association-in-fact between Sanofi, including its directors, employees, and other agents, and Express Scripts, including its directors, employees, and other agents.

256.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Sanofi actually received for these products due to the rebates and other concessions made to Express Scripts—including by arranging placements for these products on Express Scripts's formularies through the negotiation of rebates, price protection factors, and discounts for these

products with Express Scripts, and through the exclusion of competing insulin products from Express Scripts's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c). Perpetuating the use of such fraudulent pricing practices was in the common interest of Sanofi and Express Scripts because they enhanced Express Scripts' ability to demand—and Sanofi's ability to offer—larger rebates off of Sanofi's benchmark prices (to the financial benefit of Express Scripts), while also allowing Sanofi to hold its net insulin prices relatively steady (to the financial benefit of Sanofi). In other words, Sanofi and Express Scripts had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

257. To accomplish the common purpose of the Sanofi-Express Scripts Enterprise, the component entities, Sanofi and Express Scripts, developed extensive relationships, both contractually and financially. The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would provide Express Scripts for favorable formulary placement, and the price protection terms Express Scripts demanded to protect against any increase in the benchmark prices of Lantus, Apidra, and Toujeo.

258. The Sanofi-Express Scripts enterprise affected interstate commerce. Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo which were sold throughout the United States and its territories.

259. Express Scripts participated in the conduct of the Sanofi-Express Scripts Enterprise in a variety of ways, including, but not limited to:

> (a) Negotiating significant rebates from the benchmark prices set by Sanofi for Lantus, Apidra, and Toujeo;

(b) Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates Express Scripts would earn from the sale of those products;

(c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Sanofi saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Sanofi published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Sanofi from health plan clients and the general public, and therefore concealing the actual, net price Sanofi received charged for these insulin products.

260.    Express Scripts's conduct and participation is essential to the success of the enterprise.  For Sanofi to maintain its net prices for these products, it required Express Scripts to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices.  It also required Express Scripts to market to its health plan clients that the rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi.  Express Scripts's participation allowed Sanofi to inflate its benchmark prices, offer larger rebates to Express Scripts to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

261.    Sanofi participated in, controlled, and conducted the affairs of the Sanofi-Express Scripts Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Lantus, Apidra, and Toujeo insulin products;

(b) Marketing to Express Scripts the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

    (c) Including price protection terms in its contracts with Express Scripts, which allowed Express Scripts to earn additional rebates when Sanofi increased its benchmark prices;

    (d) Paying rebates to Express Scripts for each prescription filled for Lantus, Apidra, and Toujeo by a Express Scripts health plan member;

    (e) Reporting to the general public and various price reporting services the benchmark price of Lantus, Apidra, and Toujeo while claiming that such prices represented the actual approximate price it receives for those products;

    (f) Inflating the benchmark price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to Express Scripts; and

    (g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to Express Scripts.

In so conducting the Sanofi-Express Scripts Enterprise's affairs, Sanofi engaged in unlawful conduct that it could not have accomplished without Express Scripts—securing through fraud and deception favorable treatment on Express Scripts's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Sanofi would have had to do in normal commercial circumstances.

    262.   The component entities are all willing and knowing participants in the Sanofi-Express Scripts Enterprise. Sanofi negotiated rebates with Express Scripts for favorable formulary placement and entered into contracts with Express Scripts that concealed both the extent of those rebates and the price protection that Sanofi provided Express Scripts. Express Scripts represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Sanofi-Express Scripts Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its benchmark prices. Sanofi and Express Scripts could not have successfully conducted the activities of the Sanofi-Express Scripts Enterprise individually.

263.    The Sanofi-Express Scripts Enterprise is on-going and has been in existence for all times relevant to this Complaint.  Express Scripts continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra, and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays Express Scripts.  Express Scripts also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

264.    To accomplish this conduct, and to further the goals of the Sanofi-Express Scripts Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Lantus, Apidra, and Toujeo and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

265.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with Express Scripts.  Sanofi repeatedly communicated with Express Scripts regarding Sanofi's benchmark prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect Express Scripts from increases in Sanofi's benchmark prices.

266.    Sanofi then published deceptive, misleading, and misrepresentative benchmark prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated prices to various price reporting services.  Sanofi knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo.  In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid Express Scripts for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Sanofi represented that these prices constituted an accurate price for its Lantus, Apidra, and Toujeo products.

267.    It was also foreseeable to Sanofi that Express Scripts would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

268.    The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and Express Scripts, working throughout the country and were repeatedly sent across state lines.

269.    Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive and misleading benchmark prices for Lantus, Apidra, and Toujeo, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to Express Scripts.  This pattern of

racketeering conduct is separate and distinct from the Sanofi-Express Scripts Enterprise. Sanofi is a separate and distinct entity from the Sanofi-Express Scripts Enterprise.

270.   Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

271.   Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

272.   As previously described, many patients pay all or a portion of their insulin costs out-of-pocket. Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket. Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Sanofi set and publicly disseminated. Sanofi also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

273.   Because Sanofi published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to Express Scripts and inflated its benchmark prices to preserve the net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus,

Apidra, and Toujeo.  But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

274.    The benchmark prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the deceptively inflated benchmark price on to patients.

275.    Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

276.    Sanofi is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT VIII**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO SANOFI)**

277.    The State re-alleges all prior paragraphs of this Complaint.

278.    Sanofi is a person as defined by 18 U.S.C. § 1961(3).

279.    Prime Therapeutics is a person as defined by 18 U.S.C. § 1961(3).

280.    The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Sanofi's conduct.

281.    At all times relevant to this Complaint, Sanofi and Prime Therapeutics constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Sanofi-Prime Enterprise."

282.    The Sanofi-Prime Enterprise consists of an association-in-fact between Sanofi, including its directors, employees, and other agents, and Prime Therapeutics, including its directors, employees, and other agents.

283.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Sanofi's Lantus, Apidra, and Toujeo insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Sanofi actually received for these products due to the rebates and other concessions made to Prime Therapeutics—including by arranging placements for these products on Prime Therapeutics' formularies through the negotiation of rebates, price protection factors, and discounts for these products with Prime Therapeutics, and through the exclusion of competing insulin products from Prime Therapeutics' formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).  Perpetuating the use of such fraudulent pricing practices was in the common interest of Sanofi and Prime Therapeutics because they enhanced Prime Therapeutics' ability to demand—and Sanofi's ability to offer—larger rebates off of Sanofi's benchmark prices (to the financial benefit of Prime Therapeutics), while also allowing Sanofi to hold its net insulin prices relatively steady (to the financial benefit of Sanofi).  In other words, Sanofi and Prime Therapeutics had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

284.    To accomplish the common purpose of the Sanofi-Prime Enterprise, the component entities, Sanofi and Prime Therapeutics, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires

and mail regarding the deceptively and misleadingly inflated benchmark price of Lantus, Apidra, and Toujeo, the rebates that Sanofi would provide Prime Therapeutics for favorable formulary placement, and the price protection terms Prime Therapeutics demanded to protect against any increase in the benchmark prices of Lantus, Apidra, and Toujeo.

285.   The Sanofi-Prime Enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of Lantus, Apidra, and Toujeo sold throughout the United States and its territories.

286.   Prime Therapeutics participated in the conduct of the Sanofi-Prime Enterprise in a variety of ways, including, but not limited to:

> (a)   Negotiating significant rebates from the benchmark prices set by Sanofi for Lantus, Apidra, and Toujeo;
>
> (b)   Developing formularies that provided Sanofi favorable placements for Lantus, Apidra, and Toujeo based on the rebates Prime Therapeutics would earn from the sale of those products;
>
> (c)   Excluding competing insulin products from certain formularies in exchange for increased rebates;
>
> (d)   Marketing formularies to health plan clients and making material representations that the rebates negotiated from Sanofi saved those clients and their members money;
>
> (e)   Making material misrepresentations that the benchmark prices that Sanofi published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and
>
> (f)   Concealing the actual rebates earned from Sanofi from health plan clients and the general public, and therefore concealing the actual, net price Sanofi received for these insulin products.

287.   Prime Therapeutics' conduct and participation is essential to the success of the enterprise.   For Sanofi to maintain its net prices for these products, it required Prime Therapeutics to select the products based on the rebates offered, rather than on which ones had

the lowest benchmark price.  It also required Prime Therapeutics to market to its health plan clients that the rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi.  Prime Therapeutics' participation allowed Sanofi to inflate its benchmark prices, offer larger rebates to Prime Therapeutics to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

288.    Sanofi participated in, controlled, and conducted the affairs of the Sanofi-Prime Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its Lantus, Apidra, and Toujeo insulin products;

(b) Marketing to Prime Therapeutics the rebates that it could earn for favorable formulary placements of Lantus, Apidra, and Toujeo, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with Prime Therapeutics, which allowed Prime Therapeutics to earn additional rebates when Sanofi increased its benchmark prices;

(d) Paying rebates to Prime Therapeutics for each prescription filled for Lantus, Apidra, and Toujeo by a Prime Therapeutics health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of Lantus, Apidra, and Toujeo while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of Lantus, Apidra, and Toujeo to account for the rebates that it paid to Prime Therapeutics; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to Prime Therapeutics.

In so conducting the Sanofi-Prime Enterprise's affairs, Sanofi engaged in unlawful conduct that it could not have accomplished without Prime Therapeutics—securing through fraud and deception favorable treatment on Prime Therapeutics's formulary for its insulin products without

having to reduce or otherwise compete on price with rival insulin manufacturers, as Sanofi would have had to do in normal commercial circumstances.

289.    The component entities are all willing and knowing participants in the Sanofi-Prime Enterprise.  Sanofi negotiated rebates with Prime Therapeutics for favorable formulary placement and entered into contracts with Prime Therapeutics that concealed both the extent of those rebates and the price protection that Sanofi provided Prime Therapeutics.  Prime Therapeutics represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Sanofi-Prime Enterprise reaped increased profits from Sanofi's deceptive and misleading representations regarding its benchmark prices.  Sanofi and Prime Therapeutics could not have successfully conducted the activities of the Sanofi-Prime Enterprise individually.

290.    The Sanofi-Prime Enterprise is on-going and has been in existence for all times relevant to this Complaint.  Prime Therapeutics continues to have contractual relationships with Sanofi; continues to negotiate rebates with Sanofi regarding Lantus, Apidra, and Toujeo; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Sanofi pays Prime Therapeutics.  Prime Therapeutics also continues to make substantial profits on the rebates that it earns from sale of Sanofi's products.

291.    To accomplish this conduct, and to further the goals of the Sanofi-Prime Enterprise, Sanofi participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Sanofi's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these

uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of Lantus, Apidra, and Toujeo and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

292.    Through the use of the U.S. Mail and interstate wire facilities, Sanofi negotiated rebates for its Lantus, Apidra, and Toujeo products with Prime Therapeutics.  Sanofi repeatedly communicated with Prime Therapeutics regarding Sanofi's benchmark prices, the rebates that Sanofi would provide in exchange for favorable formulary placement, and price protection agreements to protect Prime Therapeutics from increases in Sanofi's benchmark prices.

293.    Sanofi then published deceptive, misleading, and misrepresentative benchmark prices of Lantus, Apidra, and Toujeo and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated  prices to various price reporting services. Sanofi knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for Lantus, Apidra, and Toujeo.   In making these transmissions, Sanofi did not disclose the existence, nature, or magnitude of the rebates that it paid Prime Therapeutics for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.   Instead, by publishing only its benchmark prices, Sanofi represented that these prices constituted an accurate price for its Lantus, Apidra, and Toujeo products.

294.    It was also foreseeable to Sanofi that Prime Therapeutics would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that

Sanofi paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

295.    The number of transmissions that Sanofi sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Sanofi and Prime Therapeutics, working throughout the country and were repeatedly sent across state lines.

296.    Through this pattern of racketeering conduct, Sanofi was able to publish and disseminate deceptive and misleading benchmark prices for Lantus, Apidra, and Toujeo, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Sanofi provided to Prime Therapeutics.  This pattern of racketeering conduct is separate and distinct from the Sanofi-Prime Enterprise.  Sanofi is a separate and distinct entity from the Sanofi-Prime Enterprise.

297.    Sanofi continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

298.    Sanofi's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

299.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent.  In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates

housed within the correctional system.  Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Sanofi set and publicly disseminated.  Sanofi also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

300.    Because Sanofi published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to Prime Therapeutics and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for Lantus, Apidra, and Toujeo.  But for this conduct, Sanofi would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

301.    The benchmark prices that Sanofi set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the deceptively inflated  benchmark price on to patients.

302.    Sanofi's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

303.    Sanofi is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT IX
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
## (AS TO ELI LILLY)

304.    The State re-alleges all prior paragraphs of this Complaint.

305.    Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

306.    CVS is a person as defined by 18 U.S.C. § 1961(3).

307.    The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

308.    At all times relevant to this Complaint, Eli Lilly and CVS constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Eli Lilly-CVS Enterprise."

309.    The Eli Lilly-CVS Enterprise consists of an association-in-fact between Eli Lilly, including its directors, employees, and other agents, and CVS, including its directors, employees, and other agents.

310.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Eli Lilly actually received for these products due to the rebates and other concessions made to CVS—including by arranging placements for these products on CVS's formularies through the negotiation of rebates, price protection factors, and discounts for these products with CVS, and through the exclusion of competing insulin products from CVS's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).  Perpetuating the use of such fraudulent pricing practices was in the common interest of Eli Lilly and CVS because they enhanced CVS's

ability to demand—and Eli Lilly's ability to offer—larger rebates off of Eli Lilly's benchmark prices (to the financial benefit of CVS), while also allowing Eli Lilly to hold its net insulin prices relatively steady (to the financial benefit of Eli Lilly).  In other words, Eli Lilly and CVS had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

311.   To accomplish the common purpose of the Eli Lilly-CVS Enterprise, the component entities, Eli Lilly and CVS, developed extensive relationships, both contractually and financially.   The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of HumaLog and Basaglar, the rebates that Eli Lilly would provide CVS for favorable formulary placement, and the price protection terms CVS demanded to protect against any increase in the benchmark prices of HumaLog and Basaglar.

312.   The Eli Lilly-CVS enterprise affected interstate commerce.   Through their respective negotiations, they determined the price of HumaLog and Basaglar sold throughout the United States and its territories.

313.   CVS participated in the conduct of the Eli Lilly-CVS Enterprise in a variety of ways, including, but not limited to:

(a) Negotiating significant rebates from the benchmark prices set by Eli Lilly for HumaLog and Basaglar;

(b) Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates CVS would earn from the sale of those products;

(c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Eli Lilly saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Eli Lilly published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Eli Lilly from health plan clients and the general public, and therefore concealing the actual, net price Eli Lilly received for these insulin products.

314.   CVS's conduct and participation is essential to the success of the enterprise.  For Eli Lilly to maintain its net prices for these products, it required CVS to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices.  It also required CVS to market to its health plan clients that the rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly. CVS's participation allowed Eli Lilly to inflate its benchmark prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

315.   Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-CVS Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its HumaLog and Basaglar insulin products;

(b) Marketing to CVS the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with CVS, which allowed CVS to earn additional rebates when Eli Lilly increased its benchmark prices;

(d) Paying rebates to CVS for each prescription filled for HumaLog and Basaglar by a CVS health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of HumaLog and Basaglar while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of HumaLog and Basaglar to account for the rebates that it paid to CVS; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to CVS.

In so conducting the Eli Lilly-CVS Enterprise's affairs, Eli Lilly engaged in unlawful conduct that it could not have accomplished without CVS—securing through fraud and deception favorable treatment on CVS's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Eli Lilly would have had to do in normal commercial circumstances.

316.    The component entities are all willing and knowing participants in the Eli Lilly-CVS Enterprise.  Eli Lilly negotiated rebates with CVS for favorable formulary placement and entered into contracts with CVS that concealed both the extent of those rebates and the price protection that Eli Lilly provided CVS.  CVS represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies. All component entities of the Eli Lilly-CVS Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its benchmark prices.  Eli Lilly and CVS could not have successfully conducted the activities of the Eli Lilly-CVS Enterprise individually.

317.    The Eli Lilly-CVS Enterprise is on-going and has been in existence for all times relevant to this Complaint.  CVS continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the

rebates that Eli Lilly pays CVS.  CVS also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

318.    To accomplish this conduct, and to further the goals of the Eli Lilly-CVS Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Eli Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of HumaLog and Basaglar and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

319.    Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with CVS.  Eli Lilly repeatedly communicated with CVS regarding Eli Lilly's benchmark prices, the rebates that Eli Lilly would provide in exchange for favorable formulary placement, and price protection agreements to protect CVS from increases in Eli Lilly's benchmark prices.

320.    Eli Lilly then published deceptive, misleading, and misrepresentative benchmark prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated prices to various price reporting services.  Eli Lilly knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections

would pay for HumaLog and Basaglar.  In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid CVS for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Eli Lilly represented that these prices constituted an accurate price for its HumaLog and Basaglar products.

321.    It was also foreseeable to Eli Lilly that CVS would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

322.    The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Eli Lilly and CVS, working throughout the country and were repeatedly sent across state lines.

323.    Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive and misleading benchmark prices for HumaLog and Basaglar, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to CVS.  This pattern of racketeering conduct is separate and distinct from the Eli Lilly-CVS Enterprise.  Eli Lilly is a separate and distinct entity from the Eli Lilly-CVS Enterprise.

324.    Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

325.    Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

326. As previously described, many patients pay all or a portion of their insulin costs out-of-pocket. Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket. Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent. In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system. Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Eli Lilly set and publicly disseminated. Eli Lilly also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

327. Because Eli Lilly published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to CVS and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for HumaLog and Basaglar. But for this conduct, Eli Lilly would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

328. The benchmark prices that Eli Lilly set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the deceptively inflated benchmark price on to patients.

329.     Eli Lilly's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

330.     Eli Lilly is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT X**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO ELI LILLY)**

331.     The State re-alleges all prior paragraphs of this Complaint.

332.     Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

333.     OptumRx is a person as defined by 18 U.S.C. § 1961(3).

334.     The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

335.     At all times relevant to this Complaint, Eli Lilly and OptumRx constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Eli Lilly-Optum Enterprise."

336.     The Eli Lilly-Optum Enterprise consists of an association-in-fact between Eli Lilly, including its directors, employees, and other agents, and OptumRx, including its directors, employees, and other agents.

337.     The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Eli Lilly actually received for these products due to the rebates and other concessions made

to OptumRx—including by arranging placements for these products on OptumRx's formularies through the negotiation of rebates, price protection factors, and discounts for these products with OptumRx, and through the exclusion of competing insulin products from OptumRx's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).  Perpetuating the use of such fraudulent pricing practices was in the common interest of Eli Lilly and OptumRx because they enhanced OptumRx's ability to demand—and Eli Lilly's ability to offer—larger rebates off of Eli Lilly's benchmark prices (to the financial benefit of OptumRx), while also allowing Eli Lilly to hold its net insulin prices relatively steady (to the financial benefit of Eli Lilly).  In other words, Eli Lilly and OptumRx had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

338.    To accomplish the common purpose of the Eli Lilly-Optum Enterprise, the component entities, Eli Lilly and OptumRx, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of HumaLog and Basaglar, the rebates that Eli Lilly would provide OptumRx for favorable formulary placement, and the price protection terms OptumRx demanded to protect against any increase in the benchmark prices of HumaLog and Basaglar.

339.    The Eli Lilly-OptumRx enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of HumaLog and Basaglar sold throughout the United States and its territories.

340.    OptumRx participated in the conduct of the Eli Lilly-Optum Enterprise in a variety of ways, including, but not limited to:

(a) Negotiating significant rebates from the benchmark prices set by Eli Lilly for HumaLog and Basaglar;

(b) Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates OptumRx would earn from the sale of those products;

(c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Eli Lilly saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Eli Lilly published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Eli Lilly from health plan clients and the general public, and therefore concealing the actual, net price Eli Lilly received for these insulin products.

341.    OptumRx's conduct and participation is essential to the success of the enterprise. For Eli Lilly to maintain its net prices for these products, it required OptumRx to select the products based on the rebates offered, rather than on ones which had the lowest benchmark price. It also required OptumRx to market to its health plan clients that the rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly. OptumRx's participation allowed Eli Lilly to inflate its benchmark prices, offer larger rebates to OptumRx to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

342.    Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-Optum Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its HumaLog and Basaglar insulin products;

(b) Marketing to Eli Lilly the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with OptumRx, which allowed OptumRx to earn additional rebates when Eli Lilly increased its benchmark prices;

(d) Paying rebates to OptumRx for each prescription filled for HumaLog and Basaglar by a OptumRx health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of HumaLog and Basaglar while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of HumaLog and Basaglar to account for the rebates that it paid to OptumRx; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to OptumRx.

In so conducting the Eli Lilly-Optum Enterprise's affairs, Eli Lilly engaged in unlawful conduct that it could not have accomplished without OptumRx—securing through fraud and deception favorable treatment on OptumRx's formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Eli Lilly would have had to do in normal commercial circumstances.

343.   The component entities are all willing and knowing participants in the Eli Lilly-Optum Enterprise.   Eli Lilly negotiated rebates with OptumRx for favorable formulary placement and entered into contracts with OptumRx that concealed both the extent of those rebates and the price protection that Eli Lilly provided OptumRx.   OptumRx represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.   All component entities of the Eli Lilly-Optum Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its

benchmark prices.  Eli Lilly and OptumRx could not have successfully conducted the activities of the Eli Lilly-Optum Enterprise individually.

344.    The Eli Lilly-Optum Enterprise is on-going and has been in existence for all times relevant to this Complaint.  OptumRx continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Eli Lilly pays OptumRx.  OptumRx also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

345.    To accomplish this conduct, and to further the goals of the Eli Lilly-Optum Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Eli Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of HumaLog and Basaglar and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

346.    Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with OptumRx.  Eli Lilly repeatedly communicated with OptumRx regarding Eli Lilly's benchmark prices, the rebates that Eli Lilly

would provide in exchange for favorable formulary placement, and price protection agreements to protect OptumRx from increases in Eli Lilly's benchmark prices.

347.    Eli Lilly then published deceptive, misleading, and misrepresentative benchmark prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated prices to various price reporting services.  Eli Lilly knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for HumaLog and Basaglar.  In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid OptumRx for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Eli Lilly represented that these prices constituted an accurate price for its HumaLog and Basaglar products.

348.    It was also foreseeable to Eli Lilly that OptumRx would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

349.    The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Eli Lilly and OptumRx, working throughout the country and were repeatedly sent across state lines.

350.    Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive and misleading benchmark prices for HumaLog and Basaglar, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to OptumRx.  This pattern of

racketeering conduct is separate and distinct from the Eli Lilly-Optum Enterprise.  Eli Lilly is a separate and distinct entity from the Eli Lilly-Optum Enterprise.

351.    Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

352.    Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

353.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent.  In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates housed within the correctional system.  Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Eli Lilly set and publicly disseminated.  Eli Lilly also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

354.    Because Eli Lilly published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to OptumRx and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for HumaLog

and Basaglar.  But for this conduct, Eli Lilly would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

355.    The benchmark prices that Eli Lilly set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the deceptively inflated benchmark price on to patients.

356.    Eli Lilly's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

357.    Eli Lilly is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT XI
## RICO ACT VIOLATION; 18 U.S.C. § 1962(c)
## (AS TO ELI LILLY)

358.    The State re-alleges all prior paragraphs of this Complaint.

359.    Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

360.    Express Scripts is a person as defined by 18 U.S.C. § 1961(3).

361.    The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

362.    At all times relevant to this Complaint, Eli Lilly and Express Scripts constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Eli Lilly-Express Scripts Enterprise."

363.    The Eli Lilly-Express Scripts Enterprise consists of an association-in-fact between Eli Lilly, including its directors, employees, and other agents, and Express Scripts, including its directors, employees, and other agents.

364.    The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Eli Lilly actually received for these products due to the rebates and other concessions made to Express Scripts—including by arranging placements for these products on Express Scripts's formularies through the negotiation of rebates, price protection factors, and discounts for these products with Express Scripts, and through the exclusion of competing insulin products from Express Scripts's formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).  Perpetuating the use of such fraudulent pricing practices was in the common interest of Eli Lilly and Express Scripts because they enhanced Express Scripts' ability to demand—and Eli Lilly's ability to offer—larger rebates off of Eli Lilly's benchmark prices (to the financial benefit of Express Scripts), while also allowing Eli Lilly to hold its net insulin prices relatively steady (to the financial benefit of Eli Lilly).  In other words, Eli Lilly and Express Scripts had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

365.    To accomplish the common purpose of the Eli Lilly-Express Scripts Enterprise, the component entities, Eli Lilly and Express Scripts, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of HumaLog and

Basaglar, the rebates that Eli Lilly would provide Express Scripts for favorable formulary placement, and the price protection terms Express Scripts demanded to protect against any increase in the benchmark prices of HumaLog and Basaglar.

366.    The Eli Lilly-Express Scripts enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of HumaLog and Basaglar sold throughout the United States and its territories.

367.    Express Scripts participated in the conduct of the Eli Lilly-Express Scripts Enterprise in a variety of ways, including, but not limited to:

> (a) Negotiating significant rebates from the benchmark prices set by Eli Lilly for HumaLog and Basaglar;

> (b) Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates Express Scripts would earn from the sale of those products;

> (c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

> (d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Eli Lilly saved those clients and their members money;

> (e) Making material misrepresentations that the benchmark prices that Eli Lilly published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

> (f) Concealing the actual rebates earned from Eli Lilly from health plan clients and the general public, and therefore concealing the actual, net price Eli Lilly received for these insulin products.

368.    Express Scripts's conduct and participation is essential to the success of the enterprise.  For Eli Lilly to maintain its net prices for these products, it required Express Scripts to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices.  It also required Express Scripts to market to its health plan clients that the

rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly.  Express Scripts's participation allowed Eli Lilly to inflate its benchmark prices, offer larger rebates to Express Scripts to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

369.   Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-Express Scripts Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its HumaLog and Basaglar insulin products;

(b) Marketing to Eli Lilly the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with Express Scripts, which allowed Express Scripts to earn additional rebates when Eli Lilly increased its benchmark prices;

(d) Paying rebates to Express Scripts for each prescription filled for HumaLog and Basaglar by a Express Scripts health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of HumaLog and Basaglar while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of HumaLog and Basaglar to account for the rebates that it paid to Express Scripts; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to Express Scripts.

In so conducting the Eli Lilly-Express Scripts Enterprise's affairs, Eli Lilly engaged in unlawful conduct that it could not have accomplished without Express Scripts—securing through fraud and deception favorable treatment on Express Scripts' formulary for its insulin products without having to reduce or otherwise compete on price with rival insulin manufacturers, as Eli Lilly would have had to do in normal commercial circumstances.

370.    The component entities are all willing and knowing participants in the Eli Lilly-Express Scripts Enterprise.  Eli Lilly negotiated rebates with Express Scripts for favorable formulary placement and entered into contracts with Express Scripts that concealed both the extent of those rebates and the price protection that Eli Lilly provided Express Scripts.  Express Scripts represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Eli Lilly-Express Scripts Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its benchmark prices.  Eli Lilly and Express Scripts could not have successfully conducted the activities of the Eli Lilly-Express Scripts Enterprise individually.

371.    The Eli Lilly-Express Scripts Enterprise is on-going and has been in existence for all times relevant to this Complaint.  Express Scripts continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Eli Lilly pays Express Scripts.  Express Scripts also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

372.    To accomplish this conduct, and to further the goals of the Eli Lilly-Express Scripts Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Eli Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. §

1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of HumaLog and Basaglar and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

373.     Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with Express Scripts.  Eli Lilly repeatedly communicated with Express Scripts regarding Eli Lilly's benchmark prices, the rebates that Eli Lilly would provide in exchange for favorable formulary placement, and price protection agreements to protect Express Scripts from increases in Eli Lilly's benchmark prices.

374.     Eli Lilly then published deceptive, misleading, and misrepresentative benchmark prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated  prices to various price reporting services.  Eli Lilly knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for HumaLog and Basaglar.  In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid Express Scripts for favorable formulary placements, nor did it disclose the substantial difference between its inflated benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Eli Lilly represented that these prices constituted an accurate price for its HumaLog and Basaglar products.

375.     It was also foreseeable to Eli Lilly that Express Scripts would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that

Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

376.    The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.   They were made by numerous employees of Eli Lilly and Express Scripts, working throughout the country and were repeatedly sent across state lines.

377.    Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive and misleading benchmark prices for HumaLog and Basaglar, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to Express Scripts.   This pattern of racketeering conduct is separate and distinct from the Eli Lilly-Express Scripts Enterprise.   Eli Lilly is a separate and distinct entity from the Eli Lilly-Express Scripts Enterprise.

378.    Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

379.    Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

380.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.   Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.   Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount spent.   In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket. Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates

housed within the correctional system.  Each amount that these persons pay is based directly on the deceptive and misleading benchmark price that Eli Lilly set and publicly disseminated.  Eli Lilly also knew that payments by these persons were based directly on the benchmark price it set, and thus could foresee that such persons would pay more for its insulin products when it publicly disseminated its deceptive and misleading benchmark prices.

381.    Because Eli Lilly published deceptive and misleading benchmark prices for the purpose of marketing larger, undisclosed rebates to Express Scripts and inflated its benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota residents and the Minnesota Department of Corrections paid more than they otherwise would have for HumaLog and Basaglar.  But for this conduct, Eli Lilly would be forced to compete with other analog insulin manufacturers on the actual price of their products and the price of insulin would decline for everyone.

382.    The benchmark prices that Eli Lilly set did not drastically harm other components of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies). Each of those entities could pass the deceptively inflated benchmark price on to patients.

383.    Eli Lilly's deceptive and misleading conduct, practices, and actions described in this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

384.    Eli Lilly is therefore liable for treble the damage suffered by the State's residents and the Minnesota Department of Corrections, costs, and reasonable attorneys' fees, and should be enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

**COUNT XII**
**RICO ACT VIOLATION; 18 U.S.C. § 1962(c)**
**(AS TO ELI LILLY)**

385.    The State re-alleges all prior paragraphs of this Complaint.

386.     Eli Lilly is a person as defined by 18 U.S.C. § 1961(3).

387.     Prime Therapeutics is a person as defined by 18 U.S.C. § 1961(3).

388.     The State, its residents, and the Minnesota Department of Corrections are all persons as defined by 18 U.S.C. § 1961(3) who were injured by Eli Lilly's conduct.

389.     At all times relevant to this Complaint, Eli Lilly and Prime Therapeutics constituted an enterprise as defined by 18 U.S.C. § 1961(4).  For purposes of this count, this enterprise is referred to as the "Eli Lilly-Prime Enterprise."

390.     The Eli Lilly-Prime Enterprise consists of an association-in-fact between Eli Lilly, including its directors, employees, and other agents, and Prime Therapeutics, including its directors, employees, and other agents.

391.     The shared and common purpose of the association is to arrange for the sale, purchase, and distribution of Eli Lilly's HumaLog and Basaglar insulin products through the fraudulent scheme described in this Complaint of publishing deceptively inflated benchmark prices for these products that were not reasonably reflective of the secret, undisclosed net prices that Eli Lilly actually received for these products due to the rebates and other concessions made to Prime Therapeutics—including by arranging placements for these products on Prime Therapeutics' formularies through the negotiation of rebates, price protection factors, and discounts for these products with Prime Therapeutics, and through the exclusion of competing insulin products from Prime Therapeutics' formulary—so that both entities could profit, in violation of 18 U.S.C. § 1962(c).  Perpetuating the use of such fraudulent pricing practices was in the common interest of Eli Lilly and Prime Therapeutics because they enhanced Prime Therapeutics' ability to demand—and Eli Lilly's ability to offer—larger rebates off of Eli Lilly's benchmark prices (to the financial benefit of Prime Therapeutics), while also allowing Eli Lilly

to hold its net insulin prices relatively steady (to the financial benefit of Eli Lilly).  In other words, Eli Lilly and Prime Therapeutics had both the mutual incentive to and the common purpose of perpetuating the fraudulent benchmark pricing practices described herein for the financial gain of both.

392.    To accomplish the common purpose of the Eli Lilly-Prime Enterprise, the component entities, Eli Lilly and Prime Therapeutics, developed extensive relationships, both contractually and financially.  The component entities communicated regularly through the wires and mail regarding the deceptively and misleadingly inflated benchmark price of HumaLog and Basaglar, the rebates that Eli Lilly would provide Prime Therapeutics for favorable formulary placement, and the price protection terms Prime Therapeutics demanded to protect against any increase in the benchmark prices of HumaLog and Basaglar.

393.    The Eli Lilly-Prime Enterprise affected interstate commerce.  Through their respective negotiations, they determined the price of HumaLog and Basaglar sold throughout the United States and its territories.

394.    Prime Therapeutics participated in the conduct of the Eli Lilly-Prime Enterprise in a variety of ways, including, but not limited to:

(a) Negotiating significant rebates from the benchmark prices set by Eli Lilly for HumaLog and Basaglar;

(b) Developing formularies that provided Eli Lilly favorable placements for HumaLog and Basaglar based on the rebates Prime Therapeutics would earn from the sale of those products;

(c) Excluding competing insulin products from certain formularies in exchange for increased rebates;

(d) Marketing formularies to health plan clients and making material representations that the rebates negotiated from Eli Lilly saved those clients and their members money;

(e) Making material misrepresentations that the benchmark prices that Eli Lilly published approximated the actual prices of these insulin products and that those prices were an accurate basis on which out-of-pocket payments should be based; and

(f) Concealing the actual rebates earned from Eli Lilly from health plan clients and the general public, and therefore concealing the actual, net price Eli Lilly received for these insulin products.

395.   Prime Therapeutics' conduct and participation is essential to the success of the enterprise.  For Eli Lilly to maintain its net prices for these products, it required Prime Therapeutics to select the products based on the rebates offered, rather than on which ones had the lowest benchmark prices.  It also required Prime Therapeutics to market to its health plan clients that the rebates Eli Lilly offered saved the clients and their members money to conceal the actual rebates paid by Eli Lilly.  Prime Therapeutics' participation allowed Eli Lilly to inflate its benchmark prices, offer larger rebates to Prime Therapeutics to maintain access to that portion of the market, and still earn additional profits from those who could not take advantage of those rebates.

396.   Eli Lilly participated in, controlled, and conducted the affairs of the Eli Lilly-Prime Enterprise by, among other ways:

(a) Setting deceptive, misleading, and misrepresentative benchmark prices for its HumaLog and Basaglar insulin products;

(b) Marketing to Eli Lilly the rebates that it could earn for favorable formulary placements of HumaLog and Basaglar, including in some cases, for omitting competing products from certain of its formularies;

(c) Including price protection terms in its contracts with Prime Therapeutics, which allowed Prime Therapeutics to earn additional rebates when Eli Lilly increased its benchmark prices;

(d) Paying rebates to Prime Therapeutics for each prescription filled for HumaLog and Basaglar by a Prime Therapeutics health plan member;

(e) Reporting to the general public and various price reporting services the benchmark price of HumaLog and Basaglar while claiming that such prices represented the actual approximate price it received for those products;

(f) Inflating the benchmark price of HumaLog and Basaglar to account for the rebates that it paid to Prime Therapeutics; and

(g) Misrepresenting and concealing from the general public the magnitude of the rebates that it paid to Prime Therapeutics.

397.    The component entities are all willing and knowing participants in the Eli Lilly-Prime Enterprise.  Eli Lilly negotiated rebates with Prime Therapeutics for favorable formulary placement and entered into contracts with Prime Therapeutics that concealed both the extent of those rebates and the price protection that Eli Lilly provided Prime Therapeutics.  Prime Therapeutics represented to its health plan clients that it secured significant savings because of those rebates and solicited those clients to select its formularies.  All component entities of the Eli Lilly-Prime Enterprise reaped increased profits from Eli Lilly's deceptive and misleading representations regarding its benchmark prices.  Eli Lilly and Prime Therapeutics could not have successfully conducted the activities of the Eli Lilly- Prime Enterprise individually.

398.    The Eli Lilly-Prime Enterprise is on-going and has been in existence for all times relevant to this Complaint.  Prime Therapeutics continues to have contractual relationships with Eli Lilly; continues to negotiate rebates with Eli Lilly regarding HumaLog and Basaglar; and continues to develop formularies that provide varying levels of preference to those products based on the rebates that Eli Lilly pays Prime Therapeutics.  Prime Therapeutics also continues to make substantial profits on the rebates that it earns from sale of Eli Lilly's products.

399.    To accomplish this conduct, and to further the goals of the Eli Lilly-Prime Enterprise, Eli Lilly participated in a pattern of racketeering activity, including acts indictable as mail fraud, pursuant to 18 U.S.C. § 1341, and wire fraud, pursuant to 18 U.S.C. § 1343.  Eli

Lilly's conduct included multiple uses of the U.S. Mail and interstate wire facilities with the intent to defraud the State, its residents, and the Minnesota Department of Corrections.  Each such use constitutes "racketeering activity," as defined by 18 U.S.C. § 1961(1), and collectively, these uses amount to a "pattern of racketeering conduct," as defined by 18 U.S.C. § 1961(5).  The use of the U.S. Mail and interstate wire facilities was related to the same purpose (i.e., inflating the benchmark price of HumaLog and Basaglar and deceptively and misleadingly publicly disseminating these inflated prices), involved the same victims, and involved similar actors and methods.  It was carried out across state boundaries.

400.    Through the use of the U.S. Mail and interstate wire facilities, Eli Lilly negotiated rebates for its HumaLog and Basaglar products with Prime Therapeutics.  Eli Lilly repeatedly communicated with Prime Therapeutics regarding Eli Lilly's benchmark prices, the rebates that Eli Lilly would provide in exchange for favorable formulary placement, and price protection agreements to protect Prime Therapeutics from increases in Eli Lilly's benchmark prices.

401.    Eli Lilly then published deceptive, misleading, and misrepresentative benchmark prices of HumaLog and Basaglar and used the U.S. Mail and interstate wire facilities to transmit information regarding those inflated prices to various price reporting services.  Eli Lilly knew that other entities, including retail pharmacies, would rely on those benchmark prices to determine the price that many Minnesota residents and the Minnesota Department of Corrections would pay for HumaLog and Basaglar.  In making these transmissions, Eli Lilly did not disclose the existence, nature, or magnitude of the rebates that it paid Prime Therapeutics for favorable formulary placements, nor did it disclose the substantial difference between its benchmark prices and net prices.  Instead, by publishing only its benchmark prices, Eli Lilly represented that these prices constituted an accurate price for its HumaLog and Basaglar products.

402.    It was also foreseeable to Eli Lilly that Prime Therapeutics would use the U.S. Mail and interstate wire facilities to transmit information regarding the magnitude of the rebates that Eli Lilly paid and to use the U.S. Mail and interstate wire facilities to market those rebates as a cost-savings benefit to its health plan clients.

403.    The number of transmissions that Eli Lilly sent or caused to be sent numbers in the hundreds, if not thousands.  They were made by numerous employees of Eli Lilly and Prime Therapeutics, working throughout the country and were repeatedly sent across state lines.

404.    Through this pattern of racketeering conduct, Eli Lilly was able to publish and disseminate deceptive and misleading benchmark prices for HumaLog and Basaglar, avoid competing on price with its competitors, and reap increased profits by deceiving those who could not take advantage of the rebates that Eli Lilly provided to Prime Therapeutics.  This pattern of racketeering conduct is separate and distinct from the Eli Lilly-Prime Enterprise.  Eli Lilly is a separate and distinct entity from the Eli Lilly-Prime Enterprise.

405.    Eli Lilly continues to engage in this pattern of racketeering conduct and will continue to do so unless the Court enjoins such activity.

406.    Eli Lilly's pattern of racketeering activity has caused monetary harm both directly and indirectly to the State, its residents, and the Minnesota Department of Corrections, all of whom have paid deceptively inflated prices for insulin products.

407.    As previously described, many patients pay all or a portion of their insulin costs out-of-pocket.  Those with high-deductible health plans pay all of the drug's cost until their deductible is satisfied and do not receive the benefit of the rebate their health plan negotiated. Uninsured patients also pay the entire cost of the drug out-of-pocket.  Those covered by Medicare Part D also must pay varying amounts out-of-pocket depending on the total amount

spent.  In addition, those with coinsurance pay a percent of their drug's total cost out-of-pocket.

Finally, the Minnesota Department of Corrections pays for pharmaceuticals on behalf of inmates

housed within the correctional system.  Each amount that these persons pay is based directly on

the deceptive and misleading benchmark price that Eli Lilly set and publicly disseminated.  Eli

Lilly also knew that payments by these persons were based directly on the benchmark price it

set, and thus could foresee that such persons would pay more for its insulin products when it

publicly disseminated its deceptive and misleading benchmark prices.

408.    Because Eli Lilly published deceptive and misleading benchmark prices for the

purpose of marketing larger, undisclosed rebates to Prime Therapeutics and inflated its

benchmark prices to preserve the actual, net prices that it received for insulin, Minnesota

residents and the Minnesota Department of Corrections paid more than they otherwise would

have for HumaLog and Basaglar.  But for this conduct, Eli Lilly would be forced to compete

with other analog insulin manufacturers on the actual price of their products and the price of

insulin would decline for everyone.

409.    The benchmark prices that Eli Lilly set did not drastically harm other components

of the pharmaceutical supply chain (such as wholesalers, health plans, and retail pharmacies).

Each of those entities could pass the deceptively inflated benchmark price on to patients.

410.    Eli Lilly's deceptive and misleading conduct, practices, and actions described in

this Complaint constitute multiple, separate violations of 18 U.S.C. §§ 1961 *et seq*.

411.    Eli Lilly is therefore liable for treble the damage suffered by the State's residents

and the Minnesota Department of Corrections, costs, reasonable attorneys' fees, and should be

enjoined from further unlawful conduct as a result of its violations of 18 U.S.C. § 1962(c).

## COUNT XIII
## CONSUMER FRAUD
## (AS TO ALL DEFENDANTS)

412.     The State of Minnesota re-alleges all prior paragraphs of this Complaint.

413.     Minnesota Statutes section 325F.69, subdivision 1, provides that:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

414.     The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes both goods and services.  *See* Minn. Stat. § 325F.68, subd. 2.

415.     Defendants have repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint with the intent that others rely thereon in connection with the sale of their respective insulin products.   Among other things, Defendants knowingly and purposefully increased their benchmark prices so that they could offer undisclosed larger rebates to PBMs, thereby allowing Defendants to retain preferred formulary access for their insulin products without reducing the actual, net price they received for their products.   Because of Defendants' conduct, the undisclosed difference between their benchmark prices and their net prices is so substantial that their benchmark prices do not reasonably approximate the actual price Defendants receive for their insulin products.   By nevertheless publishing their falsely inflated benchmark prices, Defendants fraudulently represented that they were a reasonable approximation of the actual price they receive for their insulin products, and Defendants' public dissemination of these misleading benchmark prices is thus a deceptive practice.

416.     Defendants knew, as described in this Complaint, that the prices they published would be used as a benchmark and to determine the price that Minnesota: (1) consumers without insurance; (2) consumers with high-deductible plans; (3) consumers who are Medicare Part D beneficiaries; (4) consumers who pay coinsurance as part of their health plan; and (5) the Minnesota Department of Corrections would pay for their insulin.  Because of Defendants' deceptive and misleading pricing practices, these persons and entities paid more for insulin than they otherwise would have, thereby causing them harm and enriching Defendants.

417.     Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.69, and the State is entitled to monetary relief, including damages, restitution, and/or disgorgement, civil penalties, costs, reasonable attorneys' fees, and injunctive relief, as a result.

## COUNT XIV
## DECEPTIVE TRADE PRACTICES
## (AS TO ALL DEFENDANTS)

418.     The State of Minnesota re-alleges all prior paragraphs of this Complaint.

419.     Minnesota Statutes section 325D.44, subdivision 1, provides, in part:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> ***
>
> (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
>
> *** ; or
>
> (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

420.     Defendants have repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint

that caused a likelihood of confusion or misunderstanding among Minnesotans.  Among other things, Defendants knowingly and purposefully increased their benchmark prices so that they could offer undisclosed larger rebates to PBMs, thereby allowing Defendants to retain preferred formulary access for their insulin products without reducing the actual, net price they received for their products.  Because of Defendants' conduct, the undisclosed difference between their benchmark prices and their net prices is so substantial that their benchmark prices do not reasonably approximate the actual price Defendants receive for their insulin products.  By nevertheless publishing their falsely inflated benchmark prices, Defendants fraudulently represented that they were a reasonable approximation of the actual price they receive for their insulin products, and Defendants' public dissemination of these misleading benchmark prices is thus a deceptive practice.  Defendants publishing of their falsely inflated benchmark  prices was further a deceptive and misleading representation about the existence of and/or amount of the price reductions that Defendants provided for their insulin products when they were sold. Defendants' publishing of their deceptive and misleading benchmark prices created a likelihood of confusion and misunderstanding among Minnesota persons and entities, including those referenced in the next paragraph, regarding the actual, net price that Defendants received for their insulin products.

421.    Defendants knew, as described in this Complaint, that the prices they published would be used as a benchmark and to determine the price that Minnesota: (1) consumers without insurance; (2) consumers with high-deductible plans; (3) consumers who are Medicare Part D beneficiaries; (4) consumers who pay coinsurance as part of their health plan; and (5) the Minnesota Department of Corrections would pay for their insulin.  Because of Defendants'

deceptive and misleading pricing practices, these persons and entities paid more for insulin than they otherwise would have, thereby causing them harm and enriching Defendants.

422.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44, and the State is entitled to monetary relief, including damages, restitution, and/or disgorgement, civil penalties, costs, reasonable attorneys' fees, and injunctive relief, as a result.

## COUNT XV
## FALSE ADVERTISING
## (AS TO ALL DEFENDANTS)

423.   The State of Minnesota re-alleges all prior paragraphs in this Complaint.

424.   Minnesota Statutes section 325F.67 provides that:

> Any person, firm, corporation, or association who, with intent to sell or in anywise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation, or association, directly or indirectly, to the public, for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an advertisement of any sort regarding merchandise, securities, service, or anything so offered to the public, for use, consumption, purchase, or sale, which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

425.   Defendants have repeatedly violated Minnesota Statutes section 325F.67 by engaging in the deceptive and fraudulent practices described in this Complaint, including by causing their misleadingly inflated benchmark prices to be publicly disseminated and published

in Minnesota through price reporting services and in various promotional and marketing materials.  Among other things, Defendants knowingly and purposefully increased their benchmark prices so that they could offer undisclosed larger rebates to PBMs, thereby allowing Defendants to retain preferred formulary access for their insulin products without reducing the actual, net price they received for their products.  Because of Defendants' conduct, the undisclosed difference between their benchmark prices and their net prices is so substantial that their benchmark prices do not reasonably approximate the actual price Defendants receive for their insulin products.  By nevertheless publishing their inflated benchmark prices, Defendants fraudulently represented that they were a reasonable approximation of the actual price they receive for their insulin products, and Defendants' public dissemination of these misleading benchmark prices is thus a deceptive practice.

426.    Defendants knew, as described in this Complaint, that the prices they published would be used as a benchmark and to determine the price that Minnesota: (1) consumers without insurance; (2) consumers with high-deductible plans; (3) consumers who are Medicare Part D beneficiaries; (4) consumers who pay coinsurance as part of their health plan; and (5) the Minnesota Department of Corrections would pay for their insulin.  Because of Defendants' deceptive and misleading pricing practices, these persons and entities paid more for insulin than they otherwise would have, thereby causing them harm and enriching Defendants.

427.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.67, and the State is entitled to monetary relief, including damages, restitution, and/or disgorgement, civil penalties, costs, reasonable attorneys' fees, and injunctive relief, as a result.

## COUNT XVI
## UNJUST ENRICHMENT
## (AS TO ALL DEFENDANTS)

428.    The State of Minnesota re-alleges all prior paragraphs in this Complaint.

429.    A cause of action for unjust enrichment arises where a benefit is conferred upon a defendant who knowingly accepts it and who retains it under such circumstances that it would be inequitable for the defendant to keep it.

430.    For the purposes of an unjust enrichment claim, a benefit is conferred upon another when one gives possession of money to the other or where one has extracted a benefit from another by fraud, conversion, or similar conduct.

431.    Minnesota's residents and the Minnesota Department of Corrections conferred a benefit on Defendants by purchasing their insulin products at a price based on the deceptively and misleadingly inflated benchmark prices that Defendants published for the products.

432.    Defendants knowingly accepted and retained such benefits.

433.    Defendants' acceptance and retention of such benefits under the circumstances would be unjust and inequitable, given that the State's residents and the Minnesota Department of Corrections paid prices far higher than the actual net price at which Defendants sold insulin.

434.    Defendants' conduct constitutes unjust enrichment under Minnesota common law, for which, as a matter of equity, they should not derive any gain and/or the State's residents and the Minnesota Department of Corrections should be made whole.

435.    Pursuant to the common law pertaining to unjust enrichment and the State's inherent *parens patriae* authority, the State is entitled to injunctive relief, disgorgement and/or restitution, and other legal and/or equitable relief for Defendants' conduct resulting in unjust enrichment.

## RELIEF

WHEREFORE, Plaintiff State of Minnesota, by its Attorney General, Keith Ellison, respectfully asks this Court to enter judgment against Defendants awarding the following relief:

436.   Declaring that Defendants' acts described in this Complaint constitute multiple, separate violations of 18 U.S.C. § 1962(c), Minnesota Statutes sections 325D.44, 325F.67, and 325F.69, and unjustly enriched Defendants;

437.   Enjoining, separately, under both federal RICO laws and Minnesota law, Defendants and their employees, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in the unlawful acts described in this Complaint or in any other way violating 18 U.S.C. § 1962(c) or Minnesota Statutes sections 325D.44, 325F.67, or 325F.69, including enjoining Defendants from publishing or otherwise disseminating false, deceptive, or misleading benchmark prices for their insulin products that do not reasonably approximate the actual price they receive for their insulin products after taking into account all rebates, discounts, and any other pricing-related concessions;

438.   Awarding the State, its residents, and the Minnesota Department of Corrections monetary relief, including damages, restitution, disgorgement, and/or all other available legal and equitable monetary remedies available under 18 U.S.C. § 1964, Minnesota Statutes sections 8.31, the *parens patriae* doctrine, Minnesota common law, and the general equitable powers of this Court, as necessary to remedy the harm from Defendant's acts described in this Complaint;

439.   Awarding civil penalties pursuant to Minnesota Statutes section 8.31 for each separate violation of Minnesota law;

440.   Awarding the State its attorneys' fees, litigation costs, and costs of investigation, as authorized by 18 U.S.C. § 1964(c) and Minnesota Statutes section 8.31; and

441.    Granting such further relief as provided by law or equity, or as the Court deems appropriate and just.


**LITE DEPALMA GREENBERG, LLC**


Dated: April 10, 2019                    */s/ Jeremy Nash*
                                         Jeremy Nash
                                         570 Broad Street, Suite 1201
                                         Newark, NJ 07102
                                         Telephone: (973) 623-3000
                                         Facsimile: (973) 623-0858
                                         jnash@litedepalma.com

                                         **STATE OF MINNESOTA**

                                         KEITH ELLISON
                                         Attorney General
                                         State of Minnesota

                                         JAMES W. CANADAY
                                         Deputy Attorney General

                                         BENJAMIN VELZEN (*pro hac vice*)
                                         Assistant Attorney General
                                         445 Minnesota Street, Suite 1200
                                         St. Paul, Minnesota 55101-2134
                                         (651) 757-1235
                                         benjamin.velzen@ag.state.mn.us

                                         JUSTIN MOOR (*pro hac vice*)
                                         Assistant Attorney General
                                         445 Minnesota Street, Suite 1400
                                         St. Paul, Minnesota 55101-2134
                                         (651) 757-1060
                                         justin.moor@ag.state.mn.us

                                         ***Attorneys for State of Minnesota***