**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STATE OF MINNESOTA, *by its Attorney General Keith Ellison*, | |
| Plaintiff, | Case No. 3:18-cv-14999 (BRM) (LHG) |
| v. | **OPINION (Redacted)** |
| SANOFI-AVENTIS U.S. LLC, et al., | |
| Defendants. | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Joint Motion to Dismiss filed by Defendants Sanofi-Aventis U.S. LCC ("Sanofi"), Novo Nordisk, Inc. ("Novo Nordisk"), and Eli Lilly and Company ("Eli Lilly") (collectively, "Defendants"), seeking to dismiss the First Amended Complaint ("First Amended Complaint") of Plaintiff The State of Minnesota ("Plaintiff" or "State"). (ECF No. 47.) Plaintiff filed an Opposition to Defendants' Motion to Dismiss (ECF No. 54), Defendants filed a Reply Brief to Plaintiff's Opposition (ECF No. 57), and Plaintiff filed a sur-reply (ECF No. 63). For the reasons set forth herein, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

I.   **BACKGROUND**

   A.   **Factual Background[1]**

   Defendants are pharmaceutical manufacturers and three of the largest insulin manufacturers in the world. (ECF No. 22 ¶ 1.) Plaintiffs allege Defendants have engaged in a pricing scheme whereby they "publish and disseminate deceptively and misleadingly inflated benchmark prices for their [insulin] products, which allow them to offer higher rebates to [pharmacy benefit managers ("PBMs")] while still earning approximately the same, secret net price that they previously received." (*Id.* ¶ 3.) As a result of Defendants' actions, Minnesota residents who have purchased insulin products have been harmed. (*Id.*)

   1.   **The Impact of Diabetes**

   Approximately 445,000 Minnesota residents currently have diabetes and an additional 19,000 residents are diagnosed every year. (ECF No. 22 ¶ 12.) Individuals who have diabetes require insulin injections "to help process sugar and prevent long-term complications" from the disease. (*Id.* ¶ 14.) Plaintiff brings this action "to enforce [the State's] laws, to vindicate the State's sovereign and quasi-sovereign interests in the integrity of its marketplace and the health and economic well-being of its residents, and to remediate all harm arising out of—and provide full relief for—violations of Minnesota and federal law." (*Id.* ¶ 5.) Plaintiff alleges Defendants have harmed "Minnesota residents without insurance, Minnesota residents with high-deductible health plans, Minnesota residents who pay coinsurance, Minnesota Medicare beneficiaries, and the Minnesota Department of Corrections ("Minnesota DOC"), all of whom have paid more for a live-

---

[1] For the purpose of this motion to dismiss, the Court accepts the factual allegations in the First Amended Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

saving medication because of Defendants' conduct." (*Id.* ¶ 4.) Plaintiff requests this Court toll "[a]ll relevant statutes of limitations [because of] Defendants' fraudulent concealment and denial of facts alleged herein." (*Id.* ¶85.)

Defendants are pharmaceutical companies headquartered in the United States who manufacture rapid-acting and long-acting analog insulins. (*Id.* ¶¶ 2, 6–8, 17.) Defendant Sanofi makes the "rapid-acting" analog insulin Apidra and the "long-acting" insulins Lantus and Toujeo. (*Id.* ¶¶ 17–18.) Defendant Novo Nordisk makes the "rapid-acting" analog insulins NovoLog and Fiasp and the "long-acting" insulins Levemir and Tresiba. (*Id.*) Defendant Eli Lilly makes the "rapid-acting" analog insulin Humalog and also makes Basaglar, a "follow-on biologic of Lantus." (*Id.*)

Plaintiff alleges Defendants have published "deceptive, misleading, and misrepresentative benchmark prices" for their insulin products, resulting in patients paying exorbitant costs. (*Id.* ¶ 19.) Moreover, Defendants have increased the benchmark price for their long-acting insulins at least ten times since 2008. (*Id.*) The benchmark price of a 10-milliliter vial of Lantus has increased from $99.35 in 2010 to $269.54 today. (*Id.*) The benchmark price of Levemir has increased from $113.81 in 2008 to $293.75 today. (*Id.*) The benchmark prices of Defendants' rapid-acting insulins have also increased. (*Id.* ¶ 19.) NovoLog has increased in price from $132.74 in 2008 to $289.36 today, Humalog increased from $122.60 in 2011 to $274.70 today, and Apidra increased from $93.05 in 2010 to $269.91 today. (*Id.*) Plaintiff avers that these price increases "are not tied to any meaningful change or improvement to Defendants' products" and in fact there have been "no meaningful improvement[s] to [Defendants'] products since they introduced them to the market." (*Id.* ¶ 22.) These price increases have resulted in a substantial burden to diabetes patients, particularly "the uninsured, those with high-deductible health insurance [plans], and the elderly

3

operating on limited budgets." (*Id.* ¶ 23.) The high costs have left some patients "unable to afford to keep up with their treatment." (*Id.* ¶ 24.) Patients taking less than the required dose of insulin "face increased risks of kidney dialysis, heart attacks, nerve damage, amputation, and ketoacidosis," which in turn increases their overall medical expenses. (*Id.* ¶ 26.)

### 2. Drug Reimbursement

The approximate price at which a drug manufacturer sells a drug to a wholesale drug distributor is known as the Wholesale Acquisition Cost ("WAC"). (*Id.* ¶ 31.) This price is generally set by the manufacturer, including Defendants. (*Id.*). The WAC does not take into account rebates or other discounts a manufacturer offers to pharmacy benefit managers ("PBMs"). (*Id.*) Therefore, the actual price a manufacturer receives for the sale of a drug is less than the WAC. (*Id.*) Wholesale drug distributors often markup the WAC price prior to selling the drugs to pharmacies. (*Id.*). "The manufacturer-set WAC is generally used to establish a product's Average Wholesale Price ("AWP")," although certain markups are often included. (*Id.* ¶ 32.) Because the AWP "is merely a mathematical function of WAC," a manufacturer effectively sets both prices. (*Id.*)[2] The AWP is used to calculate the price at which health plans and PBMs "reimburse pharmacies for prescriptions that they fill for plan members." (*Id.* ¶ 33.)

Drug manufacturers, like Defendants, publish the benchmark prices for their drugs through a variety of public reporting services. (*Id.* ¶ 34.) These reporting services "rely solely on Defendants' representations about the price they receive" and make "no independent effort to verify" the reported price. (*Id.*) Plaintiff claims Defendants are aware health plans, wholesalers, pharmacies, and PBMs rely on the benchmark prices published by these reporting services to set

---

[2] WAC and AWP are "colloquially referred to as the drug manufacturers' 'list' or 'benchmark' price." (*Id.* ¶ 32)

their own prices or determine the "reimbursement rates that they pay to pharmacies." (*Id.* ¶¶ 34, 36.) If Defendants raise the benchmark price of one of their drugs, the price paid by most Minnesota patients also increases. (*Id.* ¶ 36.) Markups added to the benchmark price by pharmacies and wholesalers do not affect the price paid by Minnesota patients because "Defendants' benchmark prices are the lodestar for the price charged during all subsequent sales of insulin. (*Id.*)

PBMs are hired by health plans to manage the pharmaceutical benefits of their members. (*Id.* ¶ 37.) "PBMs create contractual networks of pharmacies" and "negotiate the rates at which the health plans reimburse pharmacies in the PBMs' networks for the prescriptions the pharmacies fill." (*Id.*) PBMs and health plans create and publish drug formularies. (*Id.* ¶ 39.) A formulary lists the prescription drugs a health plan will reimburse a pharmacy for on behalf of their members. (*Id.*) Placement on a health plan's drug formulary is highly sought after. A drug not present on a health plan's formulary will typically not be covered by the health plan. (*Id.*) Similarly, if a doctor prescribes a patient a non-covered medication, the patient "must generally pay the entire cost of the drug out-of-pocket." (*Id.*)

Although historically PBMs liberally included drugs on their formularies, more recently they have begun to ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ (*Id.* ¶ 40.) In so doing, PBMs are able to ████████████████████████████████████████████ ███████████████████████████████████████ (*Id.*) Drug manufacturers, including Defendants, will offer rebates in exchange for favorable placement on the PBM's formulary. (*Id.* ¶ 41.) Such rebates are generally calculated by "taking a percentage of the drug's benchmark price and multiplying it by the number of health plan members who utilized that drug

in a given time period." (*Id.*) PBMs will retain all or a portion of the rebate as compensation for their services, but may also distribute a portion to the health plan. (*Id.*)

Drug manufacturers generally will offer larger rebates if their product is given "preferred" placement on a formulary, compared to a competing product. (*Id.* ¶ 42.) The more preferable the placement, the greater the rebate. (*Id.*) Patients are required to pay less out-of-pocket for a drug that receives "preferred" placement on a formulary. (*Id.*) This relationship creates a dynamic wherein PBMs will often make decisions about formulary placement "based on which manufacturer offers the most favorable rebate terms to the PBM." (*Id.*)

PBMs and drug manufacturers regard the "amount and nature of the rebates" to be "trade secrets" and do not disclose them, not even to wholesalers or pharmacies. (*Id.* ¶ 43.) Although health plans know the price at which a pharmacy is reimbursed for a given drug, "they often do not know the total rebate for the drug that the PBM is paid by a manufacturer" because PBMs generally do not disclose "the portion of the rebate that they retain." (*Id.*) Therefore, neither the health plan nor members of the public who purchase the drug know the "true prices that PBMs have negotiated with pharmacies." (*Id.* ¶ 44.) The net sales price a drug manufacturer receives, taking into account the rebates they pay, is similarly "concealed from and not known by wholesalers, pharmacies, health plans, or the public." (*Id.*)

### 3.    The Pricing Scheme

Defendants have exploited this complex reimbursement system for their benefit. (*Id.* ¶ 45.) "Defendants' analog insulin products are largely interchangeable" and PBMs generally must only include one long-acting insulin and one rapid-acting insulin to cover the needs of their health plan's members. (*Id.* ¶ 46.) Because Defendants "sell more[] and earn more" when their drugs receive favorable formulary placement, they have an incentive to offer large rebates to PBMs. (*Id.* ¶ 47.)

6

Because PBM revenue is, in part, based on the retention of a portion of the rebates drug manufacturers offer, companies that offer larger rebates are more likely to secure favorable formulary placement. (*Id.* ¶ 48.) Defendants, accordingly, focus their "marking and negotiating efforts with PBMs not on the benchmark price that they set for their insulin products, but on the rebate . . . that the PBM can earn" for favorable formulary placement. (*Id.*) The amount of the rebate offered by Defendants has "increased dramatically" in recent years. (*Id.*) By way of example:



- (*Id.* ¶ 50.)

- (*Id.* ¶ 52.)

- (*Id.* ¶ 54.)

Defendants have artificially inflated the benchmark prices for their drugs, allowing them to offer PBMs larger rebates, and therefore securing greater market share for their products, while ensuring the actual net price Defendants receive for their drugs remains stable. (*Id.* ¶ 56.) By way of example:

- (*Id.* ¶ 57.)

- In a blog post on Novo Nordisk's website, the company wrote, "[f]or Novo Nordisk, those price increases were our response to changes in the healthcare system, including a greater focus on cost savings, and trying to keep up with

inflation. PBMs and payers have been asking for greater savings – as they should. However, as the rebates, discounts and price concessions got steeper, we were losing considerable revenue – revenue we use for R&D, sales and marketing, education, disease awareness activities and medical information support. So, we would continue to increase the list in an attempt to offset the increased rebates, discounts and price concessions to maintain a profitable and sustainable business. We also monitored market conditions to ensure our prices were competitive with other medicines as part of our business model." (*Id.* ¶ 58.)

- Eli Lilly has similarly stated that "PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists" and, therefore, it had increased benchmark prices. (*Id.* ¶ 59.)

Defendants have never publicly disclosed the amount of rebates they offer, nor have they disclosed the difference between the benchmark price and the net price Defendants are actually paid for their drugs. (*Id.* ¶ 60.) In fact, "Defendants have falsely and deceptively represented to the patients, payers, and the public the price that they receive for their insulin products, and have done so knowing their misleadingly inflated pricing representations would be used as benchmarks to establish the price of subsequent sales of their insulin products." (*Id.* ¶ 63.) PBMs do not oppose this practice because their revenue is tied, in part, to the amount of the rebates. (*Id.* ¶ 64.) Health plans are unaware of the true net price of Defendants' products because PBMs "generally do not share with their health plan clients the total rebates they have received from manufacturers." (*Id.* ¶ 65.)

By implementing this pricing scheme, Defendants have, in effect, "created a marketplace where they do not have to complete with one another to set the lowest price." (*Id.* ¶ 66.) A company

that raises its benchmark price can offer greater rebates to PBMs and, in turn, acquire greater market share for their drug. (*Id.* ¶ 67.) Defendants, accordingly, monitor the benchmark prices set by their counterparts and "often increase them in perfect unison." (*Id.* ¶ 66.) By matching benchmark prices, Defendants can offer competitive rebates without affecting the net price they are paid for their drugs. (*Id.* ¶ 67.)

### 4.    The Effect on Consumers

The pricing scheme implemented by Defendants has led to an increase in the spread between the benchmark price and net price for insulin products. (*Id.* ¶ 69.) ██████████ ██████████████████████████████████████████ (*Id.*) The spread for Lantus increased from 16.05% to 135.77% between 2009 and 2015. (*Id.*) During the same timeframe, the spread of Humalog increased from 23% to 66%. (*Id.*) Because of this pricing scheme, the benchmark prices set by Defendants are "so removed from the actual, net prices that Defendants' receive for their insulin that [] they are no longer are an accurate approximation of [the benchmark] price, and are thus falsely, deceptively, and misleadingly inflated." (*Id.* ¶ 70.)

Defendants' pricing scheme directly impacts consumers, including Minnesota residents, because the price they pay for their drugs is directly linked to Defendants' inflated benchmark prices. (*Id.* ¶ 71.) Patients that are uninsured, have a high-deductible plans, pay coinsurance, or are Medicare Part D beneficiaries are not aware of the rebates Defendants pay to PBMs or that the prices they pay are "deceptively and misleadingly inflated." (*Id.* ¶ 73.) Diabetes is a chronic condition that patients must manage for the rest of their lives. (*Id.*) These patients, therefore, will have no choice but to continue to pay increasing prices for their diabetes medication based upon Defendants' inflated benchmark prices. (*Id.*) Many "have already or will soon find that the life-saving insulin they need is becoming unaffordable." (*Id.*).

Uninsured patients generally pay a "cash price" directly to retail pharmacies for their medication. (*Id.* ¶ 74.) Pharmacies are not offered rebates like PBMs are and, therefore, the "cash price" pharmacies charge is based on the benchmark price drug manufacturers charge wholesalers, plus a small markup. (*Id.*) When benchmark prices increase, the prices pharmacies charge consumers generally increase at a commensurate rate. (*Id.*) Patients with high-deductible health plans pay for their drugs out-of-pocket until their deductible limit is reached. (*Id.* ¶ 75.) The price these patients pay is also "based directly" on Defendants' inflated benchmark prices. (*Id.*)

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ (*Id.* ¶ 76.) The reimbursement rate PBMs pay is generally tied to a drug's WAC or AWP, █████████████████████████████████████████

███████████████████████ (*Id.*) Because Defendants' effectively set those prices, Defendants' benchmark price "becomes the basis for the price that cash customers pay to retail pharmacies." (*Id.*) The price that cash customers pay for their insulin "has increased dramatically" due to Defendants' deceptive and misleading benchmark prices. (*Id.* ¶ 77.)

Patients who are on Medicare Part D are similarly affected. (*Id.* ¶ 79.) Patients on this program are required to pay the first $405 for their medications out-of-pocket. (*Id.*) Patients are then required to pay 25% of the cost of their drugs until a combined total of $3,750 has been expended by them and Medicare. (*Id.*) Upon reaching this threshold, Medicare Part D beneficiaries enter a "donut hole" wherein they pay "35% of the cost of the brand-name drug until the beneficiary's out-of-pocket spending totals $5,000." (*Id.*) Although Medicare Part D beneficiaries do receive a manufacturer discount on the insulin drugs they purchase, "this benefit does not begin to cover the inflated costs that [beneficiaries] incur because of Defendants' misrepresentative

benchmark prices." (*Id.* ¶ 80.) Health plan members, even those with a PBM negotiating on their behalf, also pay higher prices because their plan requires them to pay a coinsurance out-of-pocket when they purchase drugs. (*Id.* ¶ 81.)

The Minnesota DOC has also "incurred additional costs to provide insulin to the offenders it supervises as a result of" Defendants' conduct. (*Id.* ¶ 82.) The Minnesota DOC purchases insulin from a wholesaler who sets the price they charge based on the benchmark price set by Defendants. (*Id.*) These inflated prices have "either reduced the amount of [the Minnesota DOC's] claims-related underspend that it is entitled to have returned to it or has increased its obligation to pay excess claims-related spend, as applicable, under the governing contracts." (*Id.*) Defendants' actions "have financially harmed the Minnesota [DOC] by reducing its health care-related savings, increasing its health care-related costs, or both." (*Id.*)

In sum, "Minnesota residents and the Minnesota [DOC] have purchased analog insulin products at higher prices [or] incurred additional insulin-related expenses than they otherwise would have because of the deceptive and misleading benchmark prices that Defendants knowingly published and publicly disseminated." (*Id.* ¶ 84.)

**B.    Procedural History**

On October 16, 2018, Plaintiff filed the original Complaint against Defendants. (ECF No. 1). On March 15, 2019, Plaintiff sought leave to file a first amended complaint (ECF No. 19), which was granted on April 2, 2019 (ECF No. 20).

On April 11, 2019, Plaintiff filed a First Amended Complaint, alleging 16 counts against Defendants. (ECF No. 22.) Counts One through Four, for violations of the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, against Novo Nordisk (ECF No. 22 ¶¶ 88–195); Counts Five through Eight for violations of RICO, against Sanofi (*Id.*

¶¶ 196–303); Counts Nine through Twelve for violations of RICO, against Eli Lilly (*Id.* ¶¶ 304–411) (collectively, Counts One through Twelve are the "RICO Claims"); Count Thirteen for consumer fraud, Minn. Stat. Ann. § 325F.69, against all Defendants (*Id.* ¶¶ 412–17); Count Fourteen for deceptive trade practices, Minn. Stat. Ann. § 325D.44, against all Defendants (*Id.* ¶¶ 418–22); Count Fifteen for false advertising, Minn. Stat. Ann. § 325F.67, against all Defendants (*Id.* ¶¶ 423–427); and Count Sixteen for common law unjust enrichment, against all Defendants (*Id.* ¶¶ 428–35).

On August 12, 2019, Defendants moved to dismiss (ECF No. 47) and on September 26, 2019, Plaintiff opposed (ECF No. 54). On November 11, 2019 Defendants replied (ECF No. 57) and on December 26, 2019 Plaintiff filed a sur-reply (ECF No. 63).

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a

13

court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220).

### B.     Rule 9(b)

Pursuant to Federal Rule of Civil Procedure 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (citations omitted); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue") (citations omitted). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## III.   DECISION

Plaintiff's First Amended Complaint seeks

> [M]onetary relief, including damages, restitution, disgorgement, and/or all other available legal and equitable monetary remedies available under 18 U.S.C. § 1964, Minnesota [statutory law], the *parens patriae* doctrine, Minnesota common law, and the general equitable powers of this Court, as necessary to remedy the harm from Defendant's acts described in this Complaint.

(ECF No. 22 ¶ 438.) Defendants' Motion to Dismiss seeks to dismiss Counts One through Twelve of the First Amended Complaint (the "RICO Claims")[3] (ECF No. 47-1 at 9–14), Counts Thirteen through Fifteen (the "Consumer Protection Claims") (*id.* at 16–28), Count Sixteen (*id.* at 28), all claims relating to the Minnesota DOC (the "Department of Corrections Claims") (*id.* at 31–33), and all claims relating to Tresiba, Fiasp, and Basaglar (the "New Insulins" and the "New Insulin Claims")[4] (*id.* at 34–35). The Court addresses each of the parties' arguments in turn.

### A.   The RICO Claims

#### 1.   RICO Damages

Defendants contend this Court should dismiss Plaintiff's RICO damages claims because they are barred by the indirect purchaser rule and because Plaintiff "is asserting claims on behalf of consumers and a state agency that do not purchase insulin directly from defendants." (ECF No. 47-1 at 9–10.)

Plaintiff acknowledges that this Court "has already held the indirect purchaser rule applies to treble damages claims at law brought under section 1964(c) in *Insulin Pricing*[5] and *MSP Recovery*,[6] and may well so hold again here." (ECF No. 54 at 17.) Plaintiff, however, argues that "relevant caselaw counsels otherwise for the many reasons discussed in the briefing in this other litigation." (*Id.*) Additionally, Plaintiff argues that § 1964(a)'s "invocation of the courts' equitable

---

[3] Plaintiff brings the RICO Claims pursuant to 18 U.S.C. §§ 1961, *et seq*.

[4] The New Insulins are Tresiba and Fiasp, manufactured by Novo Nordisk, and Basaglar, manufactured by Eli Lilly. (ECF No. 47-1 at 34.)

[5] *In re Insulin Pricing Litig.*, No. 17-699, 2019 WL 643709, at *13 (D.N.J. Feb. 15, 2019).

[6] *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 18-2211, 2019 WL 1418129, at *16 (D.N.J. Mar. 29, 2019).

powers authorize the State—a public entity acting in the public interest—to seek equitable monetary relief from Defendants." (*Id.* at 11–12.) The Court addresses these arguments in turn.

Beginning with Plaintiff's claims for treble damages under § 1964(c), the Court reiterates and reaffirms the holdings articulated *Insulin Pricing* and *MSP Recovery* and holds that the indirect purchaser rule bars Plaintiff's claims for RICO damages.[7] The Supreme Court developed the indirect purchaser rule in the antitrust context, when it held that Clayton Act plaintiffs may not demonstrate injury by providing evidence only of indirect purchases. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977). The Court warned that allowing indirect purchasers to recover under such a theory would "transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 739. Moreover, the indirect purchaser rule was also intended to prevent defendants from being exposed to "multiple liability" should both indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of a single overcharge. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996). As 18 U.S.C. § 1964(c), RICO's private cause of action, was modeled on the Clayton Act, "antitrust standing principles apply equally to allegations of RICO violations." *McCarthy*, 80 F.3d at 855; *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270-74 (1992).

The plaintiffs in *Insulin Pricing* brought a putative class action suit against these same Defendants alleging, *inter alia*, RICO claims for "a scheme to artificially inflat[e] the benchmark prices of their analog insulin." 2019 WL 643709, at *9. This Court found that the *Insulin Pricing* plaintiffs had "failed to allege that they directly purchased the analog insulin from Defendants.

---

[7] Having already conducted a thorough analysis of virtually identical claims in *Insulin Pricing* and *MSP Recovery*, here the Court only recounts facts and caselaw to the extent necessary to resolve the issues presented in this case.

Rather, Plaintiffs claim injury by virtue of inflated prices of their downstream purchase." *Id.* at \*13; *see also MSP Recovery*, 2019 WL 1418129, at \*16 (same).

Plaintiff's claims here are indistinguishable from those in *Insulin Pricing* and *MSP Recovery* as Plaintiff makes no allegations that the State, Minnesota patients, or the Minnesota DOC directly purchased insulin drugs from Defendants. (*See* ECF No. 22 ¶¶ 73–75, 79, 81–82, 438.) As such, Plaintiff, and those on whose behalf it brings suit, "are multiple purchasers down the distribution chain from Defendants and are quintessential indirect purchasers for the purposes of the indirect purchaser rule." *MSP Recovery Claims*, 2019 WL 1418129, at \*14 (citing *McCarthy*, 80 F.3d at 848 (holding that "only the purchaser immediately downstream from the alleged [RICO violator]" possesses standing to pursue an action)).

Turning to Plaintiff's claim for equitable monetary damages, Plaintiff argues that § 1964(a)'s "invocation of the courts' equitable powers authorize the State—a public entity acting in the public interest—to seek equitable monetary relief from Defendants."[8] (ECF 54 at 11–12.) Section 1964(a) states:

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

---

[8] "Restitution . . . is widely, if not universally, regarded as a tool of equity." *Fotta v. Tr. of United Mine Workers of Am., Health & Ret. Fund of 1974*, 165 F.3d 209, 213 (3d Cir. 1998) (citing *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990)). "Disgorgement is a type of restitution." *SEC v. Teo*, 746 F.3d 90, 106 n.28 (3d Cir. 2014) (citing *Porter*, 328 U.S. at 400–02).

18 U.S.C. § 1964(a). Plaintiff avers that the "Supreme Court held long ago . . . that statutes authorizing courts to restrain unlawful conduct generally invoke the full range of their equitable powers." (*Id.* at 12.) Plaintiff relies primarily on *Porter v. Warner Holding Company,* 328 U.S. 395 (1946), in support of this proposition. (*Id.*)[9]

In *Porter*, the Court considered whether a district court had the authority to "order restitution of rents collected by a landlord in excess of the permissible maximums" under § 205(a) of the Emergency Price Control Act of 1942. 328 U.S. at 396. The Court ultimately found that because the statute did not "expressly or impliedly preclude[] a court from ordering restitution in the exercise of its equity jurisdiction," the district court had erred by declining to consider whether to do so for jurisdictional reasons. *Id.* at 403. In so doing, the Court noted that when "the public interest is involved . . . [a court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Id.* at 398. The Court further found that

> [E]quitable jurisdiction . . . clearly authorizes a court, in its discretion, to decree restitution . . . in order to give effect to the policy of Congress. And it is not unreasonable for a court to conclude that such a restitution order is appropriate and necessary to enforce compliance with the [Emergency Price Control] Act and to give effect to its purposes.

*Id.* (internal citation omitted).

In *United States v. Lane Labs-USA Inc.*, the Third Circuit stated that *Porter* and its progeny had "charted an analytical course that seems fairly easy to follow: (1) a district court sitting in equity may order restitution unless there is a clear statutory limitation on the district court's equitable jurisdiction and powers; and (2) restitution is permitted only where it furthers the purposes of the statute." 427 F.3d 219, 225 (3d Cir. 2005). The *Lane Labs* court held that an order

---

[9] Plaintiff also cites to *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960).

of restitution, under the Federal Food, Drug and Cosmetic Act, was "properly within the jurisdiction of the [district court]." *Id.* at 220. The *Lane Labs* court noted that "the statutory grant of equitable power" in the Federal Food, Drug and Cosmetic Act was "identical to the language the Supreme Court considered in *Mitchell*. Consequently, the Supreme Court's reasoning in *Mitchell* applies with equal force in the instant case." *Id.* at 225.

It is on this foundation that Plaintiff argues that "*Lane Labs*'s reasoning also makes it clear that, in the Third Circuit, RICO likewise invokes courts' equitable powers and allows the State to seek restitution." (ECF No. 54 at 13.) As to the first *Lane Labs* element, Plaintiff contends that § 1964(a) invokes this Court's equitable powers because there is no statutory language that clearly limits them. (*Id.* at 13–14, 16.) As to the second element, Plaintiff avers that equitable monetary relief "indisputably furthers RICO's purposes." (*Id.* at 16.) In support of this argument, Plaintiff highlights the Supreme Court's holding in *United States v. Turkette*, wherein the Court noted that the aim of civil RICO remedies "is to divest the association of the fruits of its ill-gotten gains." 452 U.S. 576, 585 (1981). Plaintiff concludes that it is "acting in the public interest, [and] specifically pled in the Complaint that it is seeking 'restitution, disgorgement, and/or all other available legal and equitable monetary remedies available under,'" *inter alia*, RICO. (ECF No. 54 at 17.) Plaintiff, accordingly, contends it is authorized to seek equitable monetary relief for its RICO claims. (*Id.*)

Defendants contend Plaintiff's argument "fails for two independent reasons: [1] federal courts have consistently rejected Minnesota's novel interpretation of the indirect purchaser rule; and [2] RICO does not authorize the backward-looking equitable relief that Minnesota seeks. (ECF No. 57 at 3.) As to their first argument, Defendants point to a series of cases wherein district and circuit courts have found that the indirect purchaser rule bars all forms of monetary relief, including

restitution and disgorgement. (*Id.* at 4 n.2); *see In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1058 (8th Cir. 2018) (citing a series of cases that "have concluded that *Illinois Brick* prohibits indirect purchasers from seeking disgorgement"); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) ("As to parasitic claims premised on a violation of federal law, it is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by [*Illinois Brick*].");  *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010) ("The policy of *Illinois Brick* prohibits indirect purchasers from suing the manufacturer to recover any ill-gotten gains the manufacturer has obtained by violating antitrust laws."); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 211 (D. Me. 2004) ("Certainly no restitutionary remedy can escape the limitations the United States Supreme Court imposed on federal antitrust recovery in *Illinois Brick,* and the plaintiffs do not argue that it can."); *F.T.C. v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 41 (D.D.C.), *on reconsideration in part sub nom. Fed. Trade Comm'n v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1 (D.D.C. 1999) ("While disgorgement would have the additional benefit of permitting the States to compensate indirect purchasers who are excluded from recovery under current law, the Supreme Court weighed this interest against the threat of duplicative recovery and determined that only direct purchasers have standing under the Clayton Act."). Plaintiff counters, however, by arguing that the cases Defendants cite are not directly on point as they deal with individual or parasitic unjust enrichment claims rather than an attempt to invoke a statute's equitable powers. (ECF No. 63 at 2.)

In support of their second argument, that "RICO does not authorize the backward-looking equitable relief that Minnesota seeks," Defendants point to several circuit court decisions that held the statutory language of § 1964(a) does not encompass restitution and disgorgement. (ECF No. 57

at 5.) First, in *United States v. Philip Morris USA, Inc.*, the D.C. Circuit held that "[t]he remedies explicitly granted in § 1964(a) are all directed toward future conduct . . . . Disgorgement is a very different type of remedy aimed at separating the criminal from his prior ill-gotten gains and thus may not be properly inferred from § 1964(a)." 396 F.3d 1190, 1200 (D.C. Cir. 2005). "Permitting disgorgement under § 1964(a) would therefore thwart Congress' intent in creating RICO's elaborate remedial scheme." *Id.* at 1201. In *United States v. Carson*, the Second Circuit held that "the jurisdictional powers in § 1964(a) serve the goal of foreclosing future violations, and do not afford broader redress. The section does not authorize the government to recapture all the losses of those wronged by civil RICO violators." 52 F.3d 1173, 1182 (2d Cir. 1995). Moreover, disgorgement of "all ill-gotten gains may not be justified simply on the ground that whatever hurts a civil RICO violator necessarily serves to 'prevent and restrain' future RICO violations. If this were adequate justification, the phrase 'prevent and restrain' would read 'prevent, restrain and discourage,' and would allow any remedy that inflicts pain." *Id.*[10]

Although both parties make compelling arguments, the Court is not convinced that allowing Plaintiff to seek equitable monetary damages under § 1964(a) is appropriate in this case. Critically, Plaintiff cites to no cases, in this circuit or otherwise, where a court has applied § 1964(a) in the manner Plaintiff seeks. (*See generally* ECF Nos. 54, 63.) The Court additionally finds the holding of *Philip Morris* to be persuasive. Plaintiff encourages the Court to adopt the analytical framework articulated in *Lane Labs*, but it is important to note that the *Lane Labs* court was analyzing a statute—the Federal Food, Drug and Cosmetic Act—that the court itself noted was inherently different than § 1964 of RICO. *See Lane Labs*, 427 F.3d at 233. Specifically, the

---

[10] *See also Richard v. Hoechst Celanese Chem. Grp., Inc.*, 355 F.3d 345, 355 (5th Cir. 2003) (holding that absent argument that disgorgement would "prevent and restrain" similar RICO violations in the future, "[t]he disgorgement claim is therefore impermissible under § 1964(a)").

*Lane Labs* court wrote:

> [W]e believe that [*Philip Morris*] is easily distinguishable from the instant case. RICO's grant of equitable jurisdiction was far less broad than the FDCA's grant we consider here. RICO listed several specific types of relief aimed at making it difficult or impossible for a violator to commit future violations. There is nothing comparable in the text or structure of the FDCA that provides the "necessary and inescapable inference" that Congress had limited the equitable power of district courts to award restitution.

*Id.* Once more, to the extent the *Lane Labs* analytical schema can be applied to § 1964, the Court notes that the structure is permissive, and only grants the Court the authority to award restitution in its own discretion, rather than mandating such an award. *See id.* at 225 ("[A] district court sitting in equity *may* order restitution . . ." (emphasis added)).

Here, the Court has already found that Plaintiff is an indirect purchaser and, as such, cannot maintain a claim for damages under § 1964(c). *See* III.A.1. *supra*. The purpose of the indirect purchaser rule is to prevent defendants from being exposed to "multiple liability" should both indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of a single overcharge. *See McCarthy*, 80 F.3d at 851. With the purpose of the indirect purchaser rule firmly in mind, to the extent this Court does have equitable powers under § 1964(a) to order restitution and disgorgement, it declines to do so here. Accordingly, Defendants' Motion to Dismiss Plaintiff's RICO Claims, to the extent Plaintiff seeks damages, is **GRANTED WITHOUT PREJUDICE**.

### 2.    RICO Injunction

Defendants contend this Court should dismiss Plaintiff's RICO injunction claims because the statute limits injunctive relief to "actions brought by the federal government." (ECF No. 47-1 at 12.) Defendants further argue that because Plaintiff asserts its RICO claims under § 1964(c), it does so as a private plaintiff and is therefore barred from seeking injunctive relief. (*Id.* at 13 n.5.)

Plaintiff argues that, contrary to Defendants' contention, it seeks injunctive relief "in the public interest"[11] and that "Section 1964's clear text allows it to do so." (ECF No. 54 at 5.) Much like the plaintiffs in *Insulin Pricing* and *MSP Recovery*, Plaintiff urges this Court to look to opinions issued by the Second and Seventh Circuits,[12] wherein the courts found § 1964 of the RICO Act authorizes private plaintiffs to seek final injunctive relief. (*Id.* at 6.)

The Third Circuit has not directly addressed whether RICO allows for a private right of equitable relief. However, several courts within this circuit have affirmatively held RICO does not establish a private right of equitable relief. *See Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123, 1137 (D.N.J. 1989); *see also Futterknecht v. Thurber*, 2015 WL 4603010, at *4 (D.N.J. July 30, 2015); *Johnson Dev. Grp., Inc. v. Carpenters Local Union No. 1578*, 728 F. Supp. 1142, 1146 (D.N.J. 1990) (noting in dicta that RICO "makes no provision for private equitable relief"). These cases came to this conclusion by analyzing both the legislative history of RICO and the Department of Justice's Manual. *See, e.g. Futterknecht*, 2015 WL 4603010, at *4. Indeed, this very Court held similarly in *Insulin Pricing* and *MSP Recovery*.

Moreover, much like the plaintiffs in *Insulin Pricing* and *MSP Recovery*, Plaintiff is unable to point to any cases within this Circuit or District that has adopted the views of the *Donziger* or

---

[11] The Court notes that despite Plaintiff's contention, Plaintiff seeks an award of "attorneys' fees, litigation costs, and costs of its investigation" pursuant to § 1964(c), RICO's private remedy provision. 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . .").

[12] *Chevron Corp. v. Donziger*, 833 F.3d 74, 139 (2d Cir. 2016); *Nat'l Org. for Women v. Scheidler*, 267 F.3d 687, 698 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003).

*Scheidler* courts.[13] As such, this Court declines to stray from the weight of persuasive authority and its previous holdings in analogous matters. The Court, therefore, holds that a private party may not seek equitable relief under RICO. Accordingly, Defendants' Motion to Dismiss Plaintiff's RICO Claims, to the extent Plaintiff seeks injunctive relief, is **GRANTED WITHOUT PREJUDICE**.

### 3.    Plaintiff's RICO Claims Alleged *Parens Patriae*[14]

Plaintiff claims that it has

> *[P]arens patriae* authority[] to bring this action to enforce Minnesota's laws, to vindicate the State's sovereign and quasi-sovereign interests in the integrity of its market place and the health and economic well-being of its residents, and to remediate all harm arising out of—and provide full relief for—violations of Minnesota and federal law.

(ECF No. 22 ¶ 5.)

*Parens patriae* is a common-law theory that "allows a state to bring suit on its own behalf to protect the well-being of its residents." *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592 (1982)). Plaintiff

---

[13] Although not cited by either party, at least two courts in this District have considered whether RICO authorizes a private plaintiff to seek equitable relief. First, in *Adamo v. Jones*, the court held that "is not clear whether injunctive or equitable relief is available [to a private plaintiff]." No. 15-1073, 2016 WL 356031, at *12 (D.N.J. Jan. 29, 2016). Additionally, in a footnote in *Kaul v. Christie*, the court stated that "for the purposes of argument going forward, I assume that a plaintiff may obtain injunctive relief under RICO." No. 16-2364, 2019 WL 943656, at *28 n.40 (D.N.J. Feb. 24, 2019). However, neither of these cases explicitly held a private party may obtain equitable relief under RICO.

[14] To the extent Plaintiff's attempt to bring its RICO Claims *parens patriae* is not foreclosed upon by the Court's holding that they lack standing to sue under RICO because they are indirect purchasers, the Court briefly discusses the parties' arguments.

contends that the Third Circuit's en banc decision in *Pennsylvania v. Porter*[15] permits it to proceed *parens patriae* for its RICO claims. (ECF No. 54 at 18.)

In *Pennsylvania v. Porter*, the Pennsylvania Attorney General brought a civil rights action under 42 U.S.C. § 1983, *parens patriae*, to protect the civil rights of citizens of the Borough of Millvale. 659 F.2d at 309–10. The court noted that in such an action, the relevant question was not "whether either the fourteenth amendment or section 1983 protects [Pennsylvania], neither does[,] but whether [Pennsylvania] is an appropriate plaintiff in an action seeking to prevent the infliction of constitutional violations on the persons the amendment and the statute do protect." *Id.* at 314. In finding Pennsylvania could proceed *parens patriae*, the court noted that the state was "vitally interested in safeguarding the health and safety of individuals in its territory." *Id.* at 319. Plaintiff urges this Court to adopt this holding in the context of Plaintiff's RICO claims. (ECF No. 54 at 18.)

Defendants argue that Plaintiff cannot proceed *parens patriae* because federal courts have repeatedly held that state governments cannot bring RICO actions on behalf of their citizens. (ECF No. 47-1 at 14); *see, e.g.*, *Dillon v. Combs*, 895 F.2d 1175, 1177 (7th Cir. 1990) ("RICO allows suits by the federal government, § 1964(b), but otherwise only by persons injured in their 'business or property', § 1964(c), a phrase that does not include sovereign or derivative interests."); *People of State of N.Y. by Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987) ("Where the complaint only seeks to recover money damages for injuries suffered by individuals, the award of money damages will not compensate the state for any harm done to its quasi-sovereign interests. Thus, the state as *parens patriae* lacks standing to prosecute such a suit."); *People of State of Ill. v. Life of Mid-Am. Ins. Co.*, 805 F.2d 763, 766 (7th Cir. 1986) ("[E]ven if the complaint did sufficiently

---

[15] 659 F.2d 308 (3d Cir. 1981).

allege an injury to the state in its quasi-sovereign capacity, it is not clear to us that Congress, in enacting the RICO statute, intended to permit such a *parens patriae* proceeding." (citing *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)).); *see also* John Bordeau, et al., 5B Fed. Proc., L. Ed. § 10:205 ("[A] state lacks standing to bring a RICO action on behalf of its citizens. . . .Thus, a state cannot assert a RICO claim based upon an alleged scheme to defraud consumers within the state.") The text of § 1964, which allows "[a]ny person injured in *his* business or property by reason of a violation of section 1962" to sue for relief, supports this conclusion as well. 18 U.S.C. § 1964 (emphasis added).

Plaintiff contends that Defendants' argument "is squarely at odds with [*Pennsylvania v.*] *Porter*." Plaintiff's argument, however, is unconvincing. First, as discussed above, *Pennsylvania v. Porter* discussed the appropriateness of a *parens patriae* action in the context of 42 U.S.C. § 1983, not RICO. (*See generally Porter*, 659 F.2d 308 (3d Cir. 1981).) Moreover, although Plaintiff urges this Court to disregard the out-of-Circuit decisions cited by Defendants, and attempts to distinguish the facts presented in the current matter, Plaintiff cites to no cases, in this Circuit or otherwise, that have permitted a state to proceed *parens patriae* in a RICO claim. (*See generally* ECF Nos. 54, 63.) Accordingly, Defendants' Motion to Dismiss Plaintiff's RICO Claims, to the extent Plaintiff seeks to vindicate its RICO claims as *parens patriae*, is **GRANTED WITHOUT PREJUDICE**.

### B.    Plaintiff's Consumer Protection Claims Generally

As a preliminary matter, Defendants argue that all of Plaintiff's Consumer Protection Claims should be dismissed because Defendants reported its benchmark prices consistent with Minnesota law and because the First Amended Complaint does not allege that Defendants directed deceptive or misleading conduct to consumers, as required by the consumer protection statutes

under which Plaintiff brings suit. (ECF No. 47-1 at 16, 21); *see Yarrington v. Solvay Pharm., Inc.*, No. 05-2288, 2006 WL 2729463, at \*5 (Minn. Ct. App. Sept. 26, 2006) (noting that Minnesota consumer protection statutes require a showing that defendants "made a false representation, misled, or caused confusion in [their] marking of" their products).

First, Defendant argues Plaintiff's Consumer Protection Claims "are based on the contention that [D]efendants 'publish and disseminate' misleading list prices (i.e. WACs) for insulin because those prices 'are no longer accurate representations of the actual price Defendants receive for analog insulin' after paying rebates to PBMs." (*Id.* at 17 (citing ECF No. 22 at ¶ 3).) Defendants contend that such claims fail as a matter of law because "Minnesota has statutorily defined list prices to exclude rebates to PBMs." (*Id.*) Defendants point to a Minnesota statute wherein WAC is defined as "the manufacturer's list price for a drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates, or reductions in price." Minn. Stat. Ann. § 256B.0625, subd. 13e(a). Defendants also note that 42 U.S.C. § 1395w-3a(c)(6)(B) "defines WAC in a similar fashion." (ECF No. 47-1 at 17 n.7.) Defendants contend that, because Minnesota law "dictates that reported list prices for insulin should exclude rebates and discounts" and because the list price must "reflect the actual price charged to wholesalers, which is unaffected by any rebates subsequently paid to PBMs," Plaintiff's Consumer Protection Claims fail. (ECF No. 47-1 at 18.)

As to Defendants' argument that Minnesota Statutes § 256B.0625 foreclose upon Plaintiff's claims, Plaintiff notes that the cited statute "governs only how the Minnesota Department of Human Services reimburses pharmacists and other providers for dispensing drugs to Medicaid patients." (ECF No. 54 at 25–26.) Plaintiff argues "[t]he manner the Minnesota Department of Human Services has chosen to pay for Medicaid-reimbursed drugs—including

statutory definitions is uses when doing so—is irrelevant to [the] deceptiveness of Defendants' non-Medicaid pricing representations." (*Id.* at 26.) Plaintiff notes that the Court rejected a similar argument in *Insulin Pricing* where the defendants pointed to the definition of WAC in the Federal Medicaid program, 42 U.S.C. § 1395w-3a(c)(6)(B), and argued it "dispelled the deceptiveness of [defendants] non-Medicaid pricing misrepresentations." (ECF No. 54 at 26.) Notwithstanding this argument, the Court found the *Insulin Pricing* plaintiffs had adequately pled mail and wire fraud because they had alleged "Defendants committed fraud by '[holding] out their artificially increased AWPs as benchmark prices, fully aware that AWP is a pricing index intended to approximate the true cost of a drug'" and that "the AWP had no reasonable relationship to the actual price of the drugs, and that Defendants knew of this fraud." *In re Insulin Pricing Litig.*, 2019 WL 643709, at *5. Here, the Court finds Plaintiff's argument similarly persuasive and finds Defendants, on this basis, have failed to meet their burden to show that no claim has been presented. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Accordingly, Defendants' Motion to Dismiss the Consumer Protection Claims on this basis fails.

Second, Defendant argues that Plaintiff "cannot credibly assert that [D]efendants' reported list prices are misleading when the State actively negotiates rebates from pharmaceutical manufacturers." (*Id.* at 19.) Defendants note that "Minnesota has hired CVS to obtain significant rebates from pharmaceutical manufacturers" and, therefore, their "own conduct [] creates a difference between list prices and 'the net price that the manufacturer receives for' prescription drugs after the payment of those rebates." (*Id.* (citing ECF No. 22 ¶ 3).) Moreover, Minnesota "received significant rebates under the Medicaid program." (*Id.*) Defendants conclude by arguing "as a result of these negotiated and statutorily mandated rebates and discounts, it is impossible for a manufacturer to report list prices for a drug that reflect the net amount it receives." (*Id.* at 19–

20.) Defendants then seek to distinguish this matter from *Insulin Pricing* where this Court found that those plaintiffs had adequately state a claim that defendants "[held] out their artificially increased AWPs as benchmark prices, fully aware that AWP is a pricing index intended to approximate the true cost of a drug." *In re Insulin Pricing Litig.*, 2019 WL 643709, at *5. Defendants contend that Plaintiff's allegations "do not focus on AWPs for insulin" and that "the [First Amended] Complaint barely mentions AWPs at all." (ECF No. 47-1 at 20.)

Plaintiff contends that "Defendants' theory of how the state employee health plan's decision to contract with CVS—neither of which are the subject of the [First Amended] Complaint—warrants dismissal of the State's claims is not clear." (ECF No. 54 at 26.) The Court agrees with Plaintiff. Defendants' argument is unsupported by citation to legal authority and, at the pleading stage, is insufficient to meet their burden to demonstrate no claim has been presented on this basis. *Hedges*, 404 F.3d at 750. Defendants' contention that Plaintiff's claims are different than those in *Insulin Pricing* because "Minnesota's allegations do not focus on AWPs for insulin" is similarly unavailing. To the contrary, the First Amended Complaint defines AWP and notes that it is "often colloquially referred to as drug manufacturers' 'list' or 'benchmark' prices," terms Plaintiff uses throughout the rest of the First Amended Complaint. (ECF No. 22 ¶ 32.) Accordingly, Defendants' Motion to Dismiss the Consumer Protection Claims on this basis fails.

Third, Defendants argue that the Consumer Protection Claims fail because the First Amended Complaint "does not allege that defendants directed any deceptive or misleading conduct to consumers." (ECF No. 47-1.) Defendants cite to a series of cases, each concerning one of the consumer protection statutes under which Plaintiff brings suit, in support of this proposition. *See Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001); *Cooperman v. R.G. Barry Corp.*, 775 F. Supp. 1211, 1212 (D. Minn. 1991); *Novus Franchising, Inc. v. Dean*, No. 10-

2834, 2010 WL 6421674, at *1 (D. Minn. Nov. 29, 2010).

Defendants reliance on these cases is misplaced, namely, because none of these cases stand for the proposition that conduct under the various consumer protection statutes must be specifically directed at consumers in order to state a claim. *See generally id.* Indeed, the plain language of the statutes suggest the opposite. The Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. Ann. § 325F.69, broadly prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice." The Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. Ann. § 325D.44, prohibits individuals from "engag[ing] in a deceptive trade practice." Finally, the Minnesota False Statements in Advertising Act ("MFSAA"), Minn. Stat. Ann. § 325F.67, specifically prohibits the dissemination, "directly or indirectly," of an advertisement containing "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading . . . ." Minnesota's "consumer protection statutes are remedial in nature and are to be liberally construed in favor of protecting consumers." *State by Humphrey v. Alpine Air Prod., Inc.*, 490 N.W.2d 888, 892 (Minn. Ct. App. 1992), *aff'd*, 500 N.W.2d 788 (Minn. 1993). Because Defendant fails to cite to any cases where courts have specifically held that Minnesota's consumer protection statutes require that action be specifically directed at consumers to be actionable, the Court finds, on this basis, they have failed to meet their burden to show that no claim has been presented. *See Hedges*, 404 F.3d at 750. Defendants' Motion to Dismiss the Consumer Protection Claims on this basis, therefore, fails. Accordingly, Defendants' Motion to Dismiss Plaintiff's Consumer Protection Claims on the aforementioned bases, is **DENIED**.

### C.      Plaintiff's Consumer Protection Claims for Monetary Relief Generally

Defendants argue that all of Plaintiff's Consumer Protection Claims should be dismissed, to the extent they seek monetary relief, because they are "wholly duplicative of the claims brought by the putative class in *Insulin Pricing*." (ECF No. 47-1 at 24.) Specifically, Defendants contend that Plaintiff "attempts to seek monetary relief for the very same Minnesota consumers who are named plaintiffs and members of the putative class in *Insulin Pricing*. Defendants cite to *Walton v. Eaton Corp.* to support their contention that Courts may dismiss or stay lawsuits "involving the same subject matter at the same time in the same court against the same defendant." (*Id.* (quoting *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977)).)

Plaintiff contends that Defendants "mix-and-match cases involving abstention, res judicata, and the All Writs Act" and make a wholly insufficient argument. (ECF No. 54 at 36.) In order for a claim to be precluded by another judgment, there first must be a final judgment on the merits in the prior action. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). *Insulin Pricing*, which Defendants seek to use as a shield here, has barely progressed beyond the motion to dismiss stage. There has been no final judgment on the merits. Plaintiff argues that it is not in privity with the plaintiffs in *Insulin Pricing*. "It is not dispositive that the attorney general seeks victim-specific relief or that the claim is based on the facts that could permit an individual to obtain relief through a private tort claim." *State ex rel. Hatch v. Cross Country Bank, Inc.*, 703 N.W.2d 562, 570 (Minn. Ct. App. 2005). Moreover, Plaintiff argues that, under Minnesota law, private litigants cannot bind the State to their settlements. (ECF No. 54 at 39 (citing *Curtis v. Altria Grp., Inc.*, 813 N.W.2d 891, 901 (Minn. 2012) ("[A]private litigant pursuing a subdivision 3a claim does not have the authority to settle or release the section 8.31 claims of the State without the express consent of the State . . . [a private] settlement agreement and release are not binding on the State without express

written consent of the State AG, approved by the court.")))); *see also Sec'y United States Dep't of Labor v. Kwasny*, 853 F.3d 87, 95 (3d Cir. 2017) ("Because the [Labor] Secretary's interest in maintaining the integrity of, and public confidence in, the pension system is broader than the interests of private litigants, we conclude that in ERISA suits, the Secretary is not in privity with private litigants and is therefore not bound by the results reached by private litigation."). Plaintiff also contends, "to the extent that legal damages are recovered based on Defendants' sale of insulin to Minnesota members of the *Insulin Pricing* class, the State agrees that this amount should be offset against any separate recovery of equitable restitution awarded to it." (ECF No. 54 at 41–42.)

Though well-briefed by the parties, the Court finds consideration of this argument, particularly in light of the procedural posture of *Insulin Pricing*, to be premature on a motion to dismiss. The plaintiff in *Walton v. Eaton*, a Third Circuit case on which Defendants rely, had herself filed multiple lawsuits against the same defendants regarding the same underlying conduct. 564 F.2d at 71. Given Plaintiff's argument that it is not in privity with the *Insulin Pricing* plaintiffs, the Court finds Defendants have failed to meet their burden on a motion to dismiss. Accordingly, Defendants' Motion to Dismiss Plaintiff's Consumer Protection Claims, to the extent they seek monetary relief on the aforementioned basis, is **DENIED**.

    **D.**    **Plaintiff's Specific Consumer Protection Claims**

        **1.**    **Consumer Fraud**

Plaintiff brings Count Thirteen of the First Amended Complaint, against all Defendants, pursuant to the Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. Ann. § 325F.69, subd. 1. (ECF No. 22, ¶¶ 412–17.) The MCFA prohibits

> [T]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any

32

person has in fact been misled, deceived, or damaged thereby.

Minn. Stat. Ann. § 325F.69, subd. 1.

To state a claim under the MCFA, a plaintiff must demonstrate two elements: "(1) there must be an intentional misrepresentation relating to the sale of merchandise, and (2) the misrepresentation must have caused damage to the plaintiff." *Hopkins v. Trans Union, L.L.C.*, No. 03-5433, 2004 WL 1854191, at *6 (D. Minn. Aug. 19, 2004); *see also Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 12 (Minn. 2001).

Defendants do not dedicate a specific section of their briefs to an independent argument that Plaintiff's MCFA claim should be dismissed, but rather argue it should be dismissed for the wholesale reasons discussed above, including that Defendants had not made misrepresentations directly to consumers. (*See* ECF No. 47-1, 57.) As to the MCFA, Defendants rely on *Cooperman v. R.G. Barry Corp*, 775 F. Supp. 1211 (D. Minn. 1991). Specifically, Defendants note the court's holding that "[i]t is unlikely that the Legislature intended the Consumer Fraud Act to have such broad application" as to render [the MCFA] applicable to any contract remotely related to the ultimate sale of merchandise." *Id.* at 1214.

Defendants' reliance, however, is misplaced . The *Cooperman* court specifically noted that the "[p]laintiff itself has bought nothing, and has encountered no fraud in the context of a sale. Rather, the fraud alleged relates to plaintiff's employment relationship with defendant. Plaintiff invokes the statute not to protect itself as a consumer, but to protect its business relationship with defendant." *Id.* On a motion to dismiss, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges*, 404 F.3d at 750. The Court finds that here, Defendants have failed to meet their burden. Accordingly, Defendants' Motion to Dismiss Count Thirteen of the First Amended Complaint is **DENIED**.

33

### 2.      Deceptive Trade Practices

Plaintiff brings Count Fourteen of the First Amended Complaint, against all Defendants, pursuant to the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. Ann. § 325D.44. (ECF No. 22, ¶¶ 418–22.) The MDTPA prohibits the use of deceptive trade practices, which the statute defines as occurring when an individual or entity "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" of a consumer good. Minn. Stat. Ann. § 325D.44.

Defendants argue that Plaintiff's MDTPA claim should be dismissed because this Court has already held that the statute does not permit monetary damages in *MSP Recovery*. (ECF No. 47-1 at 28; *see MSP Recovery Claims, Series, LLC*, 2019 WL 1418129, at *19 ([T]he DTPA disallows the recovery of monetary damages.")[16]; *see also Finstad v. Ride Auto, LLC*, No. 15-0411, 2015 WL 7693534, at *3 (Minn. Ct. App. Nov. 30, 2015) ("[Plaintiff] does not seek an award of damages for the alleged violations of the [M]DTPA, which is consistent with the well-established caselaw stating that a district court is not authorized to award damages on a DTPA claim.").

Plaintiff argues that, unlike private parties, the State is permitted "to seek monetary relief under the [M]DTPA pursuant to Minnesota Statutes section 8.31, and separately, its *parens patriae* authority." (ECF No. 54 at 35.) Subdivision 1 of this section permits the State Attorney General to "investigation violations of the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade, and specifically, but not exclusively" several listed statutes. Minn. Stat. Ann. § 8.31, subd. 1. Plaintiff admits the MDTPA is not one of the

---

[16] The MDTPA does permit injunctive relief and the recovery of attorneys' fees. *MSP Recovery Claims, Series, LLC*, 2019 WL 1418129, at *19 (D.N.J. Mar. 29, 2019).

specifically enumerated statutes. (ECF No. 54 at 35.) Plaintiff argues, however, that Subdivision 3a permits the State to recover damages and other equitable relief. (*Id.*) That Subdivision states, in relevant part,

> **Private remedies.** In addition to the remedies otherwise provided by law, any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court . . . . In any action brought by the attorney general pursuant to this section, the court may award any of the remedies allowable under this subdivision.

Minn. Stat. Ann. § 8.31, subd. 3a. Plaintiff contends that because the MDTPA is a law "respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade," the State is "statutorily authorized to seek monetary relief" whereas private plaintiffs are not. (ECF No. 54 at 35.) Plaintiff, however, has failed to cite to a case where a court has permitted the State to recover monetary damages pursuant to the MDTPA under this theory. (*See generally* ECF Nos. 54, 63.)

Separately, Plaintiff argues that it can seek restitution under its *parens patriae* authority, "notwithstanding a lack of express statutory authorization to do so." (ECF No. 54 at 36.) Plaintiff points to *State by Humphrey v. Alpine Air Prod., Inc.*, where the Minnesota Court of Appeals upheld an award of "complete restitution to all purchasers of the [subject] air purifiers" on a complaint alleging, *inter alia*, violations of the MDTPA. 490 N.W.2d 888, 896 (Minn. Ct. App. 1992), *aff'd*, 500 N.W.2d 788 (Minn. 1993). The *Humphrey* court noted that,

> Although there is no express authority for the attorney general's action for restitution, common law has recognized that under the doctrine of *parens patriae* ("parent of the country") a state may maintain a legal action on behalf of its citizens, where the citizens have been harmed and the state maintains a quasi-sovereign interest.

35

*Id.* at 898 n.4 (citing *State by Humphrey v. Ri–Mel Inc.,* 417 N.W.2d 102, 112 (Minn. App. 1987)). Defendant does not address Plaintiff's argument that it can seek restitution *parens patriae* in their responsive brief. (*See* ECF No. 57.) The Court finds, therefore, that Defendants have failed to meet their burden to show that Plaintiff's cannot seek restitution under its *parens patriae* authority. *Hedges*, 404 F.3d at 750. Accordingly, Defendants' Motion to Dismiss Count Fourteen of the First Amended Complaint is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion is **DENIED** to the extent Plaintiff seeks restitution, but is otherwise **GRANTED WITHOUT PREJUDICE**.

### 3.    False Advertising

Plaintiff brings Count Fifteen of the First Amended Complaint, against all Defendants, pursuant to the Minnesota False Statements in Advertising Act ("MFSAA"), Minn. Stat. Ann. § 325F.67. (ECF No. 22, ¶¶ 423–27.) Anyone who " makes, publishes, disseminates, circulates, or places before the public, or causes, *directly or indirectly*, to be made, published, disseminated, circulated, or placed before the public" which "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading" has violated the MFSAA. Minn. Stat. Ann. § 325F.67.

Defendants contend that this Count should be dismissed because the First Amended Complaint does not allege any advertisements covered by the MFSAA. (See ECF No. 47-1 at 26.) Defendants argue that Plaintiff's MFSAA claim is "predicated on [D]efendants' publication and dissemination of list prices" and that "the list price of a prescription drug is not a 'public announcement' that seeks to induce Minnesota consumers into purchasing insulin." (*Id.* at 27) Additionally, Defendants argue that Plaintiff's "vague" reference to "promotional and marketing materials" in Paragraph 35 of the First Amended Complaint is a conclusory allegation insufficient

to sustain a claim under the MFSAA. (*Id.* at 28 n.15.)

Plaintiff cites to *UnitedHealth Grp. Inc. v. State ex rel. Swanson*, No. 06-2013, 2007 WL 4234545, at *4 (Minn. Ct. App. Dec. 4, 2007), wherein the court found that federal securities filings were advertisements under the MFSAA. The Court noted that "[b]ecause 'advertisement' is not explicitly defined, we give the term its plain, ordinary meaning: '[t]o make public announcement of,' and '[t]o call the attention of the public to a product or business.'" *Id.* The court held that by making securities filings, a party "is also directly or indirectly making a public announcement regarding its activities." *Id.* Critically, the *Swanson* court qualified its holding by stating, "[t]o the extent that the public relies on appellant's financial statements, press releases, and periodic filings to decide whether to buy or sell appellant's stock, we conclude that these documents are advertisements under the MFSAA." (*Id.*)

Similarly, in *Pharmaceutical Industry Average Wholesale Price Litigation*, a case cited by both parties, the District of Massachusetts found that by publishing list prices, "manufacturers are not advertising prices to the consuming public, but to doctors and pharmacies, and the manufacturers are not involved in the offering of discounts off of those prices to consumers." 491 F. Supp. 2d 20, 84 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009). Defendants argue that this shows that their "list prices are not published to influence consumers to purchase insulin" and, therefore, are not actionable under the MFSAA. (ECF No. 47-1 at 28.) Plaintiff, to the contrary, avers that this shows the publication of list prices does constitute an advertisement. (ECF No. 54 at 34.) Alternatively, Plaintiff contends that even if the publishing of list prices themselves are not per se advertisements, their publication "indisputably 'causes, directly or indirectly, Minn. Stat. Ann. § 325F.67, the setting of insulin prices that *are* advertised to Minnesota diabetics by pharmacies and others." (*Id.*) (emphasis in original).

Although Minnesota's consumer protection statutes, like the MFSAA are "generally very broadly construed to enhance consumer protection," *Grp. Health Plan, Inc.*, 621 N.W.2d at 10, the Court finds, under the facts presented here, the connection between the publication of list prices and consumer action to be too attenuated to sustain a cause of action pursuant to the MFSAA. The Court also finds Plaintiff's MFSAA claim regarding Defendants' dissemination of promotional and marketing materials to be inadequately pled. The entirety of Plaintiff's allegations about this alleged conduct consists of a single sentence, repeated two separate times. (*See* ECF No. 22 ¶ 35 ("Defendants further publish their benchmark prices in various promotional and marketing materials, in addition to with price reporting services."); ¶ 71 (same).) While Plaintiff's certainly need not provide exhaustive detail about each and every piece of promotional and marketing material, the Court cannot conclude, on the basis of a single sentence, that they have adequately pled an advertisement under the MFSAA. *See Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 1003 (D. Minn. 2006) (dismissing MFSAA claim where "[p]laintiffs [] failed to identify a single advertisement disseminated to the public in Minnesota"). Accordingly, Defendants' Motion to Dismiss Count Fifteen of the First Amended Complaint is **GRANTED WITHOUT PREJUDICE**.

### E. Unjust Enrichment

Plaintiff brings Count Sixteen of the First Amended Complaint, against all Defendants, for common law unjust enrichment. (ECF No. 22, ¶¶ 428–35.) To state a claim for unjust enrichment in Minnesota, the plaintiff must allege the defendant "knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001) (citing *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*,

544 N.W.2d 302, 306 (Minn. 1996).

Defendants argue Plaintiff's unjust enrichment claim should be dismissed for four reasons: (1) because "Minnesota has failed to allege any misleading statement by [D]efendants because [D]efendants' reported list prices were consistent with Minnesota law"; (2) because Plaintiff does not allege "[D]efendants received anything of value from Minnesota residents or the [Minnesota DOC]"; (3) "even if defendants indirectly received something of value, Minnesota does not allege that defendants retained the amount Minnesota seeks to recover pursuant to the unjust enrichment claim"; and (4) under Minnesota law a party may not seek an equitable remedy when there is an adequate remedy at law. (ECF 47-1 at 29–31.)

As to Defendants' first argument, the Court has already rejected a nearly identical recitation of it in II.B., *supra*. Other courts applying Minnesota law have likewise found that Minnesota common law does not necessarily require a benefit be directly conferred to sustain an unjust enrichment claim. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 708 (E.D. Pa. 2014), *on reconsideration in part sub nom. In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, No. 13-MD-2445, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) (holding that the court was "not convinced that *Schumacher* conclusively establishes that Minnesota law requires a direct benefit"); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 439 (E.D. Pa. 2010) ("[B]ecause Minnesota explicitly confers standing on indirect purchasers in antitrust suits, allowing a claim for unjust enrichment would not circumvent legislative policy."); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000) (denying motion to dismiss Minnesota common law unjust enrichment claim on the ground defendant did not receive a direct benefit); *but see Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1099 (D. Minn. 2017) (dismissing

plaintiff's Minnesota unjust enrichment claim where defendant-manufacturer received something of value from a third party, not plaintiff, because the complaint "lack[ed] allegations of [the] essential factual element" that defendant received a benefit attributable to plaintiff). Although Defendants correctly point out that the Court dismissed a similar unjust enrichment claim in *MSP Recovery*, that claim was predicated on New Jersey law, not Minnesota law. *See MSP Recovery*, 2019 WL 1418129, at *20. Given the weight of persuasive Minnesota authority, the Court finds Defendants have failed to meet their burden, on a motion to dismiss, that an unjust enrichment claim brought pursuant to Minnesota common law requires a direct benefit element.

Next, Defendants argue that Plaintiff's unjust enrichment claim fails because "the State does not allege that [D]efendants received and retained the amount [Plaintiff] seeks to recover. (ECF No. 57 at 22.) Defendants point specifically to Paragraph ¶ 433 of the First Amended Complaint where Plaintiff avers that it "would be unjust and inequitable, given that the State's residents and the [Minnesota DOC] paid prices far higher than the actual net price at which Defendants sold insulin." (ECF No. 22 at ¶ 433.) Defendants conclude that Plaintiff seeks to recover "the difference between [D]efendants' list prices for insulin and 'the actual net price at which Defendants sold insulin,'" which would not be permissible under a claim of unjust enrichment because it would be greater than the benefit Defendants allegedly received. (ECF No. 57 at 22.) The First Amended Complaint alleges, in relevant part,

> 430. For the purposes of an unjust enrichment claim, a benefit is conferred upon another when one gives possession of money to the other or where one has extracted a benefit from another by fraud, conversion, or similar conduct.

> 431. Minnesota's residents and the Minnesota Department of Corrections conferred a benefit on Defendants by purchasing their insulin products at a price based on the deceptively and misleadingly inflated benchmark prices that Defendants published for the products.

432. Defendants knowingly accepted and retained such benefits.

433. Defendants' acceptance and retention of such benefits under the circumstances would be unjust and inequitable, given that the State's residents and the Minnesota Department of Corrections paid prices far higher than the actual net price at which Defendants sold insulin.

434. Defendants' conduct constitutes unjust enrichment under Minnesota common law, for which, as a matter of equity, they should not derive any gain and/or the State's residents and the Minnesota Department of Corrections should be made whole.

(ECF No. 22 ¶¶ 430–33.) It is not clear to the Court that, as Defendants argue, Plaintiff improperly seeks to recover the difference between the list price and the actual net price that Defendants sold the insulin. Rather Plaintiff avers that "Minnesotans who are uninsured, within their deductible, pay co-insurance, and certain seniors on Medicare do confer a benefit on Defendants when paying inflated prices because sales of insulin to such persons are not at all or not completely offset by the rebates Defendants pay to PBMs." (ECF No. 54 at 44.) Drawing all reasonable inferences in favor of Plaintiff, the Court finds Defendants have failed to meet their burden that no viable claims has been presented.

Finally, Defendants contend that the Court should dismiss Plaintiff's unjust enrichment claim because "[i]t is well settled in Minnesota that one may not seek a remedy in equity when there is an adequate remedy at law." (ECF No. 47-1 at 31 (citing *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992)).) "However, several courts applying Minnesota law have allowed simultaneous pleadings for a legal remedy and unjust enrichment." *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665 at 708 (citing *Daigle v. Ford Motor Co.,* 713 F. Supp. 2d 822, 828 (D. Minn. 2010) (permitting plaintiff to simultaneously plead "breach of warranty and unjust enrichment claims on the grounds that, under Federal Rule of Civil

41

Procedure 8(d), a party is permitted to plead in the alternative"); *LePage v. Blue Cross & Blue Shield of Minn.,* 2008 WL 2570815, at *8 (D. Minn. June 25, 2008) (rejecting defendant's claim that plaintiff cannot plead unjust enrichment because she had an adequate legal remedy under the FLSA because "a party may plead alternative theories of relief under both legal and equitable grounds").

The Court finds Defendants have failed to meet their burden that no claim for unjust enrichment has been presented. Accordingly, Defendants' Motion to Dismiss Count Sixteen of the First Amended Complaint is **DENIED**.

### F. The Department of Corrections Claims

Defendants argue the Court should dismiss all claims relating to the Minnesota DOC for two independent reasons. (ECF No. 47-1 at 32.) First, as to Eli Lilly only, Defendants contend Plaintiff's Department of Corrections Claims should be dismissed because the Minnesota DOC did not purchase insulin from Eli Lilly and, therefore, lack standing to assert this claim. (*Id.*) Second, as to all manufacturers, Defendants aver that Plaintiff's allegations are deficient because they fail to allege "*which* insulins the [Minnesota DOC] purchased, *when* it purchased those insulins, *what* price it paid, and *how* it was purported harmed by purported inflated list prices." (*Id.* at 33.) Defendants further argue that "[n]othing on the face of [Plaintiff's] allegations suggests that Minnesota purchased insulin at artificially inflated list prices" and urges the Court not to "credit such ambiguous allegations that are within Minnesota's power to clarify." (*Id.*)

As to Defendants' first argument, the parties attach competing declarations regarding whether the Minnesota DOC purchased insulin from Eli Lilly. (*See* ECF No. 54-1 ¶¶ 3–4; *See* ECF No. 57-1 ¶¶ 5–6.) Although the Court may, in its discretion, consider matters outside the pleadings, because the parties have submitted contradictory declarations, the Court declines to address the

issue at this time.

The Court finds Defendants' second argument unconvincing. Throughout out the First Amended Complaint, Plaintiff alleges, in great detail, the alleged pricing scheme. (*See generally* ECF No. 22.) As to the Minnesota DOC, Plaintiff alleges that it

> [H]as incurred additional costs to provide insulin to the offenders it supervises as a result of Defendants' deceptive and misleading benchmark prices. The Minnesota Department of Corrections has purchased insulin from a wholesaler whose price, like those of other wholesalers, is based on the benchmark price that the manufacturer sets or passes through to the wholesaler. The inflated prices at which the department has purchased insulin through this wholesaler has either reduced the amount of its claims-related underspend that it is entitled to have returned to it or has increased its obligation to pay excess claims-related spend, as applicable, under the governing contracts.

(*Id.* ¶ 82.)

Drawing all reasonable inferences in favor of the Plaintiff, the Court finds that Plaintiff has sufficiently pled claims relating to the Minnesota DOC. Accordingly, Defendants' Motion to Dismiss the Department of Corrections Claims is **DENIED**.

### G.    The New Insulin Claims

Defendants contend the Court should dismiss all claims relating to the New Insulins because Plaintiff's allegations regarding these products are "confined to a single paragraph," representing "an egregious example of conclusory pleading." (ECF No. 47-1 at 34.) Additionally, Defendants argue that Plaintiff "alleges no actual facts indicating that [D]efendants 'dramatically increased' the list prices" of the New Insulins. (*Id.*) Therefore, Defendants contend, Plaintiff has failed to allege facts linking the New Insulins to the "purported scheme" and all claims relating to them should be dismissed. (*Id.*)

In response, Plaintiff contends that Defendants have misrepresented the gravamen of the

First Amended Complaint, which alleges that the "difference between Defendants' inflated and publicly disseminated list prices and their actual prices" is fraudulent. (ECF No. 54 at 47.) Moreover, Plaintiff argues that Paragraph 62 of the First Amended Complaint "specifically alleges that [such a difference] exists with respect to [the New Insulins]." (*Id.* at 48; *see* ECF No. 22 ¶ 62 ("[The New Insulins] . . . have seen similar increases in their benchmark price and/or reflect significant spreads between these products' respective benchmark and actual price, and all of which are the subject of this complaint."). Plaintiff contends that the remainder of the First Amended Complaint "explain[s] in detail the cause of these spreads, how Defendants' list prices are deceptive because they do not reflect their actual prices, and how Defendants profit from this deception." (ECF No. 54 at 48; *see generally* ECF No. 22.)

The Court agrees. On a motion to dismiss, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges*, 404 F.3d at 750. While Plaintiff does not include a commensurate level of detail relating to the New Insulins, this is not fatal to their claim as they have adequately alleged the New Insulins are included in Defendants' larger pricing scheme. At this stage of the litigation, the Court finds Defendants have failed to meet their burden of showing no claim has been presented.[17] Accordingly, Defendants' Motion to Dismiss the New Insulin Claims is **DENIED**.

IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the RICO Claims is **GRANTED WITHOUT PREJUDICE**; Defendants' Motion to Dismiss Count Thirteen (Consumer Fraud) is **DENIED**; Defendants' Motion to Dismiss Count Fourteen (Deceptive Trade Practices) is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion is **DENIED** to

---

[17] *See In re Insulin Pricing Litig.*, No. 17-699, 2020 WL 831552, at *4 (D.N.J. Feb. 20, 2020).

the extent Plaintiff seeks restitution, but is otherwise **GRANTED WITHOUT PREJUDICE**; Defendants' Motion to Dismiss Count Fifteen (False Advertising) is **GRANTED WITHOUT PREJUDICE**; Defendants' Motion to Dismiss Count Sixteen (Unjust Enrichment) is **DENIED**; Defendants' Motion to Dismiss the Department of Corrections Claims is **DENIED**; and Defendants' Motion to Dismiss the New Insulin Claims is **DENIED**. An accompanying Order will follow.

Date: March 31, 2020                    *s/ Brian R. Martinotti*
                                        **HON. BRIAN R. MARTINOTTI**
                                        **UNITED STATES DISTRICT JUDGE**